UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

UNITED STATES OF AMERICA    )
    )
    )
    )
vs.    )    DOCKET NO. 5:19-cr-22
    )
    )
GREG E. LINDBERG,    )
    )
    )
Defendant.    )

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE MAX O. COGBURN, JR.
UNITED STATES DISTRICT COURT JUDGE
AUGUST 26, 2025

APPEARANCES:

On Behalf of the Government:

    Lyndie Freeman
    Department of Justice, Fraud Section
    1400 New York Avenue, NW
    Washington, DC  20005

    Daniel S. Ryan
    Taylor Stout
    Dana Washington
    United States Attorney's Office
    227 W. Trade Street, Suite No. 1650
    Charlotte, North Carolina  28202

On Behalf of the Defendant:

    Brandon N. McCarthy
    Katten Law
    1717 Main Street, #3750
    Dallas, Texas  75201

    Ryan Meyer
    Katten Muchin Rosenman LLP
    2121 N. Pearl Street, Suite 1100
    Dallas, Texas  75214

    James F. Wyatt
    Wyatt & Blake, LLP
    402 West Trade Street, Suite 101
    Charlotte, North Carolina  28202

On Behalf of Joseph W. Grier, III

    Michael L. Martinez
    Grier Wright Martinez, PA
    521 E. Morehead Street, Suite 440
    Charlotte, North Carolina  28202

Also Present:  Sean P. Devereux
                Stephen Lacy Cash

      Deborah Cohen-Rojas, R.D.R., C.R.R., F.C.R.R.
              Official Court Reporter
    Deborah_CohenRojas@ncwd.uscourts.gov  704.350.7497
   *Proceedings recorded by mechanical stenography, transcript
       produced by computer-aided transcription.*

THE COURT: First matter, Lindberg.

MR. WYATT: Your Honor, we wanted to report to the Court via the status conference on the progress of things.

Since the Special Master was appointed in January of this year, the US Attorney's Office Special Master, us, and Paladin, the financial advisor, have been working very hard, very constructively, and doing several things: One, marshalling assets for sale for the payment of restitution, and, second, calculating a restitution number, which is no easy task in this matter.

The US Marshal Service has been extremely gracious in allowing Mr. Lindberg access to a computer and a phone at the Gaston County jail, where he's incarcerated, which has greatly facilitated things. But we thought it would be best for the Special Master to give the Court a brief update, and then the US Attorney's Office. And we believe we have a joint recommendation for the timing of things in the future for the Court.

THE COURT: All right.

MR. MARTINEZ: Getting cozy with Mr. Ryan here.

Your Honor, Michael Martinez. I'm counsel for the Special Master, Joe Grier, who's with me in the courtroom, sitting next to Mr. Stout. Behind Mr. Grier are Don Harer and Scott Avila. They are with Paladin Management Group, who is the court-appointed financial advisor to the Special Master.

And as Mr. Wyatt said, we'd like to just take a little bit of time to give an update without retreading too much of what's in our written report that we filed a couple months ago, just to give the Court a sense of what we've been doing, give an update on the sale of a big asset that's pending that the Court has entered an order approving, and then talk about our thoughts on timeline. And then our fee applications were also set for hearing today, so hopefully talk about that, too.

So the -- if I could convey one thing to the Court today, it's just sort of how unique and complex the assignment has been for us so far in this case. Mr. Lindberg's investment activities affected hundreds of thousands of insurance policies, life insurance policies and annuities, and probably north of a hundred thousand individual consumer victims.

And the losses we are talking about -- we group the victim body really into two groups based on the insurance companies that the products were sold through. One group was domiciled in North Carolina or came to be domiciled in North Carolina, which are called the North Carolina insurance companies for short, and the other ones we refer to as the Bermuda insurance companies based on where they are domiciled.

Those two groups of victims have asserted restitution losses of $2.9 billion. And just to size it up in my head, I compare it to one of the bigger fraud cases I worked on, not as receiver, but as different creditors, was the ZeekRewards. And

that instance, I -- Paul Burks's restitution was, I think, 250 million. So we're 12 times that amount if we just look at those restitution losses.

THE COURT: Right. Well, at least what's alleged, anyway --

MR. MARTINEZ: Alleged losses.

THE COURT: Yeah, what people are claiming.

MR. MARTINEZ: Yes, I'm sorry. That's correct.

THE COURT: All right. Thank you.

MR. MARTINEZ: So it's -- there's a large magnitude that we're dealing with here, and then there's complexities that arise even in terms of defining who is the victim, what is a victim for these purposes.

And, you know, all sorts of people have filed victim impact statements or have called us, you know, asserting they've been damaged by the defendant. And they may have, but it's not anything close --

THE COURT: Right. Some may have been and some -- yeah. There's going to be a feeding frenzy, the ones that actually were damaged and everybody else that's looking for some money.

MR. MARTINEZ: That's right. And I think we can quickly disregard the vast majority of all those.

There's a couple companies that were tied to the insurance industry that sort of get to the line of where we would cut it

off. And that -- just to summarize real quick, there's a Dutch insurance company that the defendant purchased that has a large judgment against the defendant, may or may not be a victim. And then there's a Vermont insurance company that the defendant did not own, but controlled some of the investment activities of, and some of the money found its way into the defendant's affiliated entities.

So, you know, the ownership and the affiliated-entities investment start to sound like what's in the indictment. We'll make a recommendation to the Court on whether we think they're in or out, and I expect you'll be hearing one way or the other from a disgruntled party. Either the two main victim groups, North Carolina and Bermuda, are going to complain if we're trying to let 'em in, or I suspect these companies are going to ask to be heard on why they should be a victim if we're saying to keep them out.

But Paladin Management Group has done a lot of work. We are very near to being able to make a recommendation to the Court on the victim-loss side on who we think is a victim, how those losses should be calculated, and what they think the specific dollar amount should be. That -- you know, that's the good news on the loss side of things.

Our charge also involves analyzing what assets are available to pay restitution, then coming up with a method and overseeing the liquidation of those assets. And again, there's

sort of two primary buckets.

In the Special Master order, there's a defined term, "primary restitution assets." There are two buckets under that. One is a company that operates internationally as they train, accredit, and license people engaged in medical services, insurance coding.

And we've been working with the management at that company to go through a process where they would get -- we'd monetize the asset. And so they've engaged investment bankers to start that process. There were some hiccups at first, but that -- the good news is that one is moving along well.

The more complicated bucket is there's another set of companies -- there's 300-plus companies. There's really not that many operating entities, maybe a couple dozen true company operating entities, but the corporate structure is intricate, which is why there's so many companies. I think, by design, it was complicated and confusing.

And as to those companies, prior to our involvement, the defendant promised to put them under a new holding company, which is called New Hold Co., or NHC we sometimes refer to it as. And that entity would be controlled by the North Carolina insurance companies, one of the subsets of victims, for the purposes of providing compensation to the victims.

There was all sorts of state court litigation -- or, really, one main action, but a lot of activity in a Wake County

Superior Court action which is still pending over that -- over contributing those companies to that holding company. That's still ongoing. There's injunctions entered in connection with that case.

So there's complexity caused in the sense of, first, it's not like we can just snap our fingers and liquidate things. Those companies already have -- are under another holding company with its own board that we've got to work with.

Also, there are trusts involved because certain lenders and regulators, prior to that, wanted to divest the defendant of control over these companies. So there are change in control trusts, so we've got to deal with trustees at certain levels to get stuff monetized.

And then, again, there's a state court involved, so there's an injunction preventing the sale of assets. So, for example, when we had to -- the company that we're currently trying to get sold, we had to get multiple court approvals. It's not like we can just come to this court and say approve it and then we go forward. We've got to get the other courts to lift their injunctions so we can go forward.

I'm sorry that -- I can talk all day about the complexity. I'll cut it short, but one more that's near and dear to my heart is -- another victim who's actually a subset of the Bermuda companies, they have asked the Court for a general receiver. And they just filed a reply brief, actually, last

week in the court of -- the North Carolina Court of Appeals case relating to the appointment of a general receiver over essentially all of the defendant's assets, which would include the restitution assets that we would seek to liquidate and pay the victims in this case and pay ourselves.

So right now we're sort of getting along with everybody, but there's a potential in the future of competing court orders, competing fiduciaries, you know, try to grab the moneys for each of their constituencies, which are similar, but not the exact same. So those are just some of the challenges we're facing on the asset side.

THE COURT: Well, assume that this money was being invested in these affiliated companies and things. In other words, these are life insurance policies, and they've got to have money at these insurance companies to be able to pay these people that pay these premiums for their life insurance. And, of course, they invest that money, and that's how they make the money.

And there's a question of -- you know, if they invested in legitimate stuff, like some -- some company that's always going to be going up, like a Berkshire Hathaway kind of company, then there aren't any victims from the money invested there. But somebody putting it in Coleco futures or some dumb idea, then there's probably a lot of victims there.

So I know you have issues there about some of this stuff,

but all this money that was -- the fraud was there because it was not invested -- he didn't have the right to do all these things and was leaving these companies potentially bare.

Some of those companies weren't going to lose any money anyway, in spite of what he did, and some will. So you guys have to figure that out. And everybody's claiming they're a victim. Everybody's a victim. And you guys have to figure that out, too.

MR. MARTINEZ: Your Honor, I agree with all that. Just absolutely correct. So that -- that's sort of high-level status of what we've been doing.

I want to talk just briefly about the sale of the group of companies called Clanwilliam. We filed a motion with the Court asking -- to pave the way for us to get that closing done. As things stand today, it's on-track.

That sale will generate more than $300 million to pay victims back here, and 15 million or so is being set aside to pay, you know, a bunch of the lawyers in the room, the defense counsel, us, and then the non-lawyers, Paladin Management Group. So we've -- we -- the timeline on that right now is, by the first half of September, we should have that money in-hand coming from the sale of those companies.

In terms of -- transitioning to the timeline for sentencing, I understand that our opinion probably matters less than the prosecution, the defense, and the Court. I mentioned

earlier that the primary restitution asset, the biggest company, is the one that there's already investment bankers who have been engaged to find the best way to monetize this asset. They are trying to get that process done by Q1 of next year, of 2026.

And if I had to guess -- and we want to eliminate all the guesswork here, as much as of it as we can -- that's going to be the biggest chunk of assets to pay the victims back. And if we could wait till after that closing, there's a few benefits to that.

One, we'll have the number -- or maybe we don't have to wait till closing, wait till we know sort of who won sort of the process, what's the most we can get out of this company so we've got a dollar amount that we can plug in. Two, I fear that, if the sentencing happens before we close that asset, that the defendant's motives for cooperating with us will be lessened because the sentencing will already have occurred.

And then the other reason for waiting is it just gives us more time to deal with those other 300-plus companies. We can't get those monetized by Q1 next year, but we can understand them better and have a more firm valuation on what might come out of those.

But if -- again, if I had to guess, if we were to add all those up, I still think the one company that's already started the process is really going to be the bulk of, the majority of,

the money that we're going to be able to get.  So our request would be to have sentencing sometime after the end of this year.

And then the -- just the last thing.  We filed our fee applications.  I've not heard any opposition to those from any of the victims or any of the parties to this case.  So if the Court has any questions, we're happy to answer them.  And Paladin is here if you've got any specific questions about their fee application.

THE COURT:  About the fee applications, what does the Government say?  What does the defendant, Lindberg, say?  Talk to me about that.

MR. RYAN:  Yes, your Honor.  From the Government's point of view, Mr. Martinez did a great job summarizing all the work that they've been putting in to get to where we are now. I think sentencing will be appropriate once they're done with the numbers and once the first -- the big asset -- there's a deal to close that.

THE COURT:  I want 'em to be able to do it fairly.  I mean, the idea is not clean him out and make sure -- and then give it to -- give all the money to everybody, whether they're a real victim or not.  It is to find the real victims that actually lost something and give them the money and not to blow the cash.

MR. RYAN:  I think everyone in this room agrees, your

Honor. And that said, I think Mr. Martinez is right that, likely at sentencing, there will be people who feel that they were -- they are aggrieved in that matter, but I -- hopefully the defendant, the Government, and the Special Master are on the same page about who's in that camp and who's out of that camp.

THE COURT: Well, I remember the ZeekRewards case, and nobody -- it did a great job of getting a high percentage of the money back, but it did not get everybody's money back, and everybody just didn't get made whole in that thing.

MR. RYAN: Understood, your Honor. And, you know, that may well be the case here, but we'll figure that -- I mean, that's what's going on. Also, you know, as far as --

THE COURT: What about the fees and stuff? Have you looked at that?

MR. RYAN: I have looked at the fees, your Honor. I mean, hard for me to -- they seem reasonable for me, you know, to the extent -- what I can say is I know everyone's been working extremely hard. And I think, to the extent he could have undersold it, he undersold the amount of cat rodeo that's been going on in terms of getting Clanwilliam ready for sale. I mean, every day there's a new obstacle that the Special Master and Paladin have to deal with to get everyone onboard. So they've been doing tremendous work in that regard, and I think we're going to have something to show for it soon,

hopefully, that's going to make a real difference.

THE COURT: All right. Thank you.

MR. RYAN: The other thing, just to -- one thing Mr. Martinez didn't mention that I think is part of their charge is determining who qualifies as a victim, determining how much they're owed, and then determining what order of priority they may have. And again, not to -- we don't need to discuss the details of that right now, but I assume that that will be an area of contention ultimately at sentencing, as well, not necessarily with respect to the defendant, but --

THE COURT: Yeah. Right.

Mr. Wyatt.

MR. WYATT: Yes, your Honor. We would concur with a joint recommendation to the Court of holding another status conference in January of next year and then determining a sentencing date for both the political corruption and the financial fraud cases for Mr. Lindberg.

I can state that all parties here -- Paladin, the Special Master, the US Attorney's Office, us, Mr. Lindberg -- are working very hard and very constructively to narrow any issues of disagreement for this Court to decide.

And there are tremendous complexities and working through all these matters. We are doing that, we will continue to do that, but we want to try to give the Court a limited plate of issues to resolve if possible, among us at least. Obviously,

there's going to be victim issues, too. But it's been very constructive. We just need that time in order to put this case in the right posture.

You know, luckily Mr. Lindberg is able to communicate well with us. He's already begun serving his time by being at the Gaston County jail. And so that's what we would respectfully request for the Court.

THE COURT: Okay. Any comment on anything like the -- about the fees or anything like that that you want to have -- I mean, what's -- what's happening is Mr. Lindberg's companies and Mr. Lindberg's money is all being taken care of to get to the victims. The Court wants to make sure that, just because the crime was committed, that every dime that Mr. Lindberg had is now forfeit automatically and that they just decide who it all goes to. Maybe that's the way that the result finally comes, but it's got to be done in a fair way. And so any comment about any of that?

MR. WYATT: Yes, your Honor. We're safeguarding his interest in terms of that. I believe Paladin and the Special Master are taking special care to try to determine who are legitimate victims here and what is the net loss to the victim at this point, given other payments Mr. Lindberg's already made, other assets that have already been paid for. And so that's another complexity that has to be figured into the restitution calculation.

THE COURT: Okay. Yeah. I -- and of course, this -- you know, 15 million is a high number, but I see lots of big numbers now. Back when I was practicing in private practice, our -- the -- the paralegals and the office staff were all covered by my hourly rate. Now there's separate rates for all of those, just like -- it used to be, when I first built a house, you got 10 percent over whatever the cost was. Now it's 10 percent, then 10 percent for something else, and 10 percent for something else, so it's 30 percent to the builder. If you can figure out how to build your own house, you can save yourself a whole lot of money.

So the -- yeah. I'll -- I see nothing wrong with the request. I can find nothing -- nobody's objecting to it, so I see nothing wrong with it.

MR. MARTINEZ: Thank you, your Honor.

MR. WYATT: Thank you, your Honor.

THE COURT: Okay. Anything else for the Court today? Oh, here he is. Mr. Devereux, how can I forget you?

MR. DEVEREUX: Thank you, your Honor.

THE COURT: Go ahead.

MR. DEVEREUX: Your Honor, we have a very minor request. Mr. Gray would like to be sentenced -- I think every indication is that he will receive a sentence reflecting the time he's already served.

THE COURT: Absolutely.

MR. DEVEREUX: Pending that, from the date of his release from the Bureau of Prisons till today has been over three years of supervision. So the probation officer and Mr. Gray and his attorneys would ask the Court to terminate his supervision. I understand, from talking to Mr. Washington, there may be some bureaucratic complexities to that, so I thought we'd run it by the Court, and then we'll submit, perhaps, a joint --

THE COURT: Submit a request -- you might do -- we might need to do a hearing or something like that.

What do you say, Mr. Washington?

MR. WASHINGTON: Yes, your Honor. I'm fine with that. I think I'd like to hear from probation and maybe put it in writing so we're all on the same page.

THE COURT: And I agree with you.

MR. DEVEREUX: I have a text from his probation officer begging that he be terminated. We'll work that into a joint recommendation, your Honor.

THE COURT: Yeah. I used to tell my clients that the probation officer can be your best friend or your worst enemy. And they've got a lot of people causing them problems. And if you're not, they're ready to get you off their stuff.

MR. DEVEREUX: She's ready to get him off. Thank you, your Honor.

THE COURT: All right. Thank you. Very good.

Anything else from anybody?

MR. WYATT:  No, your Honor.

MR. RYAN:  No, your Honor.

THE COURT:  Okay.  Very good.  Thank you.  This matter is concluded.

(End of proceedings.)

C E R T I F I C A T E

I, DEBORAH COHEN-ROJAS, Federal Official Court Reporter for the United States District Court for the Western District of North Carolina, a Registered Diplomate Reporter, Certified Realtime Reporter, and Federal Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the foregoing proceedings contained herein on the aforementioned subject on the date herein set forth, and that the foregoing pages constitute a full, true and correct transcript.

Dated this 29th day of August, 2025.

_____
DEBORAH COHEN-ROJAS
RDR, CRR, FCRR
Federal Official Court Reporter