**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>GREG E. LINDBERG,<br>Defendant. | No. 5:19-cr-22-MOC<br>No. 3:23-cr-00048-MOC<br>**EXPEDITED CONSIDERATION REQUESTED** |

**DEFENDANT'S EMERGENCY MOTION TO STAY ALL ASSET SALES AND ASSET-SALE PROCESSES PENDING ENTRY OF A FINAL RESTITUTION ORDER AND DE NOVO ARTICLE III DETERMINATION, AND CONSOLIDATED OBJECTIONS TO THE PRELIMINARY ORDER OF RESTITUTION (DOC. 161), THE SCOPE OF THE SPECIAL MASTER REFERENCE, AND THE SPECIAL MASTER'S STATEMENT (DOC. 159), WITH INCORPORATED MEMORANDUM OF LAW**

Defendant Greg E. Lindberg respectfully moves this Court, on an emergency basis, for an order staying all sales and dispositions of assets, and all asset-sale processes (including without limitation marketing, solicitation of bids, negotiation of letters of intent or purchase agreements, and closings), conducted by or at the direction of the Special Master or any person acting in concert with him, pending (1) this Court's entry of a final order of restitution after a de novo determination of all disputed restitution issues, and (2) this Court's adjudication, upon motion and after an opportunity to be heard, of any specific request to approve any specific sale. This filing is made within the time allowed for objections to the Preliminary Order of Restitution [Doc. 161], and every ground stated herein is asserted both in support of the requested stay and as an objection to the Preliminary Order of Restitution, to the scope and implementation of the Special Master reference, and to the Special Master's Statement Concerning Defendant's Cooperation [Doc. No. 159]. Defendant's previously filed motion to stay [Docs. 172-188] are incorporated by reference, and the grounds stated in that motion are likewise asserted as objections to the Preliminary Order of Restitution. Pursuant to LCrR 47.1, the supporting memorandum is incorporated below;

Defendant's Supplemental Statement of Facts (Addendum), cited herein as the "Statement of Facts," is attached hereto; and a proposed order is submitted herewith.

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... 4
INTRODUCTION ..... 7
FACTUAL AND PROCEDURAL BACKGROUND ..... 8
LEGAL STANDARD ..... 12
ARGUMENT ..... 13
I. Section 3664(d)(6) Authorizes a Special Master to Recommend—Not to Sell. ..... 13
II. The Restitution Determination Is a Nondelegable Article III Judicial Function. ..... 14
III. Defendant's Consent Cannot Supply What the Statute and Article III Withhold. ..... 15
IV. The New Waiver Confirms the Defect: An Attempt to Manufacture the Missing Consent, Sought by a Conflicted Officer Under Sentencing Pressure. ..... 18
V. The Special Master Is Disqualified From Recommending or Adjudicative Functions: He Demanded, as "Cooperation," a Release Running to Himself, While His Professionals Are Compensated From the Assets He Liquidates. ..... 20
VI. The Special Master's May 22 Statement (Doc. 159) Tainted the Sentencing and, Unless Stricken, Will Taint the Final Restitution Determination. ..... 23
VII. The Becket Sale Proceeded Without the Court Approval That Both the Statute and This Court's Own Order Require. ..... 28
VIII. Sales Before a Final Restitution Determination Invert the Statutory Sequence and Inflict Irreparable, Unquantifiable Prejudice. ..... 29
IX. On De Novo Review, the Court Must Find the Facts Itself—by a Preponderance at Minimum, and, After Ellingburg, Beyond a Reasonable Doubt. ..... 31
X. Every Stay Factor Is Satisfied ..... 33
CONSOLIDATED OBJECTIONS ..... 34
CONCLUSION AND RELIEF REQUESTED ..... 37
CONSULTATION STATEMENT ..... 39
CERTIFICATE OF SERVICE ..... 39

## TABLE OF AUTHORITIES

**Cases**

*Apprendi v. New Jersey*,
530 U.S. 466 (2000), ..................... 31, 35

*Blackledge v. Perry*,
417 U.S. 21, 28 (1974) ..................... 26

*Commodity Futures Trading Comm'n v. Schor*,
478 U.S. 833, 850–51 (1986) ..................... 14

*Ellingburg v. United States*,
607 U.S. 163, 166 (2026) ..................... 31, 35

*Ex parte Peterson*,
253 U.S. 300, 312 (1920) ..................... 13

*Gomez v. United States*,
490 U.S. 858, 864 (1989) ..................... 12

*In re Murchison*,
349 U.S. 133, 136 (1955) ..................... 19

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
456 U.S. 694, 702 (1982). ..................... 14

*La Buy v. Howes Leather Co.*,
352 U.S. 249, 256 (1957) ..................... 13

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847, 858–60 (1988) ..................... 20

*Nken v. Holder*,
556 U.S. 418, 434 (2009). ..................... 11

*North Carolina v. Pearce*,
395 U.S. 711, 725 (1969),
*limited on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989) ..................... 26

*Peretz v. United States*,
501 U.S. 923 (1991) ..................... 15, 16

*Southern Union Co. v. United States*,
567 U.S. 343 (2012) ..................... 31, 35

*Stern v. Marshall*,
564 U.S. 462, 484 (2011) ........ 13

*Townsend v. Burke,*
*334 U.S. 736 (1948)* ........ 23, 24, 25

*Tumey v. Ohio*,
273 U.S. 510, 523 (1927) ........ 20

*United States v. Coppenger*,
775 F.3d 799, 805 (6th Cir. 2015)) ........ 25

*United States v. Johnson*,
48 F.3d 806, 808–09 (4th Cir. 1995) ........ 13

*United States v. Miclaus*,
No. 23-3146, slip op. at 14–15 (6th Cir. May 29, 2026) ........ 25

*United States v. Raddatz,*
447 U.S. 667, 681 (1980) ........ 15

*Wellness International Network, Ltd. v. Sharif*,
575 U.S. 665 (2015) ........ 15

**Statutes**

18 U.S.C. § 3613(c). ........ 16
18 U.S.C. § 3613(f) ........ 16
18 U.S.C. § 3663(a)(3) ........ 14
18 U.S.C. § 3664 ........ passim
18 U.S.C. § 3664(a) ........ 25
18 U.S.C. § 3664(b) ........ 25
18 U.S.C. § 3664(d)(5) ........ 16, 28, 32, 35
18 U.S.C. § 3664(d)(6) ........ passim
18 U.S.C. § 3664(e) ........ passim
18 U.S.C. § 3664(j)(2) ........ 24, 28, 29, 34
18 U.S.C. § 3664(o) ........ 16, 28, 29
28 U.S.C. § 2001 ........ 28
28 U.S.C. § 455(a) ........ 21
28 U.S.C. § 455 ........ 19, 34

**Other Authorities**

Due Process Clause ........ 19, 34
S. Rep. No. 104-179 ........ passim
S. Rep. No. 104-179 (1995) (committee substitute § 105),
reprinted in 1996 U.S.C.C.A.N. 924 ........ 12
S. Rep. No. 104-179, at 19 ........ 31

**Rules**

Fed. R. Civ. P. 53(a)(2) ........ 19, 34

## INTRODUCTION

Congress has spoken with precision about what a special master may do in a federal criminal restitution proceeding, and it is not this. The only express authority for a special master in this setting is 18 U.S.C. § 3664(d)(6), and its text is narrow: the court "may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master *for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court*." A special master may propose; only the Court may decide; and nothing in the statute empowers a master to liquidate a defendant's assets—least of all before any final restitution determination exists.

This Court's own Order Appointing Special Master enforces the same design. It directs the Special Master to "identify all assets available for liquidation . . . for the benefit of the victims," to "select an appropriate method and timetable and *seek Court approval* to liquidate . . . any available assets," and to "oversee and help accomplish the liquidation *with Court approval*." Doc. No. 56, at 6 (emphases added). Court approval is not an ornament in that order; it is the mechanism by which § 3664(d)(6)'s de novo guarantee operates.

The process on the ground has departed from that design in three escalating respects. *First*, the Becket asset was sold without any order of this Court—indeed, without any trace on this Court's docket: no motion, no notice, no order. Defendant's counsel learned of the sale only orally, in a weekly meeting with the Special Master's team in or about December 2025. [Statement of Facts ¶ 11.] *Second*, even the Clanwilliam transaction—to which Defendant consented at the urging of the Special Master and the United States, while expressly preserving his valuation objections—proceeded and its $318 million in estimated proceeds were distributed without a final restitution order and without any final determination of the restitution number. Doc. No. 66, ¶¶ 18, 21(b). The Special Master himself conceded the point: "[i]n an ideal set of circumstances, the

Special Master would have completed his restitution victim analyses—and made recommendations to the Court concerning the same—before seeking Court approval of (i) a restitution asset sale or (ii) how funds from such a sale would be disbursed to victims." Doc. No. 66, ¶ 24. *Third*, Defendant's pending submissions document offsets of approximately $2.9 billion against the $1.655 billion preliminary figure [Doc. 161], which, if credited on de novo review, yield *zero* net restitution. Every asset sold before that determination is an irreversible penalty imposed before the penalty has been adjudicated. The reference as implemented exceeds § 3664(d)(6), displaces this Court's nondelegable Article III duty to resolve restitution disputes "by the court by the preponderance of the evidence," 18 U.S.C. § 3664(e), and deprives Defendant of the de novo determination the statute guarantees. A stay of all further sales and sale processes—with any future disposition requiring a specific, contested motion and this Court's own findings—is the minimum relief necessary to restore the statutory and constitutional order of operations.

## FACTUAL AND PROCEDURAL BACKGROUND

1. On November 12, 2024, Defendant pleaded guilty to Counts One and Thirteen pursuant to a written plea agreement. Doc. No. 40. In it, Defendant agreed "to the appointment of a special master to identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks *as ordered by the Court*." Doc. No. 40, ¶ 9 (emphasis added). Defendant consented, in other words, to a court-supervised process—not to dispositions of his assets unmediated by orders of this Court.

2. On January 23, 2025, the Court entered its Order Appointing Special Master, naming Joseph W. Grier, III, pursuant to 18 U.S.C. § 3664(d)(6). Doc. No. 56. That order directs the Special Master to "identify all assets available for liquidation . . . for the benefit of the victims"; to "select an appropriate method and timetable and seek Court approval to liquidate . . . any available assets for the benefit of the victims"; and to "oversee and help accomplish the liquidation

with Court approval." Doc. No. 56, at 6. The order further provides that none of the Special Master's authority is intended to authorize the violation of any other federal or state court orders. Doc. No. 56, at 10, ¶ 16.

3. On July 3, 2025, the Special Master filed a Consent Motion for an order approving the disposition of the net proceeds—estimated at $318,000,000—from the sale of the Clanwilliam Group of Companies, a transaction conducted under the supervision of the Wake County Superior Court and restrained by that court's injunction and its March 14, 2023 Clanwilliam order. Doc. No. 66, ¶¶ 10–18. Defendant consented to that disposition at the urging of the Special Master and the United States, to avoid the loss of the transaction—while expressly preserving, by agreement with the United States, his right to contest the true value of Clanwilliam for restitution-offset purposes. Defendant's preserved position, communicated in writing to the Special Master's counsel, is that Clanwilliam was sold at approximately $450 million against a market value of approximately $800 million—roughly $350 million below the value of the asset when contributed to NHC in October 2024. [Ex. S2, Lindberg–Martinez Correspondence (Aug. 14, 2025).]

4. The Clanwilliam Consent Motion is candid about its own irregularity. The Special Master acknowledged that "[i]n an ideal set of circumstances," his "restitution victim analyses" and "recommendations to the Court concerning the same" would have been completed "before seeking Court approval of (i) a restitution asset sale or (ii) how funds from such a sale would be disbursed to victims," and that the distribution "almost certainly will deviate in some degree from the general victim restitution apportionment later approved by the Court." Doc. No. 66, ¶ 24. The motion disbursed $23,520,710 to Vista even though "the Special Master is unsure whether the Special Master will recommend that the Court treat Vista as a victim in this proceeding." Doc. No. 66, ¶ 26 n.8. And it asked that distributions be credited against "Defendant's ultimate restitution

obligations *as determined by a future order of restitution* entered by the Court"—a concession that no such order existed. Doc. No. 66, ¶ 21(b) (emphasis added). The Special Master's assurance that he "anticipates collecting enough funds in the future to equalize distributions" (Doc. No. 66, ¶ 26) only underscores the problem: equalization depends on liquidating still more assets before the obligation those liquidations are meant to satisfy has been adjudicated.

5. On May 14, 2026—twelve days before sentencing—the Special Master presented Defendant with a "Consent, Waiver, and Acknowledgement" bearing an effective date of May 15, 2026 (the "New Waiver"). [Ex. W.] Its recitals assert that the Special Master "has full discretion to liquidate the Primary Restitution Assets, including determination of the timing of sale(s) and the price at which Primary Restitution Assets are sold, subject to only the approval of the Court," and characterize Defendant's execution of the instrument as "cooperation" the Special Master "deems . . . necessary" under the appointment order. Its operative clauses would waive Defendant's "right to object to any sale, the manner of the sale, the timing of the sale, and the price at which the Primary Restitution Assets are sold"; confine Defendant to a single "timely objection" in the approval proceeding; and release—and covenant not to sue—a beneficiary class that expressly includes "the Special Master" himself, together with purchasers, financing sources, and insurers. [Ex. W.] On May 22, 2026—four days before sentencing—the Special Master filed a Statement Concerning Defendant's Cooperation, itemizing Defendant's non-execution of waivers among its "clarifications" to Defendant's cooperation showing and announcing that the Special Master "expects that Defendant will execute the New Waiver before or during the sentencing hearing." Doc. No. 159, at 3, 5 & nn.5–6. Defendant has not executed the New Waiver. The conflict of interest embedded in this sequence is addressed in Part V, infra.

6. The New Waiver episode was not isolated; it fit a pattern of promises made to induce Defendant's cooperation and never honored, while adverse material moved promptly. After Defendant produced emails documenting the Zero Coupon Bond sales, the Special Master promised to correct the restitution analysis to credit those sales—a correction that was supposed to be made even before Defendant's objections were due. No correction was ever filed or made, before sentencing or since. [Statement of Facts ¶¶ 4–5; Doc. No. 173 Ex. M.] Other sale credits promised to Defendant—including the ECL credits—likewise never materialized before sentencing. [Statement of Facts ¶ 6.] And Defendant waived a $40,000,000 court-approved tax escrow in the Clanwilliam transaction on the condition—never fulfilled—that the de minimis companies be transferred to him on an unrestricted basis; the Clanwilliam order instead gave the Special Master the option to assume those companies, Doc. No. 66, ¶ 20(h), at least one of which has since been shut down. [Ex. S2.] The asymmetry is one-way: commitments that would reduce the restitution figure or benefit Defendant were promised and never delivered, while the statement adverse to Defendant was filed four days before sentencing.

7. The Special Master has not disclosed how the proceeds of completed dispositions have been used or applied. No accounting of the proceeds of the Becket sale has been provided to Defendant, and Defendant does not know whether other sales or dispositions have occurred, because none has been disclosed. [Statement of Facts ¶ 3.] A court-appointed fiduciary administering a defendant's assets for restitution owes the Court and the parties a complete accounting of every disposition and of the application of every dollar of proceeds; none has been made.

8. On May 26, 2026, the Court sentenced Defendant. On May 28, 2026, the Court entered a Preliminary Order of Restitution in the amount of $1.655 billion. [Doc. 161.] By its own terms,

the order is preliminary; no final order of restitution has been entered; and Defendant's objections and consolidated offset submissions—documenting recoveries, transfers, and payments to the recipient insurance company estates totaling approximately $2.9 billion, including the preserved Clanwilliam valuation differential—remain pending before the Court. [Doc. 161.]

9. Notwithstanding the absence of any final restitution determination, and notwithstanding Doc. No. 56's express requirement of Court approval, the Becket asset was sold—and there is no evidence of that sale anywhere on the record of this Court. No motion seeking approval of a Becket sale, no notice of such a sale, and no order authorizing one appears on the docket. Defendant's counsel learned that Becket had been sold only orally, in one of the weekly meetings with the Special Master's team described in Doc. No. 159, ¶ 1. [Statement of Facts ¶ 11.] On information and belief, additional sale processes are underway or imminent. Absent a stay, assets will continue to pass irretrievably to third parties before the Court has determined whether any restitution is owed at all.

## LEGAL STANDARD

This Court has inherent authority to control its own orders of reference and the conduct of its own appointees, and to stay proceedings ancillary to its judgments. In evaluating a stay, courts weigh the familiar four factors: (1) the movant's likelihood of success on the merits; (2) irreparable injury absent a stay; (3) injury to other parties; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

## ARGUMENT

### I. Section 3664(d)(6) Authorizes a Special Master to Recommend—Not to Sell.

The Mandatory Victims Restitution Act supplies the sole express authority for a special master in a criminal restitution proceeding, and it confines the office to a single function: "The court may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." 18 U.S.C. § 3664(d)(6). Three textual limits follow. The master's output is "proposed" findings and "recommendations"—advice, not action. The subject matter is issues arising in connection with a "proposed" order of restitution—the statute presumes the master's work precedes and informs the Court's final order, not that the master enforces an order that does not yet exist. And every recommendation is "subject to a de novo determination of the issue by the court"—a guarantee that is meaningless if the recommended (or unrecommended) disposition has already been consummated and the asset is gone.

Selling assets is none of these things. A sale is not a proposed finding; it is an executed, largely irreversible disposition. When delegation statutes touching the judicial power are at issue, they are construed strictly, precisely to avoid the constitutional questions that broad readings would raise. *Gomez v. United States*, 490 U.S. 858, 864 (1989). Section 3664(d)(6) cannot be stretched from "may recommend" into "may liquidate."

The legislative history confirms that the design was deliberate. The reference provision appeared in the Judiciary Committee's bill in precisely the form Congress enacted—a master limited to "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." S. Rep. No. 104-179 (1995) (committee substitute § 105), reprinted in 1996 U.S.C.C.A.N. 924. The Committee described the procedures it was enacting as "a streamlined process for the determination of . . . the amount of restitution," explained that "the

need for finality and certainty in the sentencing process dictates that this determination be made quickly," and insisted that "restitution must be considered a part of the criminal sentence." S. Rep. No. 104-179, at 20. Congress designed a prompt, court-centered determination followed by enforcement of the resulting judgment. A multi-year liquidation program that sells first, distributes second, and determines—if ever—last is not an administration of the statute; it is its inversion.

## II. The Restitution Determination Is a Nondelegable Article III Judicial Function.

The judicial power of the United States is vested in Article III courts and may be exercised only by them. U.S. Const. art. III, § 1; *Stern v. Marshall*, 564 U.S. 462, 484 (2011). Congress wrote that principle directly into the MVRA: "Any dispute as to the proper amount or type of restitution shall be resolved *by the court* by the preponderance of the evidence." 18 U.S.C. § 3664(e). The Fourth Circuit enforces this allocation strictly. In *United States v. Johnson*, 48 F.3d 806, 808–09 (4th Cir. 1995), the court held that the determination of restitution—there, merely the amounts and timing of payments—is a core judicial function that cannot be delegated even to a probation officer, an arm of the court itself. If a court may not delegate the scheduling of restitution payments, it surely may not delegate the liquidation of the assets from which restitution would be paid before the restitution obligation has even been fixed.

The Supreme Court's special-master jurisprudence is as follows: masters exist "to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause," and "not to displace the court." *La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957) (quoting *Ex parte Peterson*, 253 U.S. 300, 312 (1920)). In *La Buy*, references that handed the master the parties' basic issues were condemned as "little less than an abdication of the judicial function," and the Supreme Court approved the extraordinary remedy of mandamus to vacate them. *Id.* at 256–57. A reference under which the master does not merely hear disputed restitution issues but

disposes of the defendant's property—without court approval and without any final restitution determination—goes further than anything *La Buy* condemned. Defendant raises this respectfully and in the first instance here, where it belongs: this Court retains full authority to confine its reference to the boundaries Congress set.

**III. Defendant's Consent Cannot Supply What the Statute and Article III Withhold.**

The anticipated response—that Defendant "agreed" to the Special Master in his plea agreement, Doc. No. 40, ¶ 9, and consented to the Clanwilliam disposition, Doc. No. 66—fails for three independent reasons. Consent operates within settled limits, and each one forecloses reliance on it here.

*First*, consent cannot enlarge a statute. Parties may no more amend § 3664(d)(6) by stipulation than they may confer subject-matter jurisdiction by agreement. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Indeed, *Schor* makes the analogy explicit: where structural limits are implicated, "the parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850–51 (1986). Where Congress intends party consent to expand restitution authority, it says so expressly: 18 U.S.C. § 3663(a)(3) permits restitution "to the extent agreed to by the parties in a plea agreement." That provision proves the rule. Consent enlarges the *scope* of restitution only because a statute authorizes it; no provision of the MVRA or any other statute authorizes parties to transfer the adjudicative or liquidation function itself from the court to a master.

*Second*, Article III's structural guarantee is not the parties to waive. *Schor* holds that the right to an Article III adjudicator is "personal" and "subject to waiver," 478 U.S. at 848, but that

"notions of consent and waiver cannot be dispositive" where Article III's structural limitations are at issue, "because the limitations serve institutional interests that the parties cannot be expected to protect." *Id.* at 851. *Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665 (2015), permitted bankruptcy judges to adjudicate *Stern* claims on the parties' knowing and voluntary consent *precisely because* bankruptcy judges act under the appointment, removal, and review authority of Article III courts—the structural safeguards remained intact. *Peretz v. United States*, 501 U.S. 923 (1991), is to the same effect in the criminal context: "no such structural protections are implicated" by consent to a magistrate judge's supervision of felony voir dire, the Court explained, because magistrates "are appointed and subject to removal by Article III judges" and "the entire process takes place under the district court's total control and jurisdiction." *Id.* at 937 (quoting *United States v. Raddatz,* 447 U.S. 667, 681 (1980)). The teaching of these cases is uniform: consent legitimizes a *supervised* adjunct; it cannot legitimize an adjunct who has slipped the court's supervision. A special master who disposes of assets without court approval is not the supervised actor *Wellness* and *Peretz* describe—he is the unsupervised exercise of judicial power that *Schor* holds no party can authorize. This Court's own order conditioned the reference the same way, appointing a master to resolve restitution issues "under the Court's supervision and guidance." Doc. No. 56, at 3, ¶ 7.

*Third*, consent is measured by its terms, and every instrument of Defendant's consent presupposes court orders. The plea agreement consents to a special master performing tasks "*as ordered by the Court*." Doc. No. 40, ¶ 9. The appointment order conditions liquidation—twice—on "Court approval." Doc. No. 56, at 6. The Clanwilliam consent was transaction-specific, given by motion on notice, with valuation objections expressly preserved. Doc. No. 66. *Wellness* requires that consent be knowing and voluntary as to the adjudication actually conducted; a blanket,

prospective consent to unspecified future sales *without* court orders cannot be extracted from documents whose every operative clause presupposes them. Defendant consented to a master who recommends and who liquidates only with Court approval. He did not—and could not—consent to dispositions unmediated by orders of this Court. The consent documents are not a defense to the Becket sale; they are evidence that it was never authorized.

The point runs deeper than the scope of consent because the deviation here is structural. Congress prescribed an order of operations, and this Court's appointment order faithfully reproduced it. Under the MVRA, the court determines the victims' losses, § 3664(d)(5); resolves every dispute itself, by a preponderance, § 3664(e); may take a master's proposed findings, but only subject to a de novo determination, § 3664(d)(6); enters a restitution order that then becomes a final judgment, § 3664(o); and only then do the civil enforcement mechanisms attach, upon entry of judgment, § 3613(c), (f). Doc. No. 56 mirrors that architecture: identify the assets; "seek Court approval to liquidate"; accomplish liquidation "with Court approval." Doc. No. 56, at 6. In both designs, Article III adjudication comes first, execution comes second, and every act of the adjunct passes through the court. That sequencing is not a stylistic preference; it is the constitutional condition on which the use of a non-Article III adjunct rests. *Wellness* and *Peretz* sustained adjuncts precisely because "the entire process takes place under the district court's total control and jurisdiction"—appointment, supervision, review, and the final word all belonging to the Article III judge. *Peretz*, 501 U.S. at 937.

As implemented, the process inverted that sequence at every step: assets were liquidated before any final restitution determination existed; proceeds were distributed under a formula the Special Master concedes "almost certainly will deviate" from the apportionment this Court will later adopt, Doc. No. 66, ¶ 24; the Becket sale occurred off the record entirely; and the corrective

inputs promised to the Court's process—the Zero Coupon Bond credits, the ECL credits, the other promised credits—never arrived. What remains is execution without adjudication: criminal punishment, *Ellingburg v. United States*, 607 U.S. 163, 166 (2026), carried into effect by a private appointee operating outside the supervision that is the constitutional precondition for his existence. That is not a defect in Defendant's personal right to an Article III adjudicator, which *Schor* holds waivable, 478 U.S. at 848; it is a defect in the structural allocation of the judicial power, which *Schor* holds no party can waive: "the parties cannot by consent cure the constitutional difficulty," because the limitations "serve institutional interests that the parties cannot be expected to protect." *Id.* at 850–51. Under *Wellness*, supervision is what makes the adjunct constitutional; the record shows the supervision did not occur; the conclusion follows. A structural violation of this kind persists no matter what Defendant signed, said, or consented to, and it requires correction by the Court whether or not any party asks for it.

## IV. The New Waiver Confirms the Defect: An Attempt to Manufacture the Missing Consent, Sought by a Conflicted Officer Under Sentencing Pressure.

The New Waiver is the program reduced to writing. Its recitals declare that the Special Master "has full discretion to liquidate the Primary Restitution Assets, including determination of the timing of sale(s) and the price . . . , subject to only the approval of the Court." [Ex. W.] That is not what this Court ordered, and it is not what Congress authorized. Doc. No. 56 directs the Special Master to identify assets and to "seek Court approval to liquidate" them, accomplishing any liquidation "with Court approval," Doc. No. 56, at 6; and § 3664(d)(6) confines the office to proposed findings and recommendations subject to de novo determination by the Court. An instrument reciting "full discretion" over timing and price—with Court approval reduced to a backstop and the defendant's objection rights waived in advance—is an attempt to obtain by private contract the authority that the statute and the appointment order withhold. As shown in Part

III, *supra*, consent cannot supply that authority. The New Waiver is the proof that the Special Master understands this: one does not seek a waiver of rights one believes do not exist. And the demand sought more protection than this Court chose to give. The appointment order already shields the Special Master in calibrated, court-controlled terms: "No person may pursue any claim against the Special Master . . . without first seeking leave of the Court," and he bears no liability "for any action or omission taken or made in good faith." Doc. No. 56, at 9, ¶ 13. The New Waiver would replace that protection—a leave-of-court gate and a good-faith condition, both of which keep the Court in control—with an absolute personal release and covenant not to sue, with no leave requirement and no good-faith limitation, enforceable against Defendant by specific performance without bond. An officer does not demand a broader release than the Court conferred unless he wants protection the Court's own order withholds.

Nor could consent extracted in these circumstances ever satisfy *Wellness*'s requirement that waiver of Article III rights be knowing and voluntary. The chronology speaks for itself. The New Waiver was presented on May 14, 2026, twelve days before sentencing. On May 22, 2026—four days before sentencing—the Special Master filed a public statement to the sentencing court itemizing Defendant's non-execution of waivers among the "clarifications" to Defendant's cooperation showing and announcing that he "expects that Defendant will execute the New Waiver before or during the sentencing hearing." Doc. No. 159, at 3, 5 & nn.5–6. A waiver of statutory and constitutional objection rights, demanded as "cooperation" by the very officer reporting on the defendant's cooperation to the judge about to sentence him, is the antithesis of a voluntary relinquishment. It is leverage. And the leverage was applied by an officer with a disqualifying stake in the outcome: the New Waiver's beneficiary clause runs expressly to "the Special Master" himself—releasing him, personally, from suit—while his professionals are compensated from the

very assets whose accelerated, unopposed liquidation the waiver is designed to "streamline." Doc. No. 56, at 9–10; Doc. No. 66, ¶ 20(d)(i) ($14,112,426 administrative reserve). The recitals themselves brand the absence of Defendant's waiver as something that "will impair the value" of the assets—recasting rights Congress conferred as obstacles to be cleared. The Special Master's own filing concedes the pattern, acknowledging that at least one of his demands on Defendant came "[a]lthough arguably exceeding the scope of the Special Master's authority." Doc. No. 159, ¶ 3. These circumstances are detailed in Part V, infra, under 28 U.S.C. § 455, the Due Process Clause, and Fed. R. Civ. P. 53(a)(2) (by analogy). For present purposes, they confirm why a stay is necessary: the sale program is being driven by an officer whose interests favor speed and foreclosure of objections, in tension with the adjudication-first sequence the statute commands.

## V. The Special Master Is Disqualified From Recommending or Adjudicative Functions: He Demanded, as "Cooperation," a Release Running to Himself, While His Professionals Are Compensated From the Assets He Liquidates.

"[N]o man can be a judge in his own case." *In re Murchison*, 349 U.S. 133, 136 (1955). That command of due process was announced in criminal cases and applies of its own force here, binding every officer who exercises adjudicative power, whatever the label of the proceeding. This Court's own appointment order then supplies the standard in terms: the office exists, by the Court's express finding, because "an experienced, neutral, and disinterested person should be appointed to assist the Court," resolving restitution issues "under the Court's supervision and guidance." Doc. No. 56, at 3, ¶ 7. Neutrality and disinterest are not imported into this case from the civil rules; they are the express conditions of the appointment itself. As for the codified benchmark: no Federal Rule of Criminal Procedure addresses special masters, and § 3664(d)(6) is silent on their qualifications, so courts look to the lone federal rule on the subject, under which a master "must not have a relationship to the parties, attorneys, action, or court that would require disqualification

of a judge under 28 U.S.C. § 455." Fed. R. Civ. P. 53(a)(2) (governing civil masters and supplying the benchmark by analogy). An adjunct exercising quasi-judicial functions in a criminal sentencing cannot be held to a lesser standard of impartiality than a master appointed in a civil case; if anything, the standard is more exacting where liberty and criminal punishment are at stake. Section 455(a) requires disqualification "in any proceeding in which [the officer's] impartiality might reasonably be questioned"; § 455(b)(4) where the officer has "a financial interest in the subject matter in controversy." The standard is objective and protects "public confidence in the integrity of the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 858–60 (1988). Due process supplies the constitutional floor: an adjudicator may not have "a direct, personal, substantial pecuniary interest" in the outcome. *Tumey v. Ohio*, 273 U.S. 510, 523 (1927).

The record now establishes the disqualifying configuration. The New Waiver is a private contract under which Defendant would release, and covenant never to sue, "the Special Master" by name—presented not as a counterparty's request but as "cooperation" the Special Master "deems . . . necessary" under the appointment order, and enforceable against Defendant by specific performance without bond. [Ex. W.] The Special Master's professionals are compensated from the assets he administers, Doc. No. 56, at 9–10, including the $14,112,426 Clanwilliam administrative reserve, Doc. No. 66, ¶ 20(d)(i), and the New Waiver's recitals declare that Defendant's signature "would enhance value and help streamline the sale" of those assets while its absence "will impair the value." [Ex. W.] He is simultaneously (1) the recommending adjudicator of Defendant's restitution offsets as author of the restitution report, Doc. No. 106; *see* Doc. No. 159, ¶ 2(k); (2) the administrator of a fee-generating liquidation program; (3) the counterparty and personal beneficiary of a demanded release; and (4) a sentencing commentator who filed a point-by-point response to Defendant's sentencing memorandum. Doc. No. 159. Each role might be tolerable

alone; together, no reasonable observer could view them as compatible with impartiality toward a defendant who has declined to sign the waiver, whose objections slow the sales, and whose civil litigation the Special Master demanded—by his own admission "[a]lthough arguably exceeding the scope of the Special Master's authority"—be dismissed. Doc. No. 159, ¶ 3. In fairness, Doc. No. 159 also records genuine cooperation—fifteen months of weekly meetings, "voluminous data," counsel "freely available," *id.* ¶ 1—and this objection does not depend on any finding of subjective bad faith. The problem is structural, and § 455(a)'s objective standard exists for precisely this situation. Defendant accordingly objects to the Special Master's continued exercise of any recommending or adjudicative function concerning restitution, and requests that those functions be performed by a neutral successor appointed under § 3664(d)(6), or by the Court itself.

The pattern of unfulfilled inducements confirms the conflict is operative, not theoretical. Cooperation was repeatedly purchased with promises—the unrestricted transfer of the de minimis companies in exchange for Defendant's waiver of the $40 million Clanwilliam tax escrow [Ex. S2]; the promised correction of the restitution analysis to credit the Zero Coupon Bond sales once Defendant produced the documenting emails; other promised sale credits, including the ECL credits [Statement of Facts ¶¶ 4–7]—and none was honored. An officer whose practice is to extract concessions with commitments he does not keep, while reporting the concessor's "cooperation" deficits to the sentencing court, is not an officer whose impartiality a reasonable observer could credit. 28 U.S.C. § 455(a).

The Special Master's restitution report completes the picture. In the same filing in which he rejected the bulk of Defendant's asserted offsets—offsets the report itself acknowledges "total at least $1.6 billion," Doc. No. 106, at 22—the Special Master expressly "reserve[d] the right to advise the Court concerning Defendant's cooperation during the sentencing hearing." Doc. No.

106, at 33. The leverage deployed on May 22 was announced on April 3, in the very document adjudicating Defendant's credits. And the proposed order the Special Master drafted provides that Defendant "shall not receive a credit" against restitution for the Court-approved administrative expenses paid from his assets. Doc. No. 106-1, at 4. The structure this creates should be stated plainly: every dollar paid to the Special Master's professionals comes from Defendant's assets, reduces the restitution obligation not at all, and enlarges the administration whose pace and friction those same professionals' control. An officer occupying that position cannot also be the officer who grades the debtor's cooperation and adjudicates his credits.

## VI. The Special Master's May 22 Statement (Doc. 159) Tainted the Sentencing and, Unless Stricken, Will Taint the Final Restitution Determination.

Due process guarantees a sentencing untainted by materially compromised information or improper influence. A sentence resting on assumptions that are "materially untrue" denies due process, *Townsend v. Burke*, 334 U.S. 736, 741 (1948), as does one "founded at least in part upon misinformation of constitutional magnitude," *United States v. Tucker*, 404 U.S. 443, 447 (1972). Sentencing is a critical stage to which the full measure of due process applies. *Gardner v. Florida*, 430 U.S. 349, 358 (1977). Four days before sentencing, the Court's own quasi-judicial adjunct filed a statement systematically recharacterizing Defendant's cooperation—while his demand for a self-benefiting waiver was pending against Defendant, and while expressly linking the two by announcing his expectation that Defendant would execute the New Waiver "before or during the sentencing hearing." Doc. No. 159, at 3, 5 & nn.5–6. Such a statement does not reach the sentencing judge as one more adversarial submission to be discounted; it arrives bearing the imprimatur of the Court's own officer. A cooperation assessment shaped—consciously or not—by the assessor's pending personal demand on the person being assessed is materially compromised information of the kind *Townsend* and *Tucker* place outside the sentencing process.

Defendant objects that the May 26, 2026 sentencing was fundamentally affected by the submission and consideration of Doc. No. 159; the remedy as to the sentence lies with the Fourth Circuit on Defendant's pending appeal. The remedy as to *this* proceeding lies here and now: because the final restitution determination—itself criminal punishment, *Ellingburg*, *supra*—remains to be made on a record that includes Doc. No. 159 and the conflicted officer's restitution report, the Court should strike Doc. No. 159 or accord it no weight in any further proceeding, and should ensure that the de novo determination of Defendant's offsets proceeds on the recommendation of a neutral officer or on the Court's own review.

The taint was compounded by what the sentencing record did *not* contain. The Special Master had promised—before Defendant's objections were even due—to correct the restitution analysis to credit the Zero Coupon Bond sales Defendant had documented by email, and to credit other sales to Defendant, including the ECL credits. None of those corrections was ever filed. [Statement of Facts ¶¶ 4–6.] The Court therefore sentenced Defendant on an uncorrected, inflated restitution picture, accompanied by the Special Master's adverse cooperation statement—the corrective filings promised to Defendant absent, the filing adverse to Defendant present and four days fresh. And on information and belief, the statements presented at sentencing were obtained and prepared before the Clanwilliam proceeds were distributed and before the other payments and recoveries documented in Defendant's offset submissions had been received—so the Court heard descriptions of loss and harm unadjusted for the hundreds of millions of dollars the recipient insurance companies had already received. [Statement of Facts ¶ 14.] Under the framework governing the Special Master's determination, restitution distributions are made to or through the recipient insurance companies' estates—not to individual policyholders directly. [Statement of Facts ¶ 15.] That is not Defendant's characterization; it is the Special Master's: his report

recommends "directing restitution payments through the insurance companies themselves rather than directly to the individual policyholders." Doc. No. 106, App. 2; see Doc. No. 66, ¶ 20. The skew, at every point, ran in one direction. Due process does not tolerate a sentencing record curated in one direction by a conflicted officer. *Townsend*, 334 U.S. at 741; *Tucker*, 404 U.S. at 447. Congress said the same when it wrote this statute: in the Committee's words, "[t]he sole due process interest of the defendant being protected during the sentencing phase is the right not to be sentenced on the basis of invalid premises or inaccurate information." S. Rep. No. 104-179, at 20–21. That is precisely the interest the May 22 statement, the promised-and-undelivered corrections, and the pre-distribution statements compromised.

The due process violation can be stated with precision: Defendant was sentenced on restitution calculations that were incomplete and that had not been produced in compliance with the statutory order of operations. *Incomplete*, because the figure before the Court at sentencing omitted credits the Special Master had promised to apply—the documented Zero Coupon Bond sales, the ECL credits, and the other sales to be credited to Defendant [Statement of Facts ¶¶ 4–6]—and omitted the reductions that 18 U.S.C. § 3664(j)(2) makes mandatory and that this Court's own appointment order directed: "Restitution amounts should be reduced by any amount victims have recovered for the same losses." Doc. No. 56, at 6 n.2. *Noncompliant*, because the statute commits every disputed restitution issue to resolution "by the court," 18 U.S.C. § 3664(e), upon proposed findings "subject to a de novo determination," § 3664(d)(6)—and no such determination had occurred. The $1.655 billion figure that framed the § 3553(a) analysis was the unadjudicated recommendation of a conflicted adjunct, unadjusted for the approximately $2.9 billion in documented offsets then pending and unadjusted for the mandatory § 3664(j)(2) credits. A sentence imposed in the shadow of a restitution number that the governing statute required to be

reduced—but that never was—rests on the "invalid premises or inaccurate information" the Committee identified, S. Rep. No. 104-179, at 20–21, and on "misinformation of constitutional magnitude." *Tucker*, 404 U.S. at 447; *see Townsend*, 334 U.S. at 741. The courts of appeals enforce the statutory order of operations strictly: two weeks ago, the Sixth Circuit vacated a restitution award—on plain-error review, no objection having been made below—because the defendant "was not privy to the underlying calculations relied on by the government and the district court," and sentencing a defendant on undisclosed restitution information is "fundamentally at odds with the adversarial scheme" the rules establish. *United States v. Miclaus*, No. 23-3146, slip op. at 14–15 (6th Cir. May 29, 2026) (quoting *United States v. Coppenger*, 775 F.3d 799, 805 (6th Cir. 2015)); *see* 18 U.S.C. § 3664(a)–(b) (requiring "a complete accounting of the losses to each victim," disclosed to the defendant). Defendant's position is stronger still: he objects expressly, and within the objection period. Defendant objects on this ground for the record and for appellate review; the remedy as to the sentence lies with the Fourth Circuit. In this Court, the violation requires at minimum that no further consequence—no sale, no distribution, and no final order of restitution—be built upon the uncorrected, unadjudicated figure.

The off-record Becket sale magnified the distortion. Because the sale appears nowhere on the docket—and because Defendant's counsel learned of it only orally, in a weekly meeting, with sentencing approaching—the matter was not brought before the Court prior to sentencing. The structure of the process explains why. To raise the irregularity, Defendant would have had to accuse the Court's own appointee of an unauthorized disposition on the eve of sentencing—while that same appointee held the pen on the cooperation statement he would file four days before the hearing, and while his demand for a self-benefiting waiver was pending against Defendant. Objection carried a price, and the price was the cooperation narrative before the sentencing judge.

A sale process run ahead of the final restitution determination, administered by the officer who grades the defendant's cooperation, thus operated as a practical gag on the very objections the statute invites: it suppressed, at the moment of maximum consequence, the irregularities this motion now places on the record. And the consequences of that suppression fell entirely on Defendant: the Court imposed sentence on a record that included the Special Master's adverse cooperation statement and excluded the fact that an off-record, unauthorized disposition of restitution assets had already occurred, and excluded the promised and undelivered credits. A sentencing shaped by what a conflicted officer chose to file, and by what the off-record character of his administration kept from the Court, is precisely the disproportion this motion asks the Court to prevent from recurring at the final restitution determination.

Due process condemns that structure directly. A defendant may not be made to pay a penalty for the exercise of his procedural rights, because "the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right," and due process therefore requires that a defendant "be freed of apprehension of such a retaliatory motivation." *Blackledge v. Perry*, 417 U.S. 21, 28 (1974) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 725 (1969), *limited on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)). The rule does not demand proof of intent: it "was not grounded upon the proposition that actual retaliatory motivation must inevitably exist." *Blackledge*, 417 U.S. at 28. Here the deterrent was built into the sequence itself: by selling first and adjudicating later, and by uniting in one officer the roles of seller, release counterparty, and cooperation evaluator, the process ensured that a defendant who corrected the record before sentencing would do so at the cost of his cooperation assessment. Congress identified one due process interest above all at sentencing—the right not to be sentenced on invalid premises or inaccurate information, S. Rep. No. 104-179, at 20–21, *supra*—and a process that penalizes the

correction of invalid premises before sentencing defeats that interest at its root: the premises remain uncorrected precisely because correcting them is punished. That is not a gag order in form, but it operated as one in fact, and the sentencing on uncorrected premises that resulted is the very violation the statute's framers sought to foreclose.

### VII. The Becket Sale Proceeded Without the Court Approval That Both the Statute and This Court's Own Order Require.

The Becket transaction appears nowhere on the record of this Court: no motion seeking its approval, no notice of the sale, and no order authorizing it. Defendant's counsel learned that Becket had been sold only orally, in one of the weekly meetings described in Doc. No. 159, ¶ 1, in or about December 2025—and in the months since, no motion, notice, or order concerning Becket has appeared on the docket. [Statement of Facts ¶ 11.] An asset sale that leaves no trace on the docket of the Article III court supervising it is not a procedural foot-fault; it is proof that this process derailed from its constitutional moorings long ago. The docket is the constitutional record of a federal criminal proceeding, and dispositions of a defendant's property conducted entirely off that record are irreconcilable with due process, with § 3664(d)(6), and with the appointment order itself, which conditions liquidation—twice—on "Court approval." Doc. No. 56, at 6. Whatever authority the Special Master possesses is derived entirely from this Court's appointment and orders; an act undertaken without the court approval those orders require is an act undertaken without authority. The defect is not procedural housekeeping. Court approval of each disposition is the mechanism by which § 3664(d)(6)'s de novo guarantee operates: absent a motion, an opportunity for objection, and an order, the Court never makes the determination the statute reserves to it—and the contrast with Clanwilliam, where the Special Master did seek approval by motion (Doc. No. 66), shows that the Special Master knows precisely how the process is supposed to work. Where judicial sales of realty are concerned, Congress has separately prescribed

mandatory procedures—public sale, appraisal, and related safeguards—whose omission independently invalidates a sale. 28 U.S.C. § 2001. Defendant respectfully requests that the Court direct the Special Master to file a complete accounting of the Becket transaction and all other completed, pending, or contemplated dispositions, identifying the order of this Court claimed as authority for each.

Compounding the defect, the Special Master has never disclosed how the Becket proceeds were applied—whether to restitution, to administrative expenses, to the Special Master's professionals, or otherwise—nor whether other sales or dispositions have occurred beyond those of record. [Statement of Facts ¶ 3.] On the present record, the Court and Defendant are alike in the dark as to what has been sold and where the money went. The accounting requested below is therefore not ancillary relief; it is the predicate for assessing the lawfulness of what has already occurred, for crediting Defendant under 18 U.S.C. § 3664(j)(2) for amounts actually applied to the recipient insurance companies, and for the de novo determination still to come.

## VIII. Sales Before a Final Restitution Determination Invert the Statutory Sequence and Inflict Irreparable, Unquantifiable Prejudice.

The MVRA's architecture is sequential: the court determines the victims' losses, § 3664(d)(5); resolves all disputes itself by a preponderance, § 3664(e); enters a restitution order that then constitutes a final judgment, § 3664(o); and only then do the enforcement mechanisms attach. Those mechanisms are, by Congress's own designation, civil in character: 18 U.S.C. § 3613 is titled "Civil remedies for satisfaction of an unpaid fine"; it reaches restitution orders through § 3613(f); and the lien it creates "arises on the entry of judgment." § 3613(c). Congress thus prescribed post-judgment civil process—a lien and execution against an entered judgment—as the means of collecting restitution; it nowhere authorized pre-judgment liquidation of a defendant's assets by a court adjunct inside the criminal case. That the collection machinery is civil does not

make the punishment civil, *Ellingburg*, *supra*, but it does fix when collection begins: after judgment, through the remedies Congress specified. *See Dolan v. United States*, 560 U.S. 605, 607–08 (2010) (describing the statute's timetable for converting sentencing into a final restitution determination). Liquidating assets first and determining the obligation later reverses every step of that sequence. It is enforcement of a judgment that does not exist.

Nor is any of this inconsistent with Defendant's plea agreement. Defendant agreed to pay full restitution and to the immediate enforceability of monetary penalties under 18 U.S.C. § 3613. Doc. No. 40, ¶¶ 10(a), 10(d). Consent to immediate enforcement of a judgment is not consent to execution before judgment: § 3613 is a civil-remedies statute whose lien "arises on the entry of judgment," § 3613(c), so its enforcement presupposes the restitution order that § 3664(o) describes, and the amount that order may impose is full restitution less the credits § 3664(j) mandates—a computation the statute reserves to the Court. The Committee was explicit that the purpose of § 3664(j)(2) "is to ensure that the victim is not compensated twice for the same loss." S. Rep. No. 104-179, at 21. This Court's appointment order says the same: "Restitution amounts should be reduced by any amount victims have recovered for the same losses," and Defendant "has reserved all rights with regard to any arguments regarding calculating loss amount." Doc. No. 56, at 6 n.2 (citing 18 U.S.C. § 3664(j)(2)). Defendant's offset submissions enforce the plea agreement's design; they do not resist it.

The prejudice is not hypothetical; the record already quantifies it. Defendant's pending offset submissions total approximately $2.9 billion against a preliminary figure of $1.655 billion. If the Court's de novo determination credits those offsets in whole or substantial part, the final restitution obligation is zero or near it—and yet the assets will be gone, sold into the hands of third parties (including potential bona fide purchasers) from whom recovery may be legally or

practically impossible. Clanwilliam is the proof of concept. By the Special Master's own account, its $318 million in proceeds were distributed under a formula that "almost certainly will deviate" from the apportionment this Court later approves, Doc. No. 66, ¶ 24, including $23,520,710 to an entity the Special Master cannot yet say is a victim at all, *id.* ¶ 26 n.8. And Defendant's preserved valuation position is that the asset itself was sold approximately $350 million below its market value—value that, once the sale closed, no de novo determination can restore. [Ex. S2.] Defendant does not seek to unwind Clanwilliam; he consented to that disposition to preserve the transaction at the parties' request. But Clanwilliam demonstrates with arithmetic precision what each further "out of order" sale will do: fix losses, misallocate proceeds, and moot the de novo review Congress guaranteed—while the Special Master's proposed cure, "collecting enough funds in the future to equalize distributions," Doc. No. 66, ¶ 26, requires liquidating still more assets before the underlying obligation is adjudicated. Forced-sale dynamics compound the harm. Harm of that character—unrecoverable property, mootness of pending objections, evasion of de novo review—is the definition of irreparable.

## IX. On De Novo Review, the Court Must Find the Facts Itself—by a Preponderance at Minimum, and, After Ellingburg, Beyond a Reasonable Doubt.

Section 3664(e) fixes the statutory floor: every disputed restitution issue must be resolved "by the court by the preponderance of the evidence." Two consequences follow for any proposed sale. First, the finding must be the Court's own—a de novo determination on the record, not a ratification of the Special Master's conclusions. Second, the Government and the Special Master bear the burden of demonstrating, by at least a preponderance, the facts that would justify each specific disposition—including that a final restitution obligation will exist and will exceed the offsets of record.

The Constitution now requires more. In *Ellingburg* a unanimous Supreme Court held that restitution under the MVRA is "plainly criminal punishment." That holding arose under the Ex Post Facto Clause, but its premise—that MVRA restitution is a criminal penalty imposed at sentencing—activates the rule of *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), that facts increasing a criminal penalty must be proved beyond a reasonable doubt, and of *Southern Union Co. v. United States*, 567 U.S. 343, 346–49 (2012), which applied *Apprendi* to criminal monetary penalties. Defendant acknowledges that *Ellingburg* did not itself decide the burden-of-proof question and presents the argument squarely: because restitution is criminal punishment, the facts establishing the amount of that punishment—here, a contested $1.655 billion—must be found beyond a reasonable doubt. At an absolute minimum, no asset may be sold unless and until this Court itself, de novo, finds by a preponderance of the evidence that the sale is justified by a restitution obligation that survives the documented offsets. No sale to date has been supported by findings under either standard.

The Committee likewise insisted that the mandatory scheme not become a vehicle for resolving "highly complex issues related to the cause or amount of a victim's loss," that "speculative" losses be excluded, and that even restitution arising from a plea agreement be "supported by fact" and "ordered by the court." S. Rep. No. 104-179, at 19. A contested $1.655 billion figure—built on disputed valuations and met by approximately $2.9 billion in documented offsets—demands more judicial process, not less.

The Special Master's own restitution report (Doc. No. 106) proves the point with arithmetic. On the report's own figures, the principal-only measure of loss—"Unpaid Principal," net of the recoveries the Special Master credited—is $1.362 billion; the $1.625 billion the report recommends is reached only by adding approximately $263 million of "time value of money"

interest at a rate the Special Master selected, over Defendant's express objection to any interest component. Doc. No. 106, at 21–22. The Preliminary Order then entered a figure of $1.655 billion—$30 million above even the Special Master's recommendation, without explanation on the record. [Doc. 161] An interest enhancement of more than a quarter-billion dollars, computed by a court adjunct at a rate of his choosing and imposed without the Court's own findings, cannot stand: restitution is criminal punishment, *Ellingburg*, *supra*, and the facts that fix its amount must be found by the Court—on Defendant's submission, beyond a reasonable doubt under *Apprendi* and *Southern Union*. And the report's rejection of offsets is, in places, expressly provisional: the Special Master concedes that the credit for the preferred-equity interest Defendant transferred to ULICO—against which ULICO agreed to reduce its civil judgment by at least $218 million—"should occur if and when the preferred equity position is liquidated into cash," Doc. No. 106, at 23, a concession that the recommended figure overstates the obligation by amounts the Special Master himself expects to credit. Meanwhile, of the Clanwilliam proceeds, the $14,112,426 administrative reserve and the $23,520,710 paid to Vista—an entity the Special Master "is unsure" is due restitution at all—generated no credit to Defendant. Doc. No. 66, ¶¶ 20(d), 26 n.8.

## X. Every Stay Factor Is Satisfied.

*Likelihood of success*. The textual argument under § 3664(d)(6) is straightforward; the Article III argument is controlled by *Johnson* and *Stern*; and the sequencing argument follows from the face of §§ 3664(d)(5), (e), and (o). *Irreparable harm*. Assets sold to third parties before any final restitution determination cannot be recovered; the de novo review Congress guaranteed will have been rendered illusory. By the Special Master's own estimate, the Primary Restitution Assets are worth $1.162 to $1.878 billion, with a midpoint of $1.454 billion—below the preliminary figure—so every dollar of value sacrificed in a rushed or unsupervised sale directly

enlarges the unpaid balance for which Defendant remains liable. Doc. No. 106, at 30. *Harm to others*. A stay preserves the status quo; the assets remain available to satisfy whatever final restitution order the Court enters, and no restitution recipient is prejudiced by the Court deciding the obligation before liquidating the security for it. *Public interest.* The public interest lies in sentences—including criminal monetary penalties, *Ellingburg*, *supra*—being imposed by Article III judges under the procedures Congress enacted, not by court adjuncts acting beyond their statutory writ. *Nken*, 556 U.S. at 434.

**CONSOLIDATED OBJECTIONS**

Within the time allowed for objections to the Preliminary Order of Restitution [Doc. 161], Defendant objects as follows, in addition to and independent of the stay relief requested. These objections are presented within the restitution-determination process that 18 U.S.C. § 3664 commits to this Court—not in any appeal or post-conviction action—and nothing herein contests Defendant's agreement to pay full restitution as determined according to law: (i) the Special Master reference, as implemented, exceeds the sole statutory authority for it, 18 U.S.C. § 3664(d)(6), which permits proposed findings and recommendations subject to de novo determination by the Court—not the execution of asset sales; (ii) the determination of restitution is a nondelegable Article III judicial function, U.S. Const. art. III, § 1; 18 U.S.C. § 3664(e), and its delegation here violates the separation of powers; (iii) no consent by Defendant—in the plea agreement, the Clanwilliam consent motion, or otherwise—did or could enlarge § 3664(d)(6), waive Article III's structural guarantee, or authorize dispositions without court approval, and the inversion of the statutory order of operations as implemented—execution of criminal punishment before and without Article III adjudication, by an adjunct operating outside the Court's supervision—is a structural constitutional violation that no consent could waive; (iv) the Special Master labors under

disqualifying conflicts of interest under the standards of 28 U.S.C. § 455, the Due Process Clause, and Fed. R. Civ. P. 53(a)(2) (by analogy), and his reports and recommendations, including the restitution report (Doc. No. 106) and the Statement Concerning Defendant's Cooperation (Doc. No. 159), are the product of that conflict; (v) the submission and consideration of Doc. No. 159, filed four days before sentencing while the Special Master's demand for a self-benefiting waiver was pending, fundamentally compromised the May 26, 2026 sentencing in violation of due process, as did the presentation of statements obtained, on information and belief, before restitution distributions—including the Clanwilliam proceeds—had been received by the recipient insurance company estates to or through which, under the framework governing the Special Master's determination, restitution distributions are made, and as did the imposition of sentence on restitution calculations that were incomplete—omitting the promised Zero Coupon Bond, ECL, and other credits and the mandatory reductions of 18 U.S.C. § 3664(j)(2)—and that had not been subjected to the determination "by the court" that §§ 3664(e) and (d)(6) command, and as did the structure of the pre-determination sale process, under which objection to these irregularities before sentencing carried the price of an adverse cooperation assessment by the officer administering the sales and so operated as a practical restraint on Defendant's ability to bring them before the Court; (vi) the Becket sale—of which there is no evidence on the record of this Court: no motion, no notice, and no order, and of which Defendant's counsel learned only orally in a weekly meeting—was conducted without the court approval required by Doc. No. 56 and § 3664(d)(6) and was ultra vires, and the off-record character of that disposition is itself evidence that the reference departed from constitutional and statutory requirements long before sentencing; (vii) all sales and distributions conducted before entry of a final restitution order—including the disposition of the Clanwilliam proceeds under a formula the Special Master concedes "almost certainly will deviate"

from the apportionment later approved, Doc. No. 66, ¶ 24—invert the sequence commanded by §§ 3664(d)(5), (e), and (o) and are objected to as premature and prejudicial; (viii) any disputed restitution issue must be resolved by this Court de novo, on the Court's own findings, by at least a preponderance of the evidence under § 3664(e), and—because restitution is criminal punishment, *Ellingburg v. United States*, 607 U.S. 163, 166 (2026)—beyond a reasonable doubt under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Southern Union Co. v. United States*, 567 U.S. 343 (2012); (ix) the $1.655 billion preliminary figure is unsupported and is exceeded by documented offsets of approximately $2.9 billion—including the preserved Clanwilliam valuation differential of approximately $350 million [Ex. S2]—such that the final restitution obligation is zero, with substantial overpayment; further, the figure includes approximately $263 million of non-contractual interest selected by the Special Master over Defendant's objection, exceeds by $30 million even the $1.625 billion the Special Master recommended (Doc. No. 106, at 4) without record explanation, omits the ULICO preferred-equity credit of at least $218 million that the Special Master concedes "should occur" (Doc. No. 106, at 23), and gives Defendant no credit for the $14,112,426 Clanwilliam administrative reserve or the $23,520,710 distributed to Vista (Doc. No. 66, ¶¶ 20(d), 26 n.8); and (x) the preliminary restitution figure rests on an analysis the Special Master promised—before objections were due—to correct, including credits for the documented Zero Coupon Bond sales, the ECL credits, and other sales credited to Defendant, and those promised corrections were never made, before sentencing or since, such that the figure is inflated by the amount of every promised and undelivered credit, each of which must be applied on de novo review; and (xi) the Special Master has not disclosed or accounted for the use of proceeds from completed dispositions, including the Becket sale, and other dispositions may have occurred that remain undisclosed; Defendant objects to any restitution determination, credit allocation, or

further disposition made without a complete accounting of all dispositions, of the application of all proceeds, and of all administrative fees and expenses paid or accrued to any person or firm from administered assets or sale proceeds; and (xii) Defendant objects to the entry of any final order of restitution, and to the approval of any further asset disposition, except upon the procedures and findings set forth above. Defendant's substantive offset submissions, and Defendant's previously filed motion to stay [Docs. 172-188], are incorporated by reference, and the grounds stated in each are asserted as objections to the Preliminary Order of Restitution.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Defendant respectfully requests that the Court enter an order: (1) staying, effective immediately, all sales and dispositions of assets and all asset-sale processes conducted by or at the direction of the Special Master or any person acting in concert with him, pending entry of a final order of restitution following the Court's de novo determination of all disputed issues; (2) providing that no asset may be marketed, contracted, or sold absent a specific prior order of this Court entered on motion, with notice and an opportunity to be heard, supported by the Court's own findings under 18 U.S.C. § 3664(e) (and, as preserved above, beyond a reasonable doubt under Ellingburg, Apprendi, and Southern Union); (3) striking, or directing that no weight be accorded in any further proceeding to, the Special Master's Statement Concerning Defendant's Cooperation (Doc. No. 159); (4) disqualifying the Special Master from any recommending or adjudicative function concerning the determination of restitution, with those functions performed by a neutral successor appointed under 18 U.S.C. § 3664(d)(6) or by the Court; (5) directing the Special Master to file, within fourteen (14) days, a complete accounting of all completed, pending, and contemplated asset dispositions, including the Becket and Clanwilliam transactions, identifying the authority claimed for each and the application of all proceeds

therefrom—including the proceeds of the Becket sale and of any disposition not yet of record; (6) directing that there be filed with the Court, within fourteen (14) days, a full and itemized accounting of administrative fees and expenses, identifying each person and firm that has received or accrued fees or expenses from administered assets or sale proceeds—including the Special Master, his counsel, his financial advisors, and any other professional or party—together with the amount received or accrued by each, the dates and sources of each payment, and the order of this Court authorizing each payment; (7) granting such other and further relief as the Court deems just. Given the ongoing and imminent nature of the sale processes, Defendant respectfully requests expedited briefing and consideration.

Respectfully submitted, this 11th day of June, 2026.


/s/ Kenneth Barnes
**KENNETH BARNES**
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977
Email: barnesatty@aol.com
Counsel for Defendant Greg E. Lindberg

## CONSULTATION STATEMENT

Pursuant to the Court's motions practice, the undersigned states that [counsel for Defendant conferred with counsel for the United States on ___, 2026, regarding the relief requested herein; the United States' position is ___ / describe timely attempts to confer].

/s/ Kenneth Barnes________
Kenneth Barnes

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of June, 2026, the foregoing was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including counsel for the United States and counsel for the Special Master.

/s/ Kenneth Barnes________
Kenneth Barnes