**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC<br><br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S MOTION FOR A DETERMINATION THAT NO RESTITUTION IS OWED, OR IN THE ALTERNATIVE FOR EXCLUSION AND OFFSET OF LOSSES NOT PROXIMATELY CAUSED BY THE OFFENSE OF CONVICTION,**
**WITH INCORPORATED MEMORANDUM OF LAW**

Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

## TABLE OF CONTENTS

Page(s)

TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... v

PRELIMINARY STATEMENT .......... 1

STATEMENT OF FACTS .......... 4

A. The Affiliated-loan Program Operated Under a Written Risk management framework and experienced zero defaults prior to Mr. Lindberg's transfer of control to the Rehabilitator .......... 4

B. Mr. Lindberg committed approximately $1 billion of his own capital, guaranteed the loans, and purchased $1 billion of bonds to protect principal .......... 5

C. The regulator approved the affiliate concentration and praised Mr. Lindberg's regulatory performance .......... 6

D. The 2018 KPMG and Houlihan Lokey valuations confirmed the loans were well secured .......... 7

E. Before taking office, the Commissioner planned to "dismantle" Mr. Lindberg's business .......... 8

F. Mr. Lindberg ceded control to the Rehabilitator in October 2018, and the Rehabilitator proceeded to pay himself and others over $165 million in fees .......... 10

G. A series of intervening acts destroyed value after October 2018 .......... 10

H. The Plea Agreement and Factual Basis .......... 11

I. The Special Master's recommendation and the Preliminary Order .......... 13

J. The Special Master has continued to dispose of estate assets during the restitution proceeding .......... 13

ARGUMENT ..... 14

I. Restitution is Limited to Actual Losses Proximately Caused by the Offense—a Limitation the Plea Agreement Preserves. ..... 14

A. *In re Zetteler* is the law of this case and fixes the governing proximate-cause standard ..... 16

II. No Loss Was Reasonably Foreseeable at Origination (Proximate Cause: Foreseeability) ..... 18

III. The Offense Conduct Procured No Official Or Agency Action, And So Did Not Cause The Loss (Proximate Cause: No Agency Action) ..... 21

IV. Intervening Superseding Causes Broke the Chain of Causation (Proximate Cause: Intervening Cause) ..... 24

A. The Government's interference with the Ares sale (November 2018) ..... 26

B. The Rehabilitator's refusal of the Oaktree transaction (February 2019) ..... 27

C. The Rehabilitator's coercion of the ten-year hold (June 27, 2019 MOU) ..... 27

D. The Rehabilitator's pre-maturity fire-sale of the principal-protection bonds ..... 28

E. The Rehabilitator's refusal of the Montshire/Alban offer (2023) and blocking of the Quadro transaction (2024), followed by the Clanwilliam fire-sale (2025). ..... 30

F. The Special Master's continuing asset dispositions (2026) ..... 30

V. "Risk" Is Not Actual Loss, And Restitution Is Capped At Actual Loss ..... 31

VI. The Government and the Special Master Did Not Carry the Section 3664(e) Burden ..... 35

VII. The Government Should Disclose Evidence of Its Interference with the Ares Transaction ........ 37

VIII. In the Alternative, Offsets and Credits Independently Extinguish Any Obligation ........ 38

IX. Any Ambiguity Must Be Resolved In Mr. Lindberg's Favor ........ 39

CONCLUSION AND RELIEF REQUESTED ........ 39

ARTIFICIAL INTELLIGENCE CERTIFICATION ........ 41

CERTIFICATE OF SERVICE ........ 42

## TABLE OF AUTHORITIES


CASES — Page No.

*Apprendi v. New Jersey*,
530 U.S. 466 (2000) .......... 18, 33

*Arizona v. California*,
460 U.S. 605 (1983) .......... 17

*Brady v. Maryland*,
373 U.S. 83 (1963) .......... 37

*Citizens United v. FEC*,
558 U.S. 310 (2010) .......... 22

*Ellingburg v. United States*,
607 U.S. 163 (2026) .......... 18, 32, 33, 39

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp. Inc.*,
343 F.3d 189 (2d Cir. 2003) .......... 20

*Hughey v. United States*,
495 U.S. 411 (1990) .......... 14, 16, 32

*In re McNulty*,
597 F.3d 344 (6th Cir. 2010) .......... 17

*In re Zetteler*,
No. 26-1749 (4th Cir. June 13, 2026) .......... 16, 17, 31

*Irizarry v. United States*,
553 U.S. 708 (2008) .......... 15, 28

*Lagos v. United States*,
584 U.S. 577 (2018) .......... 15

*McCutcheon v. FEC*,
572 U.S. 185 (2014) .......... 22

*McDonnell v. United States*,
579 U.S. 550 (2016) .......... 21

*Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*,
No. 24-621, 2026 WL 1868932 (U.S. June 30, 2026) .......... 22

*Paroline v. United States*,
572 U.S. 434 (2014) .......... 14, 31

*Robers v. United States*,
572 U.S. 639 (2014) .......... 14, 29, 31, 33, 34, 38

*Snyder v. United States*,
603 U.S. 1 (2024) .......... 21

*Southern Union Co. v. United States*,
567 U.S. 343 (2012) .......... 18, 33

*United States v. Alalade*,
204 F.3d 536 (4th Cir. 2000) .......... 38

*United States v. Blake*,
81 F.3d 498 (4th Cir. 1996) .......... 15, 18

*United States v. Boccagna*,
450 F.3d 107 (2d Cir. 2006) .......... 34, 38

*United States v. Broughton-Jones*,
71 F.3d 1143 (4th Cir. 1995) .......... 15, 25

*United States v. Coats*,
487 B.R. 648 (E.D.N.C. 2013) .......... 34

*United States v. Davenport*,
445 F.3d 366 (4th Cir. 2006) .......... 15, 28

*United States v. Elbaz*,
52 F.4th 593 (4th Cir. 2022) .......... 16

*United States v. Fike*,
140 F.4th 351 (6th Cir. 2025) .......... 34

*United States v. Freeman*,
741 F.3d 426 (4th Cir. 2014) .......... 15, 25

*United States v. Gallant*,
537 F.3d 1202 (10th Cir. 2008) .......... 36

*United States v. Gibbens*,
25 F.3d 28 (1st Cir. 1994) .......... 26

*United States v. Goodrich*,
12 F.4th 219 (2d Cir. 2021) .......... 25

*United States v. Harvey*,
532 F.3d 326 (4th Cir. 2008) .......... 32

*United States v. Harvey*,
791 F.2d 294, 300 (4th Cir. 1986) .......... 15

*United States v. Henoud*,
81 F.3d 484 (4th Cir. 1996) .......... 18

*United States v. Hoyle*,
33 F.3d 415 (4th Cir. 1994) .......... 34

*United States v. Jesenik*,
702 F. Supp. 3d 1024 (D. Or. 2023) .......... 35

*United States v. Jordan*,
509 F.3d 191 (4th Cir. 2007) .......... 15, 16

*United States v. Karam*,
201 F.3d 320 (4th Cir. 2000) .......... 18, 35

*United States v. Lindberg*,
39 F.4th 151 (4th Cir. 2022) .......... 21

*United States v. Llamas*,
599 F.3d 381 (4th Cir. 2010) .......... 16

*United States v. Newsome*,
322 F.3d 328 (4th Cir. 2003) .......... 16

*United States v. Ocasio*,
750 F.3d 399 (4th Cir. 2014) .......... 25

*United States v. Qurashi*,
634 F.3d 699 (2d Cir. 2011) .......... 34

*United States v. Ritchie*,
858 F.3d 201 (4th Cir. 2017) .......... 26

*United States v. Shephard*,
892 F.3d 666 (4th Cir. 2018) .......... 18

*United States v. Smerling*,
No. 21-cr-317, 2022 WL 1806300 (S.D.N.Y. June 1, 2022) .......... 35

*United States v. Squirrel*,
588 F.3d 207 (4th Cir. 2009) .......... 25, 31

*United States v. Steele*,
897 F.3d 606 (4th Cir. 2018) .......... 32, 36, 38

*United States v. Stein*,
846 F.3d 1135 (11th Cir. 2017) .......... 25, 31

*United States v. Stone*,
866 F.3d 219 (4th Cir. 2017) .......... 34

*United States v. Tyler*,
767 F.2d 1350 (9th Cir. 1985) .......... 25, 39

FEDERAL STATUTES — Page No.

18 U.S.C. § 3663A(a)(2) .......... 14, 17

18 U.S.C. § 3663A(b)(1)(B) .......... 33, 34, 38, 39

18 U.S.C. § 3663A(c)(3)(B) .......... 36

18 U.S.C. § 3664(e) .......... 4, 18, 35, 37, 39

18 U.S.C. § 3664(f)(1)(A) .......... 14, 31

OTHER AUTHORITIES — Page No.

S. Rep. No. 104-179 (1995), reprinted in 1996 U.S.C.C.A.N. 924 .......... 15, 24, 25, 36, 38

## PRELIMINARY STATEMENT

Defendant Greg E. Lindberg respectfully submits this motion for a determination that no restitution is owed, or in the alternative for the exclusion and offset of losses not proximately caused by the offense of conviction which results in an overpayment of $2.89 billion. The Preliminary Order of Restitution fixes Mr. Lindberg's restitution at $1,655,000,000.[1] That figure cannot stand, for three independent reasons, any one of which is sufficient.

*First*, no loss on the affiliated investments was reasonably foreseeable to Mr. Lindberg at the time those investments were originated. The investments were made under a written, board-approved risk-management framework; they were personally guaranteed by Mr. Lindberg himself; they were backed by approximately one billion dollars of zero-coupon bonds purchased to protect principal; the regulator praised Mr. Lindberg's handling of regulatory questions in the relevant period; and the change in law that disfavored affiliated investments was not enacted until 2019, after origination. Beyond that, Houlihan Lokey, one of the largest valuation companies in the country, provided contemporaneous analysis concluding that the affiliated loans were conservatively underwritten at approximately fifty-percent loan-to-value, and KPMG provided contemporaneous analysis showing that there was over $1 billion of equity supporting the loans (Exs. E2 and E3 KPMG Valuations and HL (Houlihan Lokey, Jan. 18, 2018) & E (KPMG, Aug. 24, 2018)). As the sole owner of

---

[1] The Court has yet to determine, *de novo*, causation, offsets, and credits—whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

the insurance companies and of the operating companies that received the loans, Mr. Lindberg would have seen his entire $1 billion investment in his insurance companies and his entire investment in his non-insurance operating companies wiped out if there were a loss on the affiliated loans. Any one of the foregoing facts suffices to establish that there was no reasonably foreseeable loss to Mr. Lindberg when he oversaw the origination of the affiliated loans. No reasonable person, viewing these facts together, could have expected the safeguards Mr. Lindberg put in place to fail all at once amid the regulatory and prosecutorial onslaught that Mr. Lindberg and his businesses have endured over the last seven years. Someone who reasonably expects a loss on an investment does not personally guarantee every penny of that investment, underwrite it conservatively at 50% loan-to-value, purchase insurance against any loss, implement a robust risk-management program, invest $1 billion of his own capital as equity to support that investment and receive strong praise from his regulator on how he was handling regulatory issues. Under the Mandatory Victims Restitution Act ("MVRA") any loss must be reasonably foreseeable to form the basis for restitution. That was not the case here.

*Second*, and independently, any loss that later materialized was caused not by Mr. Lindberg's conduct but by a chain of intervening acts by independent third parties—the Government, the court-appointed Rehabilitator, and the Special Master—each occurring after Mr. Lindberg ceded control in October 2018, and some continuing to the present: the Government's interference with the signed Ares sale; the Rehabilitator's rejection of the Oaktree, Quadro, and Montshire/Alban

transactions; the coerced ten-year hold imposed by the June 2019 MOU; the fire-sale of the zero-coupon bond portfolio that had secured the affiliated-loan principal; and the Special Master's continuing disposition of estate assets—before any final restitution determination, in the case of the Beckett transaction without court approval or accounting, and while the Special Master's own compensation is paid from the same assets he sells. Those intervening causes break the chain between Mr. Lindberg's conduct and any loss. Under the MVRA, any loss must be closely related to and proximately caused by the defendant's conduct. The foregoing string of events shows the opposite: the losses occurred after Mr. Lindberg ceded control in October 2018 and were caused by independent decisions of third parties beyond his control.

*Third*, this Court has characterized the "real loss" in this case as "risk." Restitution under the MVRA is measured by, and capped at, a victim's *actual* loss. Risk is not actual loss—particularly where the policyholders the statute is designed to protect have been made whole and confirmed paid in full. Moreover, the "risk" the Court identified was not unlawful: the affiliated investments were lawful when made, were approved by the regulator, and were within prevailing industry practice. Lawful risk cannot be the predicate for a penal, loss-measured restitution award.

Mr. Lindberg accepts responsibility for his offense and does not seek to disturb his Plea Agreement. He agreed, in Paragraph 10(a), to pay restitution for harm "caused by the defendant's criminal conduct." Doc. 40. He stands by that agreement. But that agreement reaches only harm his conduct *caused*; by its own terms it does not reach losses inflicted years later by an intervening actor, and it does not convert

"risk" into a compensable, realized loss. The proximate-cause limitation that the Supreme Court and the Fourth Circuit enforce is the very limitation Paragraph 10(a) imposes by the words "caused by the defendant's criminal conduct." *Id.*

Mr. Lindberg respectfully requests a determination, under 18 U.S.C. § 3664(e), that the Government has not proved a restitution-eligible loss proximately caused by Mr. Lindberg, and that net restitution is zero. In the alternative, he requests that the Court exclude the intervening-cause losses identified in Part IV and credit the offsets identified in Part VIII, which independently reduce any obligation to zero.

## STATEMENT OF FACTS

### A. The affiliated-loan program operated under a written risk-management framework and experienced zero defaults prior to Mr. Lindberg's transfer of control to the rehabilitator.

Mr. Lindberg's North Carolina insurers operated under a Risk Mitigation Policy on Affiliated Loans, revised February 20, 2017 (Ex. C), and continuously updated (see Ex. E5 for the April 14, 2018 revision). The Policy required, among other controls: senior-secured first-lien positions on "all assets and cash flows of the borrower"; a minimum credit rating of "B-" or equivalent from an SEC-approved NRSRO for every loan; a weighted-average portfolio rating of "BB" or higher with portfolio leverage under four times; third-party arm's-length pricing opinions; perfection certificates; quarterly risk-based-capital calculations; and annual cash-flow testing "to ensure that assets are adequate to service liabilities and to prevent additional reserve requirements" (Ex. C, Phases 1–3). The Policy recited a "zero default track record" over twenty-five years and committed Mr. Lindberg's affiliates

to “prepay any underperforming loan using reserve capital” (*Id.*). This is not the architecture of a person who anticipates loss.

In fact, prior to the transfer of control of Mr. Lindberg’s insurance companies to the Rehabilitator in October 2018, there were no defaults on the affiliate loans. A reasonable person does not expect losses on an investment program that, while he controlled it, had experienced no defaults—let alone any losses.

### B. Mr. Lindberg committed approximately $1 billion of his own capital, guaranteed the loans, and purchased $1 billion of bonds to protect principal.

Mr. Lindberg invested roughly one billion dollars of his own capital into the insurance group and took no dividends from the insurers (See Ex. A11). Independent analysis by Berkeley Research Group (“BRG”) also confirms capital contributions exceeding $377 million and no dividends to Mr. Lindberg (Ex. D). He personally guaranteed the affiliates’ obligations to the insurers totaling approximately $2.39 billion under the March 11, 2019, Amended and Restated Backstop Agreement, without any regulatory requirement to do so. (Ex. B8) And in May 2018 he directed the insurers to purchase $1,006,239,867 in par value of investment-grade bank zero-coupon bonds—held inside Principal Protected Notes—as dollar-for-dollar principal-loss insurance that, if held to maturity, would have repaid the affiliated-loan principal in full. (Supp. Statement of Facts ¶¶ 27–34 (Doc. 174) & Exs. H2, I2, and I5) A person who reasonably foresees loss does not invest $1 billion of his own capital, guarantee billions in additional obligations, forgo all dividends, and purchase par-payable principal protection against the very loss he supposedly foresees.

### C. The regulator approved the affiliate concentration and praised Mr. Lindberg's regulatory performance.

The North Carolina Department of Insurance ("NCDOI") approved the affiliate-investment concentration at issue. As early as a September 2014 presentation (see Ex. A) and confirmed in the NCDOI's April 11, 2016 annual-statement Review Letter from Senior Financial Analyst Jessica Price, CPA, CFE, the NCDOI recited and agreed to the negotiated regulatory arrangement, including the approximately forty-percent ceiling on affiliated investments (NCDOI Review Letter / Ex. A12). That concentration remains within prevailing industry practice: U.S. life and annuity insurers reported approximately $413 billion in affiliated investments in 2025—roughly twice the 2020 figure (See Ex. B24). Affiliate investments have become standard practice for many of the largest names in the insurance business, including Blackstone, Brookfield, and KKR. Data published by Apollo illustrates that some large life insurers have up to 35 to 43 percent of their assets in affiliated investments, like the 40 percent limit that Mr. Lindberg proposed to the NCDOI in 2014 (See Ex. B5). That many large life insurers have since adopted an affiliate-investment strategy shows that the strategy Mr. Lindberg proposed was neither novel nor particularly controversial; it was an effective way to manage insurance-company assets in a rising-interest-rate environment. (See Ex. B5)

The statutory limitation on affiliated investments was not enacted until 2019—after the investments were originated. See Doc. 152. On March 9, 2018, Commissioner Mike Causey wrote directly to Mr. Lindberg: "You did an outstanding and impressive job of answering some really tough, hardball questions from state

regulators today" (Ex. B6). The same message reflects that Mr. Lindberg was then working to "engage JP Morgan or KKR Capital Markets to provide financing to replace intercompany loans" (*id.*)—actively working to reduce the affiliated-loan portfolio through third-party capital. In short, Mr. Lindberg was continuously responding to regulatory demands related to affiliated investments. This is not the behavior of someone who reasonably foresees a loss on these investments.

### D. The 2018 KPMG and Houlihan Lokey valuations confirmed the loans were well secured.

In 2018, two of the nation's largest and most widely trusted valuation firms—KPMG and Houlihan Lokey—analyzed Mr. Lindberg's assets. Both concluded that the asset values securing the affiliated loans exceeded the balances due on those loans by over $1 billion, and that the loans were conservatively underwritten at approximately fifty-percent loan-to-value (Exs. E2 and E3 (KPMG, Aug. 24, 2018) & HL (Houlihan Lokey, Jan. 18, 2018)). Two well-known and well-trusted authorities concluded that no loss was reasonably foreseeable on these loans in 2018 because they were backed by asset values significantly in excess of the loan amounts. Mr. Lindberg expended approximately $1.8 million on this valuation work, which spans over 380 pages (See Exs. E2 and E3). Given the nationally recognized reputations of KPMG and Houlihan Lokey, it was entirely reasonable for Mr. Lindberg to rely on their work concluding that no loss was foreseeable.

The timing is significant. KPMG completed its valuation work in August 2018, shortly before Mr. Lindberg ceded control of the insurers to the Rehabilitator in October 2018. At all times before that change of control, trusted national authorities

concluded that no loss was reasonably foreseeable on the affiliated loans. At all times after the change of control, the decision to hold the loans for ten years—rather than execute any of the transactions Mr. Lindberg proposed that would have repaid them in full—was the Rehabilitator's, not Mr. Lindberg's.

Two of these contemporaneous work products are submitted herewith and are described by their own terms: the Houlihan Lokey report dated January 18, 2018 (Ex. E3), which documents each affiliated investment held by Mr. Lindberg's insurers, including enterprise-value-coverage and loan-to-value analysis; and the KPMG valuations (Ex. E2). Each report's stated scope and assumptions appear on its face.

KPMG's August 24, 2018 valuations confirm this point. KPMG separately valued the twenty-one Eli Global operating companies—the borrowers whose enterprise value secured the affiliated loans—at an aggregate business-enterprise value of approximately $2.45 billion, including Global Health Technology Group at $1.2 billion and American Academy Holdings at $900 million, in addition to approximately $1.08 billion of insurance-entity equity value (Ex. E2).

### E. Before taking office, the Commissioner planned to "dismantle" Mr. Lindberg's business.

The genesis of the entire case against Mr. Lindberg predates Commissioner Mike Causey's inauguration as North Carolina Insurance Commissioner. In December 2016—weeks before taking office—Causey identified Mr. Lindberg, a major financial supporter of Causey's electoral opponent Wayne Goodwin, as a political problem and "significant impediment" to be eliminated. Witness statements

establish that Causey plotted to "dismantle" Mr. Lindberg's insurance operations even before assuming any official authority (See Exs. A3, A3.1, A4).

According to one witness, Causey stated that he "was concerned about a multi-millionaire named Greg Lindberg who had strongly supported Goodwin during the last election" and that Causey "saw Lindberg as a significant impediment to winning the [upcoming 2020] election against Goodwin." The same witness stated that "Causey said that he had a person in mind" to help him eliminate Lindberg as a political threat, noting that "she had been at the DOI a long time" and "she already didn't like Lindberg and would know how to go about dealing with [Lindberg's] companies and dismantling them" (*Id.*).

A second witness corroborated these statements: "Causey explained to me that Lindberg was a multimillionaire who strongly supported and contributed to Goodwin's campaign in the election that Causey had just won. Causey said that because he had beaten Goodwin by so few votes, he was worried about Greg Lindberg helping Wayne in the next election, and he felt like he needed to do something about him" (See Exs. A3, A3.1, A4).

This all casts doubt on the legitimacy of the subsequent rehabilitation proceedings. Moreover, because the affiliated investments had already received NCDOI approval, the severity of these regulatory actions was entirely unforeseeable.

### F. Mr. Lindberg ceded control to the Rehabilitator in October 2018, and the Rehabilitator proceeded to pay himself and others over $165 million in fees.

In October 2018, control of the North Carolina insurers passed to the court-supervised Rehabilitator. Every event material to the claimed loss occurred after that date and was within the control of the Rehabilitator and the Government, rather than Mr. Lindberg. The record reflects that over $165 million in fees have been paid from the insurance-company estates to the Rehabilitator and others since June 2019. This includes an estimated $25 million in compensation to the Rehabilitator, an estimated $30 million paid to the Williams Mullen law firm, and ongoing monthly fees of approximately $2.5 million to the Rehabilitator and various advisors (See Ex. M).

### G. A series of intervening acts destroyed value after October 2018.

*The Blocked Ares Sale.* On November 22, 2018, just weeks after becoming aware of the federal investigation and before he was charged with any offense, Mr. Lindberg signed an exclusive letter of intent to sell his North Carolina insurers to Ares Management for approximately $450 million, a transaction that would have preserved policyholder benefits without interruption (Ex. G). Eli Global's Chief Financial Officer, Christa Miller, contemporaneously memorialized—in a January 6, 2019 email to the company's general counsel, Peter Nordberg—that, following Ares's meeting with the Department of Justice, Ares stated it had been advised by an undisclosed "third party constituent… to avoid any ongoing connection to Eli Global," refused to identify the source, and abandoned the term under which it would have retained affiliated loans through an SPV (Ex. A15 (Miller email, Jan. 6, 2019)).

*The Rejected Oaktree Transaction (February 2019).* The Rehabilitator rejected a proposed transaction with Oaktree that would have created an approximately $1 billion special-purpose vehicle to purchase all the affiliated loans from the insurers. The transaction, if consummated, would have paid the loans off in full.

*The Coerced Ten-year Hold (June 2019).* Under threat of liquidation (see Ex. D5), the Rehabilitator required Mr. Lindberg to agree to a Memorandum of Understanding obligating a ten-year hold of the affiliated loans. This converted a position that could be exited into a forced long-term hold and foreclosed the very transactions that would have repaid the loans (*see* Ex. A14).

*The Bond Fire-sale.* The Rehabilitator sold the zero-coupon bond portfolio before maturity for approximately $394 million, rather than holding it to the contractual par value of $1,006,239,867, thereby crystallizing a loss of approximately $611.6 million and destroying the principal protection that would have repaid the affiliated loans in full at maturity (*see* Exs. H, H2, I2, and I5).

*Litigation Against Willing Counterparties (Montshire/Alban, 2023) and the Rejected Quadro Transaction (2024).* Rather than transacting with counterparties to avert losses, the Rehabilitator litigated against them, and later rejected the Quadro transaction—both of which would have protected policyholders (See Exs. O and O2).

**H. The Plea Agreement and Factual Basis.**

In the Factual Basis, the parties agreed that Mr. Lindberg's conduct involved "circular, non-economic transactions" and materially false statements "regarding these transactions," and that his "conduct caused substantial financial hardship"

such that "certain of [his] insurance companies were placed in rehabilitation." Doc. 42 at ¶¶ 5–6. Mr. Lindberg does not dispute those facts. The Factual Basis does not, however, admit any loss *amount*, does not admit that the $1.655 billion figure was foreseeable, and does not attribute to Mr. Lindberg the Rehabilitator's later conduct.

In the Plea Agreement, the parties jointly stipulated, for Guidelines purposes *only*, that "[t]he amount of loss that was known to or reasonably foreseeable by the defendant exceeded $550,000,000," while expressly providing that "'loss' under U.S.S.G. § 2B1.1 may be different from, greater, or lesser than restitution." Doc. 40 at ¶ 8(a). This does not relate to restitution. In Paragraph 10(a), Mr. Lindberg agreed to pay "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed **by the defendant's criminal conduct**." *Id*. The Plea Agreement fixes no restitution amount, and the Plea Agreement provides no admission by Mr. Lindberg of any reasonably foreseeable loss for restitution purposes. This remains a *de novo* determination for the Court on causation and reasonably foreseeable loss for restitution purposes and the Court has already said that the "real loss was risk"[2].

---

[2] The government in its Sentencing Memo explicitly acknowledges that the laws in North Carolina on affiliated investments did not change until 2019—after the relevant conduct in this case and after the affiliated investments were originated. Therefore, there is no basis for restitution based on risk. Doc. 152. The MVRA requires actual loss and does not pay restitution for "risk."

### I. The Special Master's recommendation and the Preliminary Order.

The Special Master recommended restitution of approximately $1.625 billion. On the report's own figures, the principal-only measure of loss—unpaid principal, net of credited recoveries—is approximately $1.362 billion; the recommendation reaches $1.625 billion only by adding approximately $263 million of "time value of money" interest, computed at a rate the Special Master selected over Mr. Lindberg's objection. The Preliminary Order of Restitution then entered $1,655,000,000—approximately $30 million above even the Special Master's recommendation—without explanation on the record. Doc. 161 at 3. No accounting accompanied the figure. The Beckett transaction (approximately $134 million) was effected without court approval and without any accounting for the proceeds (See Ex. B25).

### J. The Special Master has continued to dispose of estate assets during the restitution proceeding.

Value-destroying conduct by third parties did not end in 2019; it has continued into this proceeding. The Special Master has disposed of estate assets before any final restitution determination. The Special Master owes a fiduciary duty to the court, the Insurance Companies, and Mr. Lindberg to seek court approval as soon as he learns of a sale. The Special Master's sale of estate assets relating to a restitution asset—whether by misfeasance, malfeasance, or non-feasance—without court approval violates the MVRA and constitutional limits on the Special Master's powers. The Beckett transaction (approximately $134 million) was effected without court approval and without any accounting for the proceeds (See Ex. B25). The Special Master's

compensation, and that of his professionals, is paid from the same administered assets he sells, creating a structural incentive to sell. And the Special Master has sought from Mr. Lindberg a waiver of claims relating to these dispositions. Doc. 159. A fiduciary does not seek a release for conduct that creates no exposure; the request itself confirms that the dispositions generate a diminution in value independent of Mr. Lindberg's conduct. These dispositions—conducted before a final determination, in part without court approval, and under a financial conflict—also raise serious constitutional concerns that Mr. Lindberg addresses in separate filings.

## ARGUMENT

### I. Restitution is Limited to Actual Losses Proximately Caused by the Offense—A Limitation the Plea Agreement Preserves.

The MVRA authorizes restitution only for "the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), and only for "the loss caused by the specific conduct that is the basis of the offense." *Hughey v. United States*, 495 U.S. 411, 413 (1990). The statute defines a victim as one "directly and proximately harmed," 18 U.S.C. § 3663A(a)(2), importing a proximate-cause requirement that asks, "whether the harm alleged has a sufficiently close connection to the conduct." *Robers v. United States*, 572 U.S. 639, 645 (2014) (citations omitted). Proximate cause is "often explicated in terms of foreseeability" and forecloses liability for losses "caused in only a remote sense." *Paroline v. United States*, 572 U.S. 434, 445, 449 (2014). The legislative history confirms this limit in Congress's own words: mandatory restitution provisions "apply only in those instances where a named, identifiable victim suffers a physical injury or pecuniary loss directly and proximately caused by the course of conduct

under the count or counts for which the offender is convicted." S. Rep. No. 104-179, at 19 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 932. In this Circuit, a person is a "victim" only if the harm results from "conduct underlying an element of the offense of conviction" or an act in furtherance of a scheme that is itself an element of that offense, *United States v. Blake*, 81 F.3d 498, 506 (4th Cir. 1996); *United States v. Davenport*, 445 F.3d 366, 374 (4th Cir. 2006), *abrogated on other grounds by Irizarry v. United States*, 553 U.S. 708 (2008); a "factual connection" between the offense and a loss "is legally irrelevant" where the specific conduct underlying the conviction did not cause the loss, *United States v. Broughton-Jones*, 71 F.3d 1143, 1149 (4th Cir. 1995); and conduct that "may have exacerbated" a harm but "did not cause it" cannot support restitution, *United States v. Freeman*, 741 F.3d 426, 438 (4th Cir. 2014). The MVRA is read to its terms, not expanded to serve its remedial aims. *Lagos v. United States*, 584 U.S. 577, 582–85 (2018).

These limits are not displaced by Paragraph 10(a) of the Plea Agreement. It commits Mr. Lindberg to "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by [his] criminal conduct." Doc. 40 at ¶ 10(a). The Plea Agreement explicitly states that restitution under 18 U.S.C. § 3556 "may be different from, greater, or lesser than" the loss under U.S.S.G. § 2B1.1. *Id*. Therefore, restitution under 18 U.S.C. § 3556 can be zero or in fact overpaid.

The Government drafted that language, and any ambiguity in it must be resolved against the Government and in favor of Mr. Lindberg. *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986); *United States v. Jordan*, 509 F.3d 191,

195–96 (4th Cir. 2007). Two features of ¶ 10(a)'s own text are dispositive here. It reaches only persons "harmed by the defendant's criminal conduct"—an express causal predicate. And "regardless of the resulting loss amount" speaks to quantum, confirming the figure is not tied to the § 2B1.1 loss calculation—but rather to causation. *Id*. Read as its terms require, ¶ 10(a) does not abandon the requirement, central to *Hughey* and to the MVRA alike, that the loss be caused by the conduct. That reading mirrors the statute's own design: under the MVRA, "unlike sentencing, the broader concept of 'relevant conduct' does not expand 'the offense of conviction.'" *United States v. Elbaz*, 52 F.4th 593, 610 (4th Cir. 2022) (quoting *United States v. Llamas*, 599 F.3d 381, 390–91 (4th Cir. 2010)); *accord United States v. Newsome*, 322 F.3d 328, 341 (4th Cir. 2003). Paragraph 10(a) expands the conduct covered by contract; it does not repeal the causation limit its own words impose.

Proximate cause has two components, and the claimed loss fails both: the loss was not reasonably foreseeable at origination (Part II), and intervening causes severed any connection between Mr. Lindberg's conduct and the loss (Part IV). Separately, "risk" is not a compensable actual loss (Part V); the Government has not carried its burden (Part VI); and offsets extinguish any obligation (Part VIII).

### A. *In re Zetteler* is the law of this case and fixes the governing proximate-cause standard.

The controlling causation standard is not borrowed from other litigation; the Fourth Circuit announced and applied it in this very docket. In denying the Crime Victims' Rights Act mandamus petition brought by the Conservatrix insolvency practitioners, the Fourth Circuit held that a person is a compensable victim only

where "directly and proximately harmed," and that the harm must be "closely related to the conduct inherent to the offense, rather than merely tangentially linked"; it sustained the exclusion of that petitioner precisely because it failed to tie its asserted harm to Mr. Lindberg's "criminal activities." *In re Zetteler*, No. 26-1749, WL 1724731 at *2 (4th Cir. June 13, 2026) (per curiam) (quoting *In re McNulty*, 597 F.3d 344, 352 (6th Cir. 2010)). Because that determination was made by the court of appeals *in this case*, it is the law of the case: "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). This Court is bound to apply, in the restitution phase, the same proximate-cause standard the Fourth Circuit applied in this case. That the disposition is unpublished bears only on its weight as precedent in *unrelated* cases, *see* 4th Cir. R. 32.1; it does not diminish—and cannot displace—its force as the law of this case. And the standard is materially identical under the MVRA and the CVRA, which define "victim" in the same terms. *Compare* 18 U.S.C. § 3663A(a)(2), *with id.* § 3771(e)(2)(A).

The consequence is direct and symmetrical. The same "closely related" test that the Fourth Circuit applied in this case to *exclude* a claimant whose harm was not closely tied to the offense must, applied evenhandedly, *exclude* the losses—developed in Parts III and IV below—that were caused not by Mr. Lindberg but by the Government, the Rehabilitator, and the Special Master. That is not merely a persuasive authority; it is the rule of decision the Fourth Circuit has already established in this case, and it is the organizing theory of this motion.

## II. No Loss Was Reasonably Foreseeable at Origination (Proximate Cause: Foreseeability).

The Government bears the burden of proving, by a preponderance, that the claimed loss was a reasonably foreseeable result of Mr. Lindberg's conduct.[3] 18 U.S.C. § 3664(e). It cannot. In the Fourth Circuit, restitution reaches a loss only where the loss is a "direct result" of the defendant's conduct or is "closely related to the scheme." *United States v. Henoud*, 81 F.3d 484, 488 (4th Cir. 1996) (citations omitted); accord *United States v. Karam*, 201 F.3d 320, 325 (4th Cir. 2000). *See also United States v. Blake*, 81 F.3d 498, 506 (4th Cir. 1996) (a person is a victim only where the harmful act is "conduct underlying an element of the offense of conviction" or an act in furtherance of a scheme that is an element of the offense). Foreseeability is measured as of the time the defendant acted—by what he knew or reasonably should have known then. *Cf. United States v. Shephard*, 892 F.3d 666, 672–73 (4th Cir. 2018) (assessing foreseeability of harm from the defendant's vantage point at the time of the conduct). The Factual Basis admits no loss amount and no foreseeability of the $1.655 billion figure; the only foreseeability figure Mr. Lindberg ever stipulated is the

---

[3] Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this filing without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, *see Ellingburg v. United States*, 607 U.S. 163, 166 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012) (applying *Apprendi* to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

“>$550,000,000” Guidelines figure, which the Plea Agreement expressly decouples from restitution. Doc. 40 at ¶ 8(a). The contemporaneous record affirmatively negates foreseeability of loss:

- Mr. Lindberg’s insurers operated under a written Risk Mitigation Policy requiring first-lien senior-secured positions, minimum NRSRO ratings, portfolio leverage caps, arm’s-length pricing opinions, and annual cash-flow testing to confirm assets were adequate to service liabilities. (Ex. C.)
- He guaranteed roughly $2.39 billion of the affiliates’ obligations under the March 11, 2019 Backstop Agreement (Ex. B8), invested roughly $1 billion of his own capital with no dividends (Ex. A11), and directed the purchase of $1,006,239,867 in par value of bank zero-coupon bonds to insure the affiliated-loan principal dollar-for-dollar (Supp. Statement of Facts ¶¶ 27–34).
- The regulator approved the affiliate concentration—confirmed in the NCDOI’s April 11, 2016 Review Letter (Ex. A12)—and, in the relevant period, praised Mr. Lindberg’s regulatory performance in writing (Ex. B6). Affiliate concentrations of this magnitude remain ordinary: U.S. life and annuity insurers reported roughly $413 billion in affiliated investments in 2025, about twice the 2020 level. (See Exs. B5 and B24)
- The legal limitation on affiliated investments was enacted only in 2019—after origination. Doc. 152. A loss produced by a later change in law is not a foreseeable consequence of the origination.

Persuasive authority confirms the point: foreseeability is measured by what the defendant could anticipate when he acted, and the economic harm "ultimately suffered" must be a foreseeable consequence of the conduct. *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003), *disapproved of by Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435 (S.D.N.Y. 2007). Where, as here, nationally recognized advisors were engaged to analyze and document the positions, and the regulator itself approved the concentration and praised the conduct, the Government cannot show that loss was reasonably foreseeable. As set out in the Statement of Facts § D, both KPMG and Houlihan Lokey concluded in 2018 that the asset values securing the affiliated loans exceeded the loan balances by over $1 billion, at approximately fifty-percent loan-to-value (See Exs. E2 and E3, KPMG & Houlihan Lokey Valuations).

*By way of illustration:* imagine you build your house on high ground, buy flood insurance, and have three engineers certify that it is safe and dry. Then a stranger bulldozes your levee and deliberately floods the house. The law requires payment only for losses a person could reasonably see coming when he acted—and a person who guarantees the loans himself, invests a billion dollars of his own money, buys a billion dollars of bonds as insurance, and hires the top firms in the country to check the numbers is not a person who foresaw a loss.

The Motion should be granted for this reason alone. The record forecloses any showing that loss was reasonably foreseeable. A loss that no reasonable person saw coming cannot support restitution under the MVRA.

## III. The Offense Conduct Procured No Official Or Agency Action, And So Did Not Cause The Loss (Proximate Cause: No Agency Action).

The Fourth Circuit's decision in this case draws the line that decides causation—the line between the entity and its agent. In vacating the original convictions, the court held that the "business" that 18 U.S.C. § 666 protects "is not the business *of the agent* receiving the bribe but, rather, the business *of the entity* on whose behalf the agent is authorized to act." *United States v. Lindberg*, 39 F.4th 151, 174 (4th Cir. 2022) (emphasis in original). That distinction is dispositive. The conduct of conviction concerned a staff reassignment—which deputy commissioner would be assigned to review Mr. Lindberg's companies. A reassignment of staff is an act of the agent, not of the entity: it is not an act of the North Carolina Department of Insurance, whose business is the external regulation of insurers, and there is no evidence that the Department took any regulatory action—no examination, no order, no change in enforcement—as a result of the conduct. (Ex. W.)

The Supreme Court's definition of an "official act" confirms the point. An official act must involve "a formal exercise of governmental power" that is "similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee," and must be more than "[s]etting up a meeting, talking to another official, or organizing an event[.]" *McDonnell v. United States*, 579 U.S. 550, 574 (2016). The reassignment of a deputy is none of these. The Court's most recent construction of the bribery statute confirms the trend: § 666 reaches only a bribe to influence an official act. *Snyder v. United States*, 603 U.S. 1, 19 (2024).

The causation consequence follows directly. The offense procured no action by the entity. The $1.655 billion loss, by contrast, could arise only from action by the entity and its court-appointed successors—the Department's October 2018 supervision, the 2019 rehabilitation, and the Rehabilitator's and Special Master's later decisions (Part IV). Conduct that set no Department action in motion cannot be the proximate cause of a loss that only the Department's (and its appointees') actions could produce, and no such loss was foreseeable from it. This goes to causation, not guilt: taking the conviction as given, the offense still procured no exercise of the entity's regulatory power.

The Court's own view of the offenses is consistent. At sentencing, the Court explained that it had "always viewed this once, with the two cases together, because they were really part of the same thing." (Sentencing Tr. 47 (May 26, 2026); Ex. ST.) The constitutional character of the conduct confirms the point: the payments were campaign contributions—made through an independent-expenditure committee and the North Carolina Republican Party (Ex. W, at 8)—which the First Amendment protects, see *Citizens United v. FEC*, 558 U.S. 310 (2010); *McCutcheon v. FEC*, 572 U.S. 185 (2014), and which the Supreme Court reaffirmed in 2026 may be reached only as "contributions in exchange for official action," *Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*, No. 24-621, 2026 WL 1868932, at *8 (U.S. June 30, 2026). A contribution that bought no official act procured no governmental action, and a loss flowing from governmental action the contribution never procured was not a foreseeable consequence of it.

The trial record confirms that Mr. Lindberg never sought any action from the entity. Even while secretly recorded, he asked only for fair, rigorous regulation: he said he was "happy to be well regulated" and "just [did not] want to be subject to personal vendettas," and that all he sought was "an even playing field." (Ex. W (quoting GEL Exh. 164, at 36:3–5; GEL Exh. 195, at 19:4–11).) He asked the Commissioner to assign a competent, unbiased regulator—Debra Walker—precisely because she was tough and fair: "Debbie will do a competent job, and a very rigorous job, but she doesn't have a built in bias against us … She's going to be tough and fair, that's all we need." (Ex. W (quoting GEL Exh. 189, at 18:14–17).) The second trial produced no evidence that Mr. Lindberg ever asked the North Carolina Department of Insurance—the entity—to take any action whatsoever.

The regulator Mr. Lindberg suggested confirmed the point. Testifying for the Government, Ms. Walker stated that there was no "side deal" with Mr. Lindberg or his companies, that no one ever approached her about anything inappropriate, and that there was "no type of guaranteed financial benefit … from her looking over the files instead of Jacquelyn Obusek." (Ex. W (Day 6 Rough Tr. 28:16–22; id. 25:7–9).) The Government conceded in closing that there was "no evidence" that Ms. Walker "was corrupt or had some sort of side deal" with the Defendants. (Ex. W (Day 7 Rough Tr. 19:10–11 (Gov't Closing)).) A request for a regulator who will do no favors is not the purchase of an official act.

That the diminution in value was set in motion by a political vendetta only confirms that no such loss was foreseeable. The record reflects that Commissioner

Causey targeted Mr. Lindberg's insurance group for "dismantling" before he took office, and that the long-serving Department employee he "had in mind" to accomplish it was the very deputy—Jacquelyn Obusek—whose apparent bias led Mr. Lindberg to seek her replacement, and whom Causey later promoted. (Ex. A3 (Loftin Aff.); Ex. A4 (Thompson Interview); Ex. K2 (Closing Demonstratives).) A loss on affiliated investments was not a reasonably foreseeable consequence of asking that a biased deputy be replaced with a tough, fair regulator who testified she would give Mr. Lindberg no favor. A Commissioner's determination to dismantle the business of his electoral opponent's largest supporter is a rare, one-time event that no reasonable person originating an affiliated-investment program could have anticipated.

## IV. Intervening Superseding Causes Broke the Chain of Causation (Proximate Cause: Intervening Cause).

Even if some losses were assumed, the chain of proximate causation was severed by independent intervening acts that occurred after October 2018 and that Mr. Lindberg neither caused nor could have foreseen. Congress made the point explicit: "A loss caused in part by intervening circumstances cannot be said to have been directly and proximately caused by the offense of conviction, unless the intervening cause is related to or a foreseeable consequence of that offense," and restitution should not lie where the conduct "is too far removed, either factually or temporally, from the loss." S. Rep. No. 104-179, at 19 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932. A sentencing court accordingly "should take into account intervening events contributing to the loss unless those events also were reasonably foreseeable to the defendant," and a restitution order entered without findings on the

effect and foreseeability of such events must be vacated. *United States v. Stein*, 846 F.3d 1135, 1154–56 (11th Cir. 2017). The Ninth Circuit's decision in *United States v. Tyler* is directly on point: a defendant convicted of timber theft could not be ordered to pay the amount the timber "declined in value" after it was returned, because "[a]ny reduction in its value stems from the government's decision to hold the timber during a period of declining prices, not from [the defendant's] criminal acts." 767 F.2d 1350, 1352 (9th Cir. 1985). So too here: control of the insurers returned to the Rehabilitator in October 2018, and any later diminution stems from the Rehabilitator's decisions—not from Mr. Lindberg's offense. *Stein*, 846 F.3d at 1154–56. The Fourth Circuit enforces the same limit, vacating restitution where the loss is fixed by events outside the scope of the offense conduct. *United States v. Squirrel*, 588 F.3d 207, 215 (4th Cir. 2009) (restitution "is to be based upon the loss directly and proximately caused by the defendant's offense conduct" (citing S. Rep. No. 104-179, at 19)); *see also United States v. Goodrich*, 12 F.4th 219, 228–29 (2d Cir. 2021). Critically, each intervening act below also falls outside Paragraph 10(a), because none is harm "caused by the defendant's criminal conduct." Doc. 40. The Fourth Circuit polices the same line: a "factual connection" between offense and loss "is legally irrelevant" absent causation by the conviction conduct, *Broughton-Jones*, 71 F.3d at 1149; conduct that "may have exacerbated" a harm but "did not cause it" supports no restitution, *Freeman*, 741 F.3d at 438; and losses from an "uncharged" scheme cannot be recovered, because "it would ... be inappropriate to penalize [the defendant] as though he was also convicted of that offense." *United States v. Ocasio*, 750 F.3d 399, 412–13 (4th Cir. 2014). Nor does

*United States v. Ritchie*, 858 F.3d 201, 211 (4th Cir. 2017), aid the Government: *Ritchie* faulted a defendant who "presented no evidence" of a superseding cause; Mr. Lindberg carries that burden with contemporaneous record evidence of affirmative, unilateral acts of value destruction—not a victim's mere delay in a falling market.

*By way of illustration:* think of a relay race. Mr. Lindberg ran the first leg and handed the baton to the Rehabilitator in October 2018. Everything that went wrong happened on the Rehabilitator's leg of the race—not Mr. Lindberg's.

**A. The Government's interference with the Ares sale (November 2018).**

Mr. Lindberg signed an exclusive LOI to sell the insurers to Ares for approximately $450 million, preserving policyholder benefits. (Ex. B.) Following Ares's contact with the Department of Justice, Ares cited undisclosed third-party advice to "avoid any ongoing connection to Eli Global" and abandoned a key favorable term. (Ex. A15.) The intervening cause here is not merely a counterparty's commercial change of heart; it is governmental interference with a signed, value-preserving transaction—an act of the Government itself, separate from and additional to the Rehabilitator's later conduct. Such interference was not a foreseeable consequence of underwriting an affiliated loan, and the loss it produced is not harm "caused by the defendant's criminal conduct." *Cf. United States v. Gibbens*, 25 F.3d 28, 29, 36 (1st Cir. 1994) (the "sovereign is not entitled to restitution" for a loss the Government itself "provoke[d]"; a loss set in motion by the Government's own conduct is not the kind of harm the restitution statutes compensate).

### B. The Rehabilitator's refusal of the Oaktree transaction (February 2019).

Within weeks of the Ares termination, Mr. Lindberg personally directed the negotiation of an independent, arm's-length transaction with Oaktree Capital Management, L.P.—one of the world's largest credit-focused asset managers. The February 2019 Oaktree "Global Solution Presentation" proposed an approximately $1.0 billion Oaktree investment into a holding-company special-purpose vehicle that would have acquired the affiliated-loan positions held by the insurers and 100% of the GBIG equity, removing the affiliated loans from the insurers' balance sheets at face value. (Supp. Statement of Facts ¶ 72 & see Exs. C and C2) Had the Rehabilitator permitted the transaction to close, every NCIC policyholder would have been paid in full by approximately June 2019. The Rehabilitator discretionarily elected not to proceed. That second refusal—of a second sophisticated buyer pricing the same portfolio at face value within four months of the first—is the proximate cause of the loss of the Oaktree alternative; it is not Mr. Lindberg's conduct.

### C. The Rehabilitator's coercion of the ten-year hold (June 27, 2019 MOU).

Having refused both face-value exits, the Rehabilitator then foreclosed any future exit. The Memorandum of Understanding was first proposed on or about May 9, 2019; Mr. Lindberg met with the Rehabilitator in Durham, North Carolina in late May or early June 2019; and on June 27, 2019, the Rehabilitator presented the MOU on a take-it-or-leave-it basis under **express written threat of immediate liquidation of all four NCICs**. (Supp. Statement of Facts ¶ 34, 56-57 and see Ex.

D5.) The MOU affirmatively locked the affiliated loans in place for a **ten-year term**, converting a marketable portfolio—one that two buyers had just offered to purchase at par—into a forced decade-long hold. The Rehabilitator's counsel characterized the tactic as a "hammer and nail" used to extract representations and warranties under the same liquidation threat. *Id. at* ¶ 34 and see also Wake County MOU Trial Tr. (Vol. 5, p. 1012:11–12) *("Mr. Lindberg, you're the nail. I'm the hammer")*. The election to hold the loans for ten years rather than monetize them was the Rehabilitator's, and it is that election—not the origination years earlier—that drove any subsequent diminution in recoverable value. *See Davenport*, 445 F.3d at 374 (4th Cir. 2006), *abrogated on other grounds by Irizarry v. United States*, 553 U.S. 708 (2008) *(Davenport's* restitution holding is intact).

*By way of illustration:* two buyers were ready to pay full price. The Rehabilitator, holding the threat of shutting the companies down, forced Mr. Lindberg to promise to keep the loans locked in a drawer for ten years instead of selling them. You cannot lock someone's car in a garage for ten years, refuse to let him sell it, and then bill him for the rust.

**D. The Rehabilitator's pre-maturity fire-sale of the principal-protection bonds (2019).**

In May 2018, Mr. Lindberg had directed the insurers to purchase $1,006,239,867 in par value of investment-grade zero-coupon bonds—held inside Principal Protected Notes for the sole purpose of insuring the affiliate-loan principal dollar-for-dollar. (Supp. Statement of Facts ¶¶ 27–34 and see Exs. H, H2, and I2) After taking control, the Rehabilitator made the unilateral decision to **sell those**

**bonds before maturity for approximately $394 million**—less than forty cents on the dollar of guaranteed par—**crystallizing a loss of approximately $611.6 million** on the very instruments whose only function was to prevent loss. *Id.* at ¶¶ 38–39. He did so without the advance approval of the Wake County Superior Court that N.C. Gen. Stat. § 58-30-85 and the June 27, 2019 Consent Order of Rehabilitation required for material asset dispositions. *Id.* at ¶ 45. And he ignored at least three loss-free alternatives—holding the bonds to maturity, using them to credit-enhance a sale, or borrowing against them. *Id.* at ¶ 40.

This is the paradigm of a superseding cause. The Supreme Court has held that a victim's own independent decision regarding collateral can break the chain of proximate causation, *Robers v. United States*, 572 U.S. 639, 647–48 (Sotomayor, J., concurring); where a passive decision to hold collateral too long can break the chain, a fiduciary's *affirmative* decision to liquidate a held-to-maturity, par-payable principal-protection instrument before maturity—forgoing $611.6 million of contractually mandated value—breaks it *a fortiori*. The crystallized loss is "attributable to the victim's independent decisions" and cannot be charged to Mr. Lindberg. *Id.* at 648; *accord United States v. Tyler*, 767 F.2d 1350, 1352 (9th Cir. 1985) (loss from holding asset "during a period of declining prices" is not caused by the offense). *Id.* at 648. Mr. Lindberg bought a billion-dollar insurance policy—bonds guaranteed to repay the loans in full if you simply waited for them to mature, like a savings bond you cash at the end. The Rehabilitator tore up that policy early and sold

it for forty cents on the dollar, throwing away $611 million. That loss does not belong to the person who bought the insurance policy to protect against the loss.

### E. The Rehabilitator's refusal of the Montshire/Alban offer (2023) and blocking of the Quadro transaction (2024), followed by the Clanwilliam fire-sale (2025).

The pattern continued. In 2023, Mr. Lindberg negotiated with Montshire Advisors and an investment group formed by Bob Alban to submit a purchase agreement to the NCDOI for the insurers—a transaction that, like Ares and Oaktree, would have paid every policyholder in full. The Rehabilitator not only rejected the offer; he filed litigation against Mr. Alban. (Supp. Statement of Facts ¶ 117 and Exs. O and O2.) Then, in the first quarter of 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing the Specified Affiliated Companies at approximately $3.4 billion—and Clanwilliam alone at $880 million. (Supp. Statement of Facts ¶ 118; and see Exs. G2, I3, I4.) The Rehabilitator blocked the Quadro transaction over Mr. Lindberg's repeated objections, and then, in September 2025, forced a below-market fire-sale of Clanwilliam to TA Associates for $450 million—a destruction of approximately $474 million in value attributable entirely to the Rehabilitator's discretionary decision to block Quadro. *Id.*

### F. The Special Master's continuing asset dispositions (2026).

The chain of intervening causation extends into the present proceeding. Since his appointment, the Special Master has disposed of estate assets before any final restitution determination. With respect to the Beckett transaction, the sale occurred without court approval, and the record does not reflect an accounting of proceeds. At

the same time, the Special Master's compensation is derived from the assets administered, and he has sought a waiver of liability for actions taken in that role (See Ex. B25 and see Doc. No. 159).

These actions were undertaken independently by the Special Master. To the extent the claimed loss reflects value attributable to the disposition of these assets, that reduction cannot be attributed to Mr. Lindberg.

Applying *Robers*, *Paroline*, *Stein*, and *Squirrel*, the losses produced by these intervening acts are "more aptly described as mere fortuity" than as harm proximately caused by Mr. Lindberg, and they are not harm "caused by the defendant's criminal conduct" within Paragraph 10(a). Doc. 40. As Part I.A establishes, the "closely related" proximate-cause test the Fourth Circuit applied in this case is the law of the case, *In re Zetteler*, *supra*; the same test that excluded a claimant whose harm was not closely tied to the offense excludes the Government-, Rehabilitator-, and Special Master-caused losses here. Because the conduct by these third parties has continued into the present proceeding, the chain of causation remains broken as of this determination: the Government cannot establish proximate causation between Mr. Lindberg's conduct and the claimed loss *even now*. At least for this reason, the Motion should be granted.

## V. "Risk" Is Not Actual Loss, And Restitution Is Capped at Actual Loss.

This Court has characterized the "real loss" in this case as "risk." (See Sentencing Transcript) That characterization is dispositive. Restitution is owed only "in the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), measured by

realized actual loss, *Hughey*, 495 U.S. at 413. Risk of loss is not actual loss; a victim who has suffered no realized loss has no "loss" to compensate. Although the Supreme Court has held that MVRA restitution is criminal punishment, the Fourth Circuit enforces both halves of that rule: restitution "must be based on actual loss," not intended loss, *United States v. Harvey*, 532 F.3d 326, 340–41 (4th Cir. 2008), and the MVRA "makes clear that the defendant is expected from the outset to repay all of the actual losses that he caused, but no more," *United States v. Steele*, 897 F.3d 606, 611 (4th Cir. 2018) (citations omitted) (arising from this District). *Ellingburg v. United States*, 607 U.S. 163, 166 (2026), it remains a *loss-measured* sanction—not a free-standing fine—and it may not be imposed in an amount untethered from a realized actual loss. The point is concrete: even though the Special Master has determined that in this case the policyholders are not victims (and only the insurance companies are the victims), they have been "made completely whole" and "confirmed paid in full" (Ex. D7 and Docket 100). Where the protected victims are whole (indeed overpaid by $1.2 billion per Mr. Lindberg's filings) and the Court's premise is "risk," the actual loss attributable to Mr. Lindberg is zero.

*By way of illustration:* there is a difference between the chance of getting hurt and actually getting hurt. Driving a car always carries a risk of an accident, but the law does not require payment for a crash that never happened. The Court said the "real loss was risk"—and the policyholders were paid every penny. A defendant cannot be ordered to repay money that was never actually lost.

To the extent the figure rests on an interest enhancement, that enhancement compounds the error. Restitution is now criminal punishment, *Ellingburg*, *supra*; the facts that fix a penal amount must be found by the Court, and—on Mr. Lindberg's submission—beyond a reasonable doubt under *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000), and *Southern Union Co. v. United States*, 567 U.S. 343, 350 (2012). A quarter-billion-dollar interest component selected by a court adjunct, over objection and without the Court's own findings, and in violation of the DOJ's own policy forbidding interest awards in restitution, cannot satisfy even the preponderance standard, let alone a higher one.[4] The Motion should be granted for this reason alone.

---

[4] The Special Master recommends that "some interest component" should be applied to the Affiliate Investment balances "to account for the time value of money." Doc. 106 at 3-4. Based on a 2.19% interest rate (representing the 30-Day U.S. Treasury rate as of June 27, 2019, through March 31, 2026), the Special Master proposes adding an additional $263 million in restitution for "post-IALA interest." App'x 3 at 8. This is legal error.

As a threshold matter, the MVRA does not expressly include interest among the compensable forms of financial loss recoverable through restitution. And more specifically, DOJ policy recognizes this fact; it expressly excludes interest as a "financial loss," clarifying that it is "not eligible for restitution." Therefore, any interest should be excluded from any restitution calculation.

An award of interest is also contrary to the plain language of the MVRA. As explained above, the MVRA requires "offenders to restore property lost by their victims as a result of the crime." *Robers*, 572 U.S. at 640. And it provides two ways for a sentencing court to accomplish that: by ordering a defendant to either "return the property to the owner," 18 U.S.C. § 3663A(b)(1)(A) or, "if return of the property . . . is impossible, impracticable, or inadequate," to pay an amount equal to "the greater of (I) the value of the property on the date of the [loss]; or (II) the value of the property on the date of sentence" less the value of any part of the property that is returned. *Id.* § 3663A(b)(1)(B).

Notably, there is no provision under the first option—subsection (b)(1)(A)—for a court to add interest when the defendant can return the property at issue. Where, as here, the "property" at issue is cash, the only option for the Court is to order Mr. Lindberg to "return the property to the owner" under subsection (b)(1)(A). As the

Supreme Court taught in *Robers,* if "the 'property that was 'damage[d],' 'los[t],' or 'destr[oyed]' was the money, then 'the property . . . returned' must also be the money." 572 U.S. at 643 (alterations in original). And "money being fungible," the return of any cash equivalent to the amount the victim lost satisfies the statute. *Id.* In contrast, where a defendant takes something other than cash and cannot return that specific piece of property (e.g., a necklace) because it would be impossible, impracticable, or inadequate to do so, then the Court must determine the "value of the property" on the date of the loss or at the time of sentencing under subsection (b)(1)(B).

The property that the Pre-Designated Restitution Parties lost is cash—the money taken out of the companies via Affiliate Investments. And an order directing Mr. Lindberg to return that "property"—the amount of cash taken—fully satisfies the MVRA. 18 U.S.C. § 3663A(b)(1)(A). Accordingly, under a straightforward application of the MVRA, any award of interest is inappropriate.

To be sure, a handful of other circuit courts have allowed prejudgment interest to be included in a restitution order. *See, e.g.*, *United States v. Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011); *United States v. Fike*, 140 F.4th 351, 356 (6th Cir. 2025) (collecting cases). But these cases were wrongly decided, and none is binding on this Court. Both the Second Circuit in *Qurashi* and the Sixth Circuit in *Fike* incorrectly assumed that the amount of restitution in the case was governed by subsection (b)(1)(B). *See Fike*, 140 F.4th at 356 (citing 18 U.S.C. § 3663A(b)(1)(B) for the proposition that "a victim's losses may change in value between the date of the loss and the date of sentencing"); *Qurashi*, 634 F.3d at 703 (similar). But as explained above, a court may apply subsection (b)(1)(B) only where a defendant returns *substitute* property because it is impossible, impracticable, or inadequate to return the property that was taken; that subsection has no application where, as here and in both *Fike* and *Qurashi*, a victim lost cash that a defendant can return.

Nor has the Fourth Circuit held that prejudgment interest may be awarded under the MVRA. Although the Special Master claims the Fourth Circuit authorized interest on restitution in *United States v. Hoyle*, 33 F.3d 415, 420 (4th Cir. 1994), *see* App'x 3, at 10, *Hoyle* was decided prior to the enactment of the MVRA and focuses on the unremarkable proposition that the determination of loss for sentencing and restitution are separate inquiries. It therefore does not speak directly to when interest qualifies as a compensatory form of damages under the MVRA. *See Hoyle,* 33 F.3d at 420.

At bottom, the Special Master's proposal cannot be squared with the law. Restitution is not concerned with a victim's "disappointed expectations" but only with his actual loss. *United States v. Boccagna*, 450 F.3d 107, 109 (2d Cir. 2006); *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017). Thus, restitution is not meant to "guarantee the benefit of any bargain." *Id.* And it "cannot include consequential damages." *United States v. Coats*, 487 B.R. 648, 653 (E.D.N.C. 2013).

The Court has identified the real loss as risk, the victims have been confirmed paid in full, and restitution measured by actual loss is therefore zero.

## VI. The Government and the Special Master Did Not Carry the Section 3664(e) Burden.

"Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and the "burden of demonstrating the amount of the loss… shall be on the attorney for the Government." 18 U.S.C. § 3664(e). The restitution order must rest on findings adequate for review. *Karam*, 201 F.3d at 325. Courts "abuse their discretion by granting the defendant a 'bailout' or by

---

Here, interest is not part of the Pre-Designated Restitution Parties' actual loss. Instead, it constitutes recompense for the benefit of the parties' bargain—the time value of money while the insurance companies provided loans covering the Affiliated Investments. Accordingly, any interest would exceed the restitution statutorily allowed by the MVRA.

Courts applying these principles have excluded interest from restitution awards or at least reduced the amount of the award to avoid giving the victims more than they are statutorily eligible to receive. In *United States v. Jesenik*, the court explained that **"accrued but unpaid interest" on an investment does not constitute part of a victim's actual losses**. 702 F. Supp. 3d 1024, 1039 (D. Or. 2023). Similarly, in *United States v. Smerling*, the defendant and government agreed that a restitution award based on fraudulently obtained loans should not include interest based on the loan agreement's post-default rate, because "including such interest in the restitution order would inappropriately award [the victim] its expectation under the loan agreement, not merely compensate it for its loss." No. 21-cr-317, 2022 WL 1806300, at *2 (S.D.N.Y. June 1, 2022).

In this case, including only the principal amount of the Affiliate Investments serves the purposes of restitution. It redresses the actual loss caused by Mr. Lindberg's conduct but avoids imposing undue punishment on him and exceeding the bounds of what the MVRA authorizes.

For these reasons, neither the MVRA nor the principles of restitution support adding any interest to the restitution award. Accordingly, the amount of restitution ordered should be further reduced by at least $263 million.

allowing the victim to obtain a 'windfall.'" *Steele*, 897 F.3d at 611. Here, the Preliminary Order entered $1.655 billion—$30 million above the Special Master's own recommendation—without explanation; the recommendation itself reaches $1.625 billion only by adding approximately $263 million of interest at a rate the Special Master chose; and no accounting supports the figure. The Beckett transaction (approximately $134 million) was effected without court approval and without any accounting of proceeds. (See Ex. B25) A record in that condition cannot support a $1.655 billion finding by a preponderance. *See* 18 U.S.C. § 3663A(c)(3)(B) (restitution need not be ordered where complex causation issues would unduly burden the sentencing process).

The Committee designed exactly this safeguard. Any special master submits only "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." S. Rep. No. 104-179 (1995) (committee substitute § 105), *reprinted in* 1996 U.S.C.C.A.N. 924. And Congress authorized courts to decline restitution altogether where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). Here, where causation and offsets are genuinely complex and disputed, that burden falls on the Government, not on Mr. Lindberg. *See also United States v. Gallant*, 537 F.3d 1202, 1247 (10th Cir. 2008) (citations omitted) (loss calculation for restitution may "present[] complex factual issues" warranting an evidentiary hearing).

## VII. The Government Should Disclose Evidence of Its Interference with the Ares Transaction.

The causation inquiry turns in significant part on why the Ares sale—which would have paid every policyholder in full—collapsed. The contemporaneous record reflects that, following Ares's meeting with the Department of Justice, Ares was advised by an undisclosed party to avoid any ongoing connection to Eli Global and abandoned the transaction's key term (Ex. A15). That gives Mr. Lindberg a good-faith basis to believe a governmental actor communicated with Ares concerning the transaction. If the Government possesses evidence of such communications and has not disclosed it, that evidence is favorable and material to the causation issue now before the Court—it would show that an intervening act of the Government, not Mr. Lindberg's conduct, caused the loss of the Ares transaction—and due process requires its disclosure. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Mr. Lindberg therefore requests that the Court order the Government to disclose any communications between any federal or state governmental actor and Ares, or its advisors, concerning the proposed acquisition of the insurers or any ongoing relationship with Eli Global. Where the Government bears the burden of proving causation by a preponderance under 18 U.S.C. § 3664(e), basic fairness requires that Mr. Lindberg have access to the evidence bearing on whether the Government itself caused the very loss it now seeks to charge to him.

## VIII. In the Alternative, Offsets and Credits Independently Extinguish Any Obligation.

Should the Court find any portion of the loss proximately caused by Mr. Lindberg's conduct, the MVRA requires that restitution be reduced by the value of property returned to the victims and by amounts the victims have received or will receive. 18 U.S.C. §§ 3663A(b)(1)(B), 3664(j)(2); *see Robers*, 572 U.S. at 645; *United States v. Boccagna*, 450 F.3d 107, 118 (2d Cir. 2006); *United States v. Alalade*, 204 F.3d 536, 540 n.4 (4th Cir. 2000). The Committee was equally explicit that restitution may not exceed a victim's actual loss or yield a windfall: the offset provisions ensure that "the victim is not compensated twice for the same loss." S. Rep. No. 104-179, at 20 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 933. *Accord Steele*, 897 F.3d at 611 (no victim "windfall"). Applied, the credits below yield net restitution of zero and a substantial overpayment, as the chart illustrates:

| **Description** | **Amount** | **Body §** |
|---|---:|---:|
| **Special Master's Proposed Restitution Figure** | **$1,655,000,000** | — |
| **Improper Additions to Affiliate Investment Balances** | | **I.** |
| Pre-Judgment Interest | ($263,000,000) | I.A |
| Corrected Starting Balance of Affiliate Investments | ($141,000,000) | I.B |
| **Additional Credits** | | **II.** |
| AAPC Preferred Equity Par Value as of May 26, 2026 | ($352,906,240) | II.A |
| SNIC Payments | ($27,823,425) | II.B |
| Cash Payments to Pre-Designated Restitution Parties Not Captured by the Special Master | ($79,655,289) | II.C |
| CBL Subordination Fee (Beckett refinancing) | ($3,000,000) | II.D |
| Additional Clanwilliam Sale Proceeds | ($20,000,000) | II.E |
| ULICO Sale of Contributed Real Estate | ($13,596,013) | II.F |
| Bermuda ICs' Proceeds from Sale of Affiliated Assets | ($9,800,076) | II.F |
| Sale Proceeds of Zero-Coupon Bonds in PPNs | ($243,000,000) | II.G |
| Value of NCICs as of October 2018 | ($454,000,000) | Exh. A |

| **Losses Not Proximately Caused by Mr. Lindberg** | | **III.** |
|---|---|---|
| Loss on Agera | ($129,000,000) | III. |
| ECL Losses | ($22,288,826) | Exh. A |
| Loss on UKAT | ($39,000,000) | Exh. A |
| Insurance-Holdco Debt Portion | ($14,897,805) | Exh. A |
| Loss on Clanwilliam Below-Market Sale | ($474,000,000) | Exh. A |
| Loss on Early Zero-Coupon Bond Sales | ($611,600,000) | Exh. A |
| **TOTAL MINIMUM OFFSETS AND REDUCTIONS** | **($2,899,418,383)** | |
| **NET RESTITUTION OWED** | **$0** | |

## IX. Any Ambiguity Must Be Resolved In Mr. Lindberg's Favor.

The Plea Agreement fixes no restitution amount and stipulates only a ">$550M" Guidelines figure expressly decoupled from restitution. Because restitution is now criminal punishment, *Ellingburg*, *supra*, and because Paragraph 10(a)'s reach is bounded by causation, any genuine ambiguity over whether third-party-caused losses are "caused by the defendant's criminal conduct" must be resolved in Mr. Lindberg's favor under the rule of lenity.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Mr. Lindberg respectfully requests that the Court enter an order: (1) determining, under 18 U.S.C. § 3664(e), that the Government has not proved a restitution-eligible loss proximately caused by the offense of conviction; (2) in the alternative, excluding from restitution the intervening-cause losses identified in Part IV; (3) crediting all offsets required by 18 U.S.C. §§ 3663A(b)(1)(B) and 3664(j)(2); (4) directing a complete accounting of all asset dispositions and of all fees and expenses paid from administered assets, including the Beckett proceeds; (5) ordering the Government to disclose any governmental communications with Ares or

its advisors regarding the proposed transaction or any ongoing relationship with Eli Global; (6) fixing net restitution at zero; and (7) granting such other and further relief as is just. Given the pendency of related proceedings, Mr. Lindberg respectfully requests expedited consideration.

Dated: July 14, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*

Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*Counsel for Greg E. Lindberg*

## ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order *In Re: Use of Artificial Intelligence* entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: July 14, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 13, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices.

Dated: July 14, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*