**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC<br><br>Judge Max O. Cogburn, Jr. |

**CONSOLIDATED STATEMENT OF FACTS IN SUPPORT OF**
**DEFENDANT'S MOTION REGARDING RESTITUTION CAUSATION**

**INTRODUCTION**

Defendant Greg E. Lindberg respectfully submits this Statement of Facts in support of his motion regarding restitution. The facts set forth below are established by the exhibits filed herewith and cited in the text; the exhibits are identified in the accompanying Schedule of Exhibits.

## A. The Affiliated-loan Program Operated Under a Written Risk-Management Framework and Experienced Zero Defaults Prior to Mr. Lindberg's Transfer of Control to the Rehabilitator.

1. Mr. Lindberg's North Carolina insurers operated under a written Risk Mitigation Policy on Affiliated Loans, revised February 20, 2017. The Policy provided that "the majority of loans are senior secured investments where the insurer lender as a first claim on all assets and cash flows of the borrower"; that "All loans have a

minimum credit rating of 'B-' or equivalent from a SEC approved NRSRO"; that "the portfolio has weighted average credit score of 'BB' or higher and leverage ratio of less than 4x"; and that "All loans receive a third party arms' length pricing opinion." (Ex. B21 (Risk Mitigation Policy on Affiliated Loans, rev. Feb. 20, 2017).)

2. The Policy recited a track record of no defaults, stating that "SNH's affiliates have provided additional capital as needed to pay down any underperforming loans over the last 25 years, producing a zero default track record on these investments," and it committed the affiliates to "[p]repay any underperforming loan using reserve capital from SNH's non-insurance affiliates." (Ex. B21.)

3. The April 14, 2018 successor Policy also required "Cash flow testing needs of the portfolio to ensure that assets are adequate to service liabilities and to prevent additional reserve requirements." (Ex. C (Risk Mitigation Policy).)

### B. Mr. Lindberg Committed Approximately $1 Billion of His Own Capital, Guaranteed the Loans, and Purchased $1 Billion of Bonds to Protect Principal.

4. Mr. Lindberg's documented total investment in the insurance group from 2014 to 2018 was "$963 million," as summarized with source documentation by entity — including Colorado Bankers Life ($71 million, plus $193 million of additional capital), Southland National Insurance Corporation ($48 million), Pavonia Life ($45 million net of its sale), the investment into Agera and replacement of Agera assets ($187 million), and management, overhead, and legal costs ($83 million and $72

million, respectively). (Ex. A11 (Lindberg Total Investment in the Insurance Group), Part I.)

5. Independent analysis by Berkeley Research Group ("BRG") separately states that "capital contributions, consisting of cash infusions, foregone dividends and certain non-cash transactions, amount to at least $377 million," and that BRG did not "uncover payment of any dividends to Mr. Lindberg, GBIG or any Lindberg-affiliated companies." (Ex. D (BRG letter).)

6. Mr. Lindberg executed an "AMENDED & RESTATED BACKSTOP AGREEMENT … dated as of March 11, 2019," personally guaranteeing scheduled payments on the affiliated obligations. (Ex. B22 (Amended & Restated Backstop Agreement, Mar. 11, 2019), at 1.)

7. In 2018 the insurers held a portfolio of zero-coupon and related bonds with an aggregate notional (par) value of $1,006,239,867, acquired for an aggregate purchase price of $359,714,888.58. (Ex. H2 (Principal Value of Zero-Coupon Bonds), at 1.) The bonds were issued by a diversified group of financial institutions, including CIBC, Citigroup, TVA, Nomura, Wells Fargo, Natixis, Barclays, RBC, Bank of Montreal, UBS, and JPMorgan. (Id.)

### C. The Regulator Approved the Affiliate Concentration and Praised Mr. Lindberg's Regulatory Performance.

8. The affiliate-investment strategy was presented to the North Carolina Department of Insurance ("NCDOI") as early as a September 17, 2014 presentation, which represented that "Controlled investments will be personally guaranteed by Eli Global owner, Greg Lindberg – this puts in a backstop for any potential failed deals,"

and would "Serve as backstop for any bad investments beyond historical zero percent default rate." (Ex. A22 (NCDOI Presentation on Affiliate Investments, Sept. 17, 2014).)

9. The 2014 presentation described "Strong risk management from (a) zero historical default rate on controlled deals … and (C) full guarantee backstop from owner on all controlled deals." (Ex. A22.)

10. The parties negotiated a percentage ceiling on affiliated investments. In the NCDOI's Review Letter 1 (dated April 11, 2016), the Department found that, at December 31, 2015, the company had "50% of total admitted assets invested in affiliates" and "directed [the company] to refrain from investing further in affiliates and to provide a plan outlining how it will return to compliance with the 40% agreed upon limit." The company's April 19, 2016 written response to Senior Financial Analyst Jessica Price, CPA, CFE, stated that "we interpreted the 40% limit to apply to affiliated sub-investment grade investments, not to affiliated investments in total," and undertook to bring "total affiliate investments (not including affiliated insurance investments) … below 40% of total assets." (Ex. A12 (SNIC Response to NCDOI Review Letter 1, Apr. 19, 2016), at 1–2.)

11. Affiliated-investment concentrations of this general character are widespread in the life-insurance industry. A May 26, 2026 Wall Street Journal report is titled "For Wall Street's Private Investments, In-House Insurers Are the Go-To Buyer," and states that "[r]egulators are trying to keep up with insurers' $413 billion in 'affiliated investments,'" observing that "[i]nsurance companies are increasingly

investing policyholders' money in private credit sold by parent firms or affiliated parties." (Ex. B24 (Wall St. J., May 26, 2026).)

12. On March 9, 2018, Insurance Commissioner Mike Causey wrote directly to Mr. Lindberg: "You did an outstanding and impressive job of answering some really tough, hardball questions from state regulators today." The same message requested "[d]etails and status of plans to engage JP Morgan or KKR Capital Markets to provide financing to replace intercompany loans." (Ex. B6 (Causey email, Mar. 9, 2018), at 1.)

**D. The 2018 KPMG and Houlihan Lokey Valuations Confirmed the Loans Were Well Secured.**

13. KPMG, in accordance with an engagement letter "dated May 21, 2018," completed a valuation "to determine the fair value of a 100.0 percent interest in the equity of certain insurance entities (the 'Subject Companies' …) owned by Global Bankers Insurance Group … on marketable, controlling interest basis as of December 31, 2017." The report is dated August 24, 2018. (Ex. E (KPMG, Final Valuation of Eli Global Insurance Entities, Aug. 24, 2018) and Ex. E2.)

14. KPMG's stated "Fair Value of Equity" conclusions were: Colorado Bankers Life Insurance Company, $380,500,000; Bankers Life Insurance Company, $57,500,000; Southland National Insurance Corporation, $29,000,000; Southland National Reinsurance Corporation, $46,500,000; Pavonia Life Insurance Company of Michigan, $120,000,000; Private Bankers Life and Annuity Co., Ltd., $283,500,000; Omnia Ltd., $7,000,000; Conservatrix N.V., €74,000,000; Standard Re (Malta) Limited, €4,000,000; GB Life Luxembourg S.A., €32,700,000; Bankers Reinsurance Company Ltd., $12,400,000; and PB Investment Holdings Ltd., $8,300,000. (Ex. E.)

In the aggregate, these conclusions total on the order of one billion dollars — described in Mr. Lindberg's investment summary as "aggregate fair value of the insurance entities of approximately $1.08 billion." (Ex. A11 (Lindberg Total Investment in the Insurance Group), Part II, S-5.)

15. KPMG completed this work in August 2018, less than sixty days before control of the insurers passed to State administrative supervision on October 18, 2018 (see § F below), making it contemporaneous evidence of the value of the companies at the time regulatory control was imposed. (Ex. A11, Part II, S-5, S-10 and Ex. E2.)

16. Houlihan Lokey Financial Advisors, Inc. separately prepared a "written Report containing certain financial analyses and documentation pertaining to investments … controlled by Eli Global," held by Colorado Bankers Life and Southland National "as of December 15, 2017," dated January 18, 2018. The Report presents, for each position, "[e]nterprise value ranges and associated enterprise value coverage and loan-to-value calculations." (Ex. E3 HL (Houlihan Lokey, Summary of Certain Investments Held by Colorado Bankers Life and Southland National, Jan. 18, 2018), at 3, 5.)

17. The Houlihan Lokey Report repeatedly concludes that the enterprise value of the borrowers fully covered the loans. Representative of its position-level findings, it states: "Our assessment of enterprise value implied full coverage through the Term Loan, with a loan-to-value range through the security of 38.7% to 43.4%," and elsewhere "implied full coverage through the aggregate subordinate debt with a net loan-to-value of 42.8% to 47.3%." Loan-to-value results vary by position across

the portfolio, but the Report's consistent conclusion is "full coverage" of the secured loans. (Ex. E3.)

18. A summary of the KPMG August 24, 2018 valuations, compiling KPMG's per-entity conclusions as of the December 31, 2017 valuation date, reflects fair values of equity for the insurance entities totaling approximately $1.08 billion, and separately values the twenty-one Eli Global operating companies — the borrowers whose assets and enterprise value secured the affiliated loans — at an aggregate business-enterprise value of approximately $2.45 billion. (Ex. E2 (KPMG Valuations Summary), Overview.)

19. KPMG's concluded enterprise values for the principal operating-company borrowers included Global Health Technology Group, LLC at $1,200,000,000; American Academy Holdings (AAPC) at $900,000,000; Practice Insight, LLC at $146,000,000; and Claris Vision, LLC at $51,500,000, among others. These contemporaneous valuations of the borrowers confirm that the asset values securing the affiliated loans substantially exceeded the loan balances. (Ex. E2.)

## E. Before Taking Office, the Commissioner Planned to "Dismantle" Mr. Lindberg's Business.

20. The affidavit of Roland M. Loftin, Jr. states that, in mid-2016, "Mike Causey told Cartret that he was concerned about a multi-millionaire named Greg Lindberg who had strongly supported Goodwin during the last election," and "saw Lindberg as a significant impediment to winning the election against Goodwin." (Ex. A3 (Affidavit of Roland M. Loftin, Jr.).)

21. The Loftin affidavit further states that Causey "said that he had a person in mind who had already helped him a lot and she had been at DOI a long time," and that "she already didn't like Lindberg and would know how to go about dealing with the companies and dismantling them." (Ex. A3.)

22. In a recorded interview, Lyne Thompson stated that Causey "explained to me that Lindberg was a multimillionaire who strongly supported and contributed to Goodwin's campaign in the election that Causey had just won," and that "because he had beaten Goodwin by so few votes, he was worried about Greg Lindberg helping Wayne in the next election, and he felt like he needed to do something about him." (Ex. A4 (Interview of Lyne Thompson, Mar. 28, 2024), at 2–3.)

23. Thompson further stated that Causey "already knew that the biggest problem he was going to have if Goodwin ran again against him in four years was this multimillionaire funding Wayne's campaign." (Ex. A4, at 3.)

### F. Mr. Lindberg Ceded Control to the Rehabilitator in October 2018, and the Rehabilitator Proceeded to Pay Himself and Others Over $165 Million in Fees.

24. On October 18, 2018, the North Carolina insurers were placed under a "CONSENT ORDER FOR ADMINISTRATIVE SUPERVISION." The order recites that "[t]he Companies have consented to administrative supervision" and were "placed under administrative supervision for a period of 120 days from the date of execution of this Consent Order," subject to extension in the Commissioner's discretion. (Ex. F2 (Southland Confidential Administrative Supervision Consent Order, Oct. 18, 2018).)

25. Since June 2019, the fees and expenses paid out by the Rehabilitator/Receiver total $165,749,392, of which an estimated $30,000,000 was paid to Williams Mullen and an estimated $25,000,000 to Noble Consulting/Mike Dinius, with current estimated monthly fees of $2,744,743. (Ex. M (Expenses + Losses of NCICs), at 1.)

**G. A Series of Intervening Acts Destroyed Value After October 2018.**

26. The blocked Ares transaction. On November 22, 2018, Ares submitted a letter of intent that was "non-binding (other than in respect of Section 12 (Exclusivity …))," proposing an "Upfront Purchase Price" of "$400 million" under Option A and "$420 million" under Option B. (Ex. G (Ares Project Triangle Proposal, Nov. 22, 2018).)

27. Eli Global's Chief Financial Officer, Christa Miller, memorialized in a January 6, 2019 email that, when Ares was asked whether it was withdrawing the SPV term under which it would retain affiliated loans, "they said that they had been told by a third party constituent that they should avoid any ongoing connection to Eli Global after the close," and "refused to say" who had given that advice. Ms. Miller wrote that "it seems very likely from their comments on both occasions that they have been heavily influenced by a third party with power." (Ex. A15 (Miller email, Jan. 6, 2019), at 1.)

28. The rejected Oaktree transaction. In or about February 2019, an Oaktree "Global Solution" presentation proposed that "IG will fund a [$1.0B] investment into an SPV Holding Company" that would acquire the affiliated-loan

positions and the GBIG equity. (Ex. C2 -- Oaktree (Oaktree Global Solution Presentation), at 1.)

29. The June 27, 2019 liquidation demand and MOU. On June 27, 2019, Mike Dinius wrote to Mr. Lindberg: "If you do not sign the consent, we will contact the guaranty associations and move directly to liquidation. You know what that means." He added that, "[i]f this is not signed, the P&I deferral ends immediately … That means the ELI companies will be in default on millions of loan and interest payments. We will then take all legal action that is necessary." (Ex. D5 (Dinius email, June 27, 2019), at 1.)

30. The Memorandum of Understanding "is made and entered into as of this 27th day" of June 2019 and recites the intent to "protect the best interests of the policyholders" and to "increase the long-term equity value." The accompanying Interim Loan Amendment fixed the loans on a decade-long term: it provides that "the maturity date of each Senior Loan shall be December 31, 2029," with junior and other loan maturities set to 2029 as well, and it refers to the "(10)-year anniversary of the Amendment Effective Date." (Ex. A14 (Memorandum of Understanding and Interim Loan Amendment, June 27, 2019).)

31. The bonds sold before maturity. A summary schedule states, under the heading "Zero Coupon Loss by Dinius Decision to Sell Early," a figure of $611,660,960, and reflects "Total Proceeds" of $394,578,906 from the sale of the bond portfolio that carried an aggregate par value of $1,006,239,867. (Ex. I2 (Summary of Loss on Zero Coupon Bond Sales), at 1.)

32. The Quadro transaction (2024). A January 24, 2024 investor presentation for a Quadro business combination states a “Proforma enterprise value” of $3,153 million (approximately $3.2 billion) for the combined companies. (Ex. I3 (GG-Quadro Investor Presentation, Jan. 24, 2024).)

33. The Universal Financial Holdings offer (2022). On November 17, 2022, Universal Financial Holdings LLC submitted an “indication of interest … to acquire 100% of the membership interest of GBIG Holdings,” including its insurance subsidiaries Bankers Life, Colorado Bankers Life, and Southland National, stating that upon completion of diligence it “will immediately sign a binding purchase agreement.” (Ex. O2 (Universal Financial Holdings Indication of Interest, Nov. 17, 2022), at 1.)

## H. Forced Private-market Sales Understate Value Relative to Public-Market Benchmarks.

34. Independent academic research submitted with the exhibits finds that private acquirers systematically pay less than public acquirers: “for most premium measures private operating companies pay less than public firms,” and “target shareholder premiums are 63.3% higher if an offer is by a public firm rather than by a private equity firm.” (Ex. R (Bargeron et al., Why Do Private Acquirers Pay So Little Compared to Public Acquirers?).) This bears on the measurement of any claimed loss: the values realized through the Rehabilitator’s forced private dispositions are not a reliable measure of the companies’ value, particularly as against the public-market benchmark reflected in the 2024 Quadro presentation (§ G above).

Dated: July 15, 2026

Respectfully submitted,

*<u>/s/ Kenneth N. Barnes</u>*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*Counsel for Greg E. Lindberg*