**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>GREG E. LINDBERG,<br>Defendant. | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC<br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S SECOND MOTION TO SET ASIDE THE SPECIAL MASTER'S REPORT AND THE RESTITUTION ORDERS (DOCS. 161, 245, 245-1)**

Defendant Greg E. Lindberg respectfully moves the Court to set aside, in their entirety, the Preliminary Order of Restitution (Doc. 161), the Special Master's Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-1). This is Defendant's second motion to set aside the Special Master's report. Its legal grounds are those set forth in Defendant's previously filed Motion to Declare the Special-Master Reference Unconstitutional as Applied, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Orders (the "Motion to Disqualify") (Doc. 269), which Defendant adopts here without change. Its additional ground is factual and present: the same officer who produced the report has been shopping the estate's companies "for the debt" — proposing to accept roughly $100 million for Damovo — when a contemporaneous, arm's-length expression of interest values Damovo at $400 to $450 million. This motion is further supported by the accompanying Declaration of Greg E. Lindberg. In support, Mr. Lindberg states:

## I. The legal grounds are those set forth in the Motion to Disqualify, which Defendant adopts without change.

1. The legal basis for setting aside the Special Master's report and the restitution orders is set forth in full in Defendant's previously filed Motion to Disqualify (Doc. 269). Defendant adopts and incorporates by reference the legal arguments and authorities of that motion, without change, as though fully set forth herein. As established there, the Second Supplement (Doc. 245) and the proposed Final Order of Restitution (Doc. 245-1) are the work product of an officer who unites in himself the receiver's custody, liquidation, and fee interest and the Article III function of quantifying each victim's loss and fashioning the restitution order — an officer subject to disqualification; the report of such an officer may not be adopted, is not cured by a later de novo determination under 18 U.S.C. § 3664(d)(6), and must be suppressed; and the Preliminary Order of Restitution (Doc. 161), the Second Supplement, and the proposed Final Order must be set aside. Defendant does not repeat those authorities here; he adopts them in full and relies on them as the legal basis for this motion. This motion supplies an additional, factual ground that independently requires the same relief.

## II. The Special Master has been shopping Damovo "for the debt" — roughly $100 million — while a present, arm's-length offer values it at $400 to $450 million.

2. The Special Master has been shopping the estate's operating companies "for the debt." As to Damovo, he has represented, through Defendant's former counsel, that he intends to accept roughly $100 million — the approximate amount of Damovo's outstanding debt. Decl. ¶¶ 3–4. But Damovo is worth far more than the

debt recorded against it. On July 31, 2026, Twelve Seas Investment Company III (NASDAQ: TWLV), a publicly traded acquisition company, delivered a signed, arm's-length expression of interest to combine with Damovo at a $400 million enterprise value, with an anticipated, negotiated price of up to approximately $450 million achievable at arm's length. Decl. ¶¶ 2–3. That is an offer in the market today — from a real, independent counterparty — for roughly four times what the Special Master proposes to accept.

3. An arm's-length expression of interest of this kind is not a projection or an advocate's estimate; it is present market evidence that the enterprise value of these companies remains. A willing, independent buyer is offering $400 to $450 million for the same Damovo the Special Master would surrender for roughly $100 million. The report's premise — that a company is worth only the debt recorded against it — is refuted by the market itself, in real time, as to an asset still within the estate. A report and restitution figure built on that refuted premise cannot stand.

## III. Debt is not a stand-alone measure of value; the same pattern recurs in every company the Special Master sold "for the debt."

4. The Damovo offer exposes the analytic error at the core of the report. A company's enterprise value is determined by its assets, its earnings, and its cash flows — not by the amount of debt it happens to carry. Decl. ¶¶ 10–11. Debt is a claim to be satisfied out of enterprise value, not a subtraction from it, and virtually every substantial operating company carries debt and uses it deliberately as an instrument of growth. *Id.* The debt a company carries is therefore not a variable that stands alone; it must be weighed together with the many other factors that determine value

— the enterprise's earnings, cash flows, growth prospects, and the arm's-length prices independent buyers will actually pay. Treating the debt figure in isolation, as though it were the company's worth, is not a valuation at all.

5.The Damovo offer is not an isolated data point; it confirms a pattern already documented in the other companies the Special Master sold "for the debt." Beckett Collectibles, appraised at approximately $1 billion, was sold for approximately $134 million; and Clanwilliam, valued at approximately $880 million in the signed Quadro purchase agreement [Doc. 235 ¶ 32; Doc. 174 ¶ 117; Ex. I3], was sold for approximately $450 million. Decl. ¶ 4. In each case the enterprise value far exceeded the debt, and in each case selling the company "for the debt" destroyed hundreds of millions of dollars in value the Special Master was charged with preserving. Damovo is exemplary of that same value destruction: applying the identical "sell it for the debt" premise, the Special Master stands to destroy roughly $300 to $350 million of Damovo's value — the difference between the approximately $100 million he proposes to accept and the $400 to $450 million the market offers today — just as value was destroyed in Beckett, Clanwilliam, and the other companies already sold. The difference is only one of timing: as to Damovo, the market's proof of the true value is before the Court now, before the loss is locked in, rather than after. A report built on the premise that these companies are worth only their debt therefore systematically understates their value and overstates the loss.

6. The report compounds the error by treating as loss amounts that are covered or already satisfied. The American policyholders have been paid in full —

more than $157 million distributed to over 43,000 policyholders. Decl. ¶ 1. The approximately $208 million the report alleges remains owing to Northstar, OMNIA, and PBIHL is covered by the Damovo transaction described above. Decl. ¶¶ 2–3. And the approximately $339 million the report alleges remains owing to ULICO has been satisfied by ULICO's acceptance of AAPC preferred equity with a par value of $352,906,240 — the very figure the Special Master lists in his own table. Decl. ¶ 5; see Doc. 245 at 6 (Issue 3). A restitution figure that values these companies at their debt and disregards these mandatory offsets and credits, 18 U.S.C. § 3664(j)(2), overstates the loss; the report cannot be adopted, and the orders resting on it must be set aside.

**IV. The report cannot contain the complete accounting the MVRA requires: the parties holding the loss and valuation data refused to produce it and disputed the Special Master's authority to compel it, and Defendant has been denied the subpoenas that would supply it.**

7. The report cannot be the complete and accurate accounting the MVRA requires, because the Special Master never obtained — and, by the express position of the parties who hold it, could not compel — the information a restitution accounting demands. The Special Master circulated a term sheet defining the scope of his rights and responsibilities, which he intended to use as the basis for a motion seeking a "Clarification Order" from this Court. See Ex. ___ (Term Sheet — Scope of the Special Master's Rights and Responsibilities). That process collapsed. The institutional parties that hold the books, records, valuations, and loss data — the North Carolina insurance companies (the "NCICs") and NHC Holdings, LLC — refused to consent and disputed the Special Master's authority, and the Court's authority, over the

assets and the information at issue. They took the position that "[t]he Special Master has no authority to compel the [companies] to provide him with information," and that "[i]f the Special Master is unable to complete a task because of a lack of information, his job is to report that to the Court." Ex. ___. The term sheet itself expressly contemplated that these parties might "refuse to furnish to the Special Master any documents and information in their possession reasonably requested by the Special Master, whether relating to loss calculations, asset valuations, or otherwise." *Id.* That is precisely what occurred: despite the efforts of Defendant's counsel and of Paladin Management, no agreement was reached and the information was never produced.

8. The consequence is dispositive, and it does not depend on resolving whether the Special Master controls these records. Defendant contends he does — the Special Master having stepped into Defendant's shoes as record owner through the assignment of Defendant's interests, the AAPC voting trust, and his designees on the NHC board, and having refused to compel production, as the Motion to Disqualify (Doc. 269) establishes — while the Special Master contends he does not (Docs. 266, 268). Either way, the accounting cannot be completed on this record: on the Special Master's own account the books, records, and valuations the MVRA requires are held by third parties beyond the reach of this Court, the Special Master, and the Government alike, and the asset-holding parties refused to produce them. An accounting assembled without the very books, records, and valuations that the asset-holding parties refused to produce cannot satisfy the MVRA's command that the

Court determine "the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), on a complete record. And Defendant's own effort to obtain that same information through compulsory process — his Motion for Issuance of Rule 17(c) Subpoenas (Doc. 248) — has been opposed and remains undecided. To deny Defendant the subpoenas that would complete the record while adopting a Final Report the Special Master himself could not complete would stand the MVRA's accounting requirement on its head, fixing a restitution exceeding $1.6 billion on an admittedly incomplete accounting — assembled from information that no participant in this proceeding, the Special Master included, has ever seen in full. Because a complete accounting is a statutory predicate to any final restitution order, and because that accounting cannot be made until the necessary process issues, the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-1) must be set aside. Because that accounting cannot be assembled on this record, the Court cannot satisfy 18 U.S.C. § 3664(f)(1)(A) in any event and is powerless to adopt the Report or to fix restitution upon it.

## V. Neither the Government nor the Special Master has produced evidence of any loss.

9. The record also refutes the causation the restitution orders assume. Neither the Government nor the Special Master has produced evidence of any loss to the protected victims caused by Mr. Lindberg. To the contrary, the records filed in support of Defendant's Motion for a Determination That No Restitution Is Owed, and the accompanying Consolidated Statement of Facts (Docs. 234, 235), show that he contributed approximately $1 billion of his own capital to the businesses as a net

addition to their surplus — a first-loss position that would be exhausted before any protected policyholder or creditor bore a dollar of loss — and that, when control passed, independent firms valued the companies and found the affiliated loans well secured. That a company carries debt is not evidence of loss: debt is the ordinary engine of corporate growth that every company uses, and at a loan-to-value ratio of roughly 40 to 50 percent it is conservatively secured and reflects the retention of value, not its loss. Causation is an element the Government must prove by a preponderance of the evidence, 18 U.S.C. § 3664(e); on this record it is unproven. A report that fixes a loss the Government has not proven cannot support the restitution orders, and they must be set aside.

## VI. Relief.

WHEREFORE, Mr. Lindberg respectfully requests that the Court:

(1) set aside the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-1) in their entirety;

(2) order that the Special Master's report, recommendations, and other work product not be adopted, relied upon, or otherwise disseminated in any manner, consistent with the authorities adopted from the Motion to Disqualify;

(3) order the Special Master to render a full and verified accounting of every sale, transfer, or disposition of Primary Restitution Assets he made, approved, attempted, or declined — including the Beckett sale, and including every sale, offer, or expression of interest that came before him

but that he did not approve, did not pursue, or did not take (such as the Twelve Seas expression of interest for Damovo), with the price and terms offered and his reasons for declining — and of all proceeds and all fees paid from the estate, together with credit for all amounts already paid or satisfied (including the policyholder distributions and the ULICO preferred-equity satisfaction described in the Declaration), as required to fix restitution under 18 U.S.C. § 3664(f)(1)(A), (e), (j)(2), (k), (n), and (d)(6);

(4) direct that the § 3664(e) loss and causation determination be made by the Court itself, on the Government's own proof and on motion practice, with a written response from the Government to the pending motions and a right of reply for Mr. Lindberg; and

(5) grant such other and further relief as is just.

Dated: August 6, 2026.

Respectfully submitted,

/s/ Kenneth N. Barnes
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com
*Counsel for Greg E. Lindberg*[1]

[1] Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

## CONSULTATION STATEMENT

Pursuant to the Local Rules, counsel states that the relief requested was raised with counsel for the United States and counsel for the Special Master, both of whom were consulted last week on two motions to disqualify and to set aside the report; the Government disagrees with and opposes the relief requested, as does the Special Master.

s/ Kenneth N. Barnes
Kenneth N. Barnes

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 6, 2026.

/s/ Kenneth N. Barnes
Kenneth N. Barnes
Counsel for Greg E. Lindberg