**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 5:19-cr-0022-MOC<br>Case No. 3:23-cr-00048-MOC |

**DEFENDANT GREG E. LINDBERG'S PRELIMINARY RESPONSE AND OBJECTION TO THE SPECIAL MASTER'S SECOND SUPPLEMENT TO REPORT AND RECOMMENDATIONS REGARDING RESTITUTION (DOC. 245)**


/s/ Kenneth N. Barnes
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*Counsel for Greg E. Lindberg*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .......... 6

I. THE SECOND SUPPLEMENT CONCEDES THE FACTS AND DISCLAIMS THE FINDINGS THE MVRA REQUIRES .......... 9

A. The Special Master concedes the material facts in thirteen footnotes. .......... 9

B. The Special Master expressly declines to prove foreseeability. .......... 9

C. The Special Master abstains from the very inquiry that determines causation. .......... 10

D. The Second Supplement applies standards the MVRA does not contain. .......... 10

E. The Second Supplement is nearly devoid of legal authority. .......... 11

F. The Second Supplement carries none of the Government's § 3664(e) burden. .......... 11

II. THE LEGAL STANDARD IS A BURDEN OF PROOF, AND ON EVERY ELEMENT BUT THE OFFSETS IT IS THE GOVERNMENT'S .......... 13

A. The allocation the statute makes. .......... 13

B. What happens when the Second Supplement's seventeen issues are sorted by that allocation. .......... 14

C. The consequence for this Court's determination. .......... 15

D. The substantive limits the Government's proof would have had to satisfy. .......... 16

III. THE MATERIAL FACTS REMAIN UNDISPUTED .......... 17

IV. NO LOSS WAS REASONABLY FORESEEABLE AT ORIGINATION .......... 19

V. INTERVENING, SUPERSEDING CAUSES BROKE THE CHAIN OF CAUSATION 20

A. Robers and Ritchie do not shift this burden to Mr. Lindberg. .......... 21

B. The Ares transaction, defeated by governmental interference (November 2018). .......... 22

C. The Rehabilitator's refusal of the Oaktree transaction (February 2019). .......... 22

D. The Rehabilitator's coercion of a ten-year hold (June 27, 2019 MOU). .......... 22

E. The pre-maturity sale of the principal-protection bonds ($611.6 million). .......... 23

F. The refusal of the Montshire/Alban transaction (2023). .......... 24

G. The blocking of the Quadro transaction (first quarter 2024). .......... 24

VI. THE CONVERGING 2018 VALUATIONS REFUTE THE REPORT'S CONCLUSORY DISMISSAL OF NCIC VALUE .......... 25

VII. THE SPECIAL MASTER'S OWN VALUATIONS ARE A "CURRENT GUESS," HAVE BEEN CUT BY A THIRD, AND ARE OFFERED UNDER SEAL .......... 26

VIII. THE RECOMMENDATION MEASURES EXPOSURE, NOT REALIZED LOSS.. 28

IX. MANDATORY OFFSETS AND CREDITS INDEPENDENTLY REDUCE ANY RESTITUTION TO ZERO ........ 29

A. The ULICO preferred equity ($352,906,240). ........ 31

B. The zero-coupon bond proceeds ($243 million) — denied for want of documents the Government withholds. ........ 31

C. Prejudgment interest ($263 million). ........ 32

D. Losses not proximately caused by the offense. ........ 35

X. THERE WAS NO WAIVER ........ 35

XI. THE REHABILITATION PLAN WAS NEVER A LIQUIDATION PLAN ........ 38

XII. COMPLEXITY MUST BE RESOLVED IN MR. LINDBERG'S FAVOR ........ 39

XIII. THE SECOND SUPPLEMENT FAILS THE MVRA'S REQUIREMENT OF AN ACCOUNTING OF THE RESTITUTION AMOUNT ........ 39

A. The statute makes an accounting the predicate for the Court's determination. ........ 40

B. No accounting of any component of the recommendation has ever been produced. ... 41

C. Without an accounting, the mandatory credits cannot be computed and the no-windfall rule cannot be honored. ........ 42

D. The Report's promise to track credits in the future is not a substitute for the accounting now.43

XIV. THE SPECIAL MASTER'S PURPORTED VALUATIONS MEET NONE OF THE STANDARDS FOR VALUATION EVIDENCE IN FEDERAL COURT ........ 44

A. The governing standard is reliability, and it is not satisfied by assertion. ........ 44

B. The Report's valuations fail every one of those markers. ........ 46

C. The valuations come from an interested source, which compounds rather than cures the problem. ........ 46

D. The valuations the Defendant has offered are of precisely the kind federal courts credit. 47

E. A defendant may not be charged for value destroyed after he lost control of the assets. 48

F. The consequence of a one-directional valuation is a manufactured shortfall. ........ 49

XV. KEY FACTS THE SECOND SUPPLEMENT DOES NOT AND CANNOT DISPUTE 50

A. It remains undisputed that the Department of Justice's own policy does not permit interest to be charged to a defendant in a restitution case. ........ 50

B. The $141 million opening-balance correction is denied on a record the Government itself has made unavailable. .......... 51

C. ULICO agreed in December 2022 to accept the AAPC preferred equity as a dollar-for-dollar credit and cannot now insist on cash. .......... 52

D. The Special Master refuses to credit more than $130 million in cash payments on theories found nowhere in the MVRA. .......... 53

E. The zero-coupon bonds were not sold to meet any liquidity need, and the Rehabilitator's own reports identify a different problem. .......... 54

F. It remains undisputed that the Agera exposure was inherited from ULICO's prior reinsurer and that the loss was not caused by Mr. Lindberg. .......... 56

G. It remains undisputed that Clanwilliam was worth more than $800 million on the only contemporaneous market evidence, and that the Quadro comparables are higher today than in 2024. .......... 57

XVI. THE GOVERNING CAUSATION STANDARD IS THE FOURTH CIRCUIT'S, IT IS BINDING, AND THE SECOND SUPPLEMENT APPLIES IT IN ONE DIRECTION ONLY 58

A. The controlling standard, stated by the Fourth Circuit in this very proceeding. .......... 58

B. Zetteler does not stand alone — it states, in this case, what binding Supreme Court and Fourth Circuit authority already command. .......... 59

C. The § 3663A(a)(2) scheme clause converges on the same limit and cannot enlarge the award. .......... 60

D. The MVRA's committee notes confirm the limitation. .......... 61

E. The record convergence: the master's own criteria state the same proximate-cause test. 61

F. The Report cites the decision for its result, never for its standard — and cites almost nothing else. .......... 62

G. Applied evenhandedly, the standard turns away the $1.616 billion figure. .......... 62

H. Preservation of objections. .......... 64

XVII. THE FACTS THAT WOULD SUPPORT ANY RESTITUTION AWARD MUST BE FOUND BY A JURY BEYOND A REASONABLE DOUBT (PRESERVED) .......... 64

XVIII. SCHEDULE OF THE REPORT'S DEPARTURES FROM THE MVRA STATUTE, CASE LAW, AND LEGISLATIVE COMMITTEE NOTES .......... 66

A. Lack of online database access, and the access order that remains unsigned. .......... 70

B. The Government's refusal of the access requested in the Motion for Subpoenas. .......... 70

XIX. THE DAMOVO EXPRESSION OF INTEREST AND THE SPECIAL MASTER'S OWN ADMISSIONS CONFIRM THAT THE REPORT RESTS ON RECORDS NO PARTICIPANT CAN REACH ........ 71

CONCLUSION AND RELIEF REQUESTED ........ 74

CONSULTATION STATEMENT ........ 76

CERTIFICATE OF SERVICE ........ 77

## PRELIMINARY STATEMENT

This Response is filed under protest and as a preliminary response. Defendant Greg E. Lindberg has had only a few hours to review the Special Master's Final Report before this response was due, and submits this preliminary Response to preserve his objections, expressly reserving the right to supplement it once he has had a meaningful opportunity to review the Report and to obtain the records the Court's process requires.

The document styled a "Final Report" is not final. The accounting the MVRA requires has never been produced; the records that would complete it remain the subject of Defendant's pending Motion for Issuance of Subpoenas (Doc. 248); and the Special Master now claims that the books and records the accounting requires are "none of which are under the Special Master's control" and that his sole authority over them "is the power to appoint two directors to the board of NHC" — a claim Defendant disputes, the Special Master having stepped into Defendant's shoes as record owner and trustee able to compel production, but which even credited means only that no participant can reach the records except through compulsory process. Doc. 266; Doc. 268. Defendant therefore adopts and re-files, by this Response and mutatis mutandis, each of his pending motions — including his Motion to Disqualify the Special Master (Doc. 269), his Second Motion to Set Aside the Special Master's Report, and his Motion to Adopt All Prior Motions as if Filed After the Final Report and to Hold the Report in Abeyance — as though filed after the Final Report, with every reference to the preliminary report or the Preliminary Order of Restitution (Doc. 161) deemed a reference to the Final Report and to any final order of restitution entered upon it.

And because the Government has not responded on the merits to any of those motions, its silence cannot be cured by adopting the Special Master's recommendation. Nor is adopting the Report a substitute for responding to those motions, each of which raises multiple independent issues the Report does not resolve. Under 18 U.S.C. § 3664(e) the burden of proving the amount, causation, and foreseeability of any loss rests on the Government, and a defendant's burden arises only after the Government has carried its own. To adopt the Report over Defendant's unanswered objections would invert that burden — requiring Mr. Lindberg to disprove a loss the Government has never proven — and would be incompatible with the MVRA.

The Special Master's Second Supplement (Doc. 245) asks this Court to impose $1.616 billion in criminal restitution. It cannot support that request, because its author disclaims having made the findings the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A, 3664, requires. In thirteen separate footnotes, the Special Master concedes that he and Mr. Lindberg "agree on the basic, objective, material facts"; in eight of those thirteen, the only disagreement he identifies is the legal conclusion "of whether the chain of proximate cause was broken." On

foreseeability, he states outright that this is a matter "which the Special Master has not set out to prove (and does not consider it within the Special Master's charge to prove)." Doc. 245 at 30. And three times he declines to examine the conduct of the state-court fiduciaries at all, explaining that he is "not well-situated to second guess discretionary decisions made by state court supervised fiduciaries in their business judgment." Doc. 245 at 19, 21–22, 25.

That is not a record on which restitution may be ordered. Under § 3664(e), the Government bears the burden of proving the amount of each victim's loss by a preponderance of the evidence, and the MVRA reaches only losses "directly and proximately" caused by the offense of conviction. 18 U.S.C. § 3663A(a)(2). The Second Supplement does not apply that standard. It asks instead whether Mr. Lindberg has "convinced the Special Master" — a formulation it repeats six times — whether he has offered "compelling evidence," and whether any intervening act would "definitively cause" a decline in value. Those are not the statutory tests. Under § 3664(d)(6) the Special Master is not the decisionmaker; his recommendation is a proposal only — "subject to a de novo determination of the issue by the court" — and is owed no deference. Reviewed without deference against the facts the Special Master himself concedes, the recommendation supplies no basis on which restitution of any amount could be ordered.

The substance fares no better. The Second Supplement never once mentions the Quadro transaction, the Montshire/Alban transaction, the Oaktree transaction, the Ares letter of intent, the KPMG valuation, or the Houlihan Lokey coverage analysis — the very transactions and valuations that break the causal chain and establish value. It cites no MVRA causation authority at all: not *Hughey*, not *Lagos*, not *Paroline*, not *Stein*. Of some $2.9 billion in documented offsets,[1] it allows

[1] The $866 million loss of value on the sale of Beckett increases the documented offsets and credits from $2,899,418,383 to $3,765,418,383 (approximately $3.7 billion). The Beckett Collectibles Trust documents are attached as Exhibits 6(a) (Trust Agreement, executed, dated as of June 2021), 6(b) (Amended and Restated Trust Agreement, executed December 5, 2023, the

$39 million — about 1.3% — and denies others expressly for want of documentation that the Government's refusal of subpoenas prevents Mr. Lindberg, in custody and four times divested of his companies' books, from obtaining. Meanwhile the Special Master has quietly cut his own estimate of the assets available for restitution by roughly a third, to a "current guess" of $998 million at the midpoint, resting on a "desktop exercise" performed by the financial advisors to the entity that holds and sells those assets — and has moved to file the explanation for that reduction under seal. Each of these is established in Mr. Lindberg's prior filings. *See* Doc. 235 ¶¶ 12–19, 26–32; Doc. 174 ¶¶ 94–122.

For the reasons below, any one of which is independently sufficient, the Court should decline to adopt the Second Supplement and determine that no restitution is owed; or, in the alternative, exclude the losses not proximately caused by the offense and credit the offsets that extinguish any obligation.

Because the Government bears the burden on loss, foreseeability, and causation, 18 U.S.C. § 3664(e), and because the Special Master's advisory recommendation neither carries that burden nor can substitute for the Court's de novo determination, 18 U.S.C. § 3664(d)(6), the deficiencies identified below are not gaps for the Court to fill. On this record they are failures of proof that require denial. Restitution is a penalty the Government must prove; it is not a figure the Court supplies.

---

instrument in effect at the time of the sale — retaining the identical Grantor-consent requirement for Fundamental BKX Matters), and 6(c) (Certification of Trust). The Special Master controls Global Growth's board seats at NHC and the Beckett Trust documents attached here clearly give the NHC board a veto right over any sale of Beckett assets given that such a sale is a Fundamental BKX Matter which requires Grantor approval, and the Grantor to the trust is controlled by NHC. The fact that the Special Master took no action to require court approval of this sale as required by the Order Appointing Special Master is clear evidence that he violated the terms of the order that appointed him. NHC was designed as a Primary Restitution Asset, and the Order Appointing Special Master gives the Special Master full federal court authority over NHC as the fiduciary for all decisions undertaken by NHC. The Special Master violated his own order by failing to bring the Beckett sale to the court for adjudication as required by the Order Appointing Special Master. This led to an $866 million loss of value on Beckett, which is an additional $866 million offset that Lindberg is due under MVRA. The complete revised schedule of offsets, credits and reductions is set out in Part IX.

## I. THE SECOND SUPPLEMENT CONCEDES THE FACTS AND DISCLAIMS THE FINDINGS THE MVRA REQUIRES

### *A. The Special Master concedes the material facts in thirteen footnotes.*

The Second Supplement does not contest Mr. Lindberg's evidence. It contains no new affidavit, no new exhibit, no new testimony, and no new verified fact. To the contrary, the Special Master states at the outset:

> *"For all or nearly all of the issues raised in the Defendant's Response and the Defendant's Supplemental Responses, the Special Master and the Defendant agree on the historical, objective facts of what transpired, but disagree on what legal conclusions to draw from those facts for restitution purposes." Doc. 245 at 7.*

He then repeats that concession in thirteen separate footnotes, each stating that "the Special Master and the Defendant agree on the basic, objective, material facts." Doc. 245 at 16 nn.9–10, 17 n.11, 17 n.12, 18 nn.13–14, 19 n.16, 20 n.17, 21 n.20, 22 nn.21–22, 23 n.25, 24 n.26, 25 n.26. In eight of those footnotes, the sole disagreement identified is "the legal conclusion of whether the chain of proximate cause was broken." The practical consequence is important: on a factual record the Special Master concedes, the causation question is a legal one for this Court to decide de novo — and the conceded facts establish that the chain was broken.

### *B. The Special Master expressly declines to prove foreseeability.*

Reasonable foreseeability is not optional under the MVRA; it is an element of the proximate-cause inquiry the Government must satisfy. The Special Master's response to Mr. Lindberg's foreseeability argument is to disclaim the task:

> *"That it was reasonably foreseeable to the Defendant that his conduct could be harmful is a critical component of the Defendant's criminal intent, which the Special Master has not set out to prove (and does not consider it within the Special Master's charge to prove)." Doc. 245 at 30.*

He says the same of the underlying offense conduct: "The Special Master has not set out to prove—and does not consider it within the Special Master's charge to prove—whether the Defendant committed the crimes to which he pled guilty as part of the restitution analysis." Doc.

245 at 29–30. A report that declines to prove foreseeability cannot establish the foreseeable loss that restitution requires.

### *C. The Special Master abstains from the very inquiry that determines causation.*

The intervening acts at the heart of this dispute were all taken by the state-court fiduciaries after Mr. Lindberg ceded control. Three times, the Special Master declines to evaluate them:

> *"At a minimum, the Special Master is not well-situated to second guess discretionary decisions made by state court supervised fiduciaries in their business judgment (to the extent doing so falls within the Special Master's duties)." Doc. 245 at 19; see also id. at 21–22, 25.*

He adds that questions concerning the companion public-corruption case "exceed the scope of the Special Master's assignment," Doc. 245 at 31, and that whether a crime was committed "falls outside of the scope of the Special Master's assignment," *id.* at 29 n.28. The Special Master is of course entitled to define his own role. But the consequence is that no one has made the findings § 3664(e) demands. The Government cannot satisfy its burden by adopting a report whose author disclaims the analysis. And because the Special Master's product is advisory only, 18 U.S.C. § 3664(d)(6), his abstention leaves no findings on foreseeability or intervening cause for this Court to adopt — and the Court cannot supply findings the record does not contain.

### *D. The Second Supplement applies standards the MVRA does not contain.*

Rather than ask whether the Government has proved causation by a preponderance, the Second Supplement asks whether Mr. Lindberg has persuaded the Special Master. It concludes six times that "the Defendant has not convinced the Special Master" or has "not produced evidence sufficient to convince the Special Master" (Doc. 245 at 19, 22, 22, 24); twice that it has "not seen compelling evidence" (*id*. at 21, 24); once that it has "not seen convincing evidence" (*id.* at 18); once that no act would "definitively cause" a decline in value (*id*. at 19); and once that Mr. Lindberg "has failed to raise a genuine issue of material fact" (*id*. at 31). Five times it concludes

only that Mr. Lindberg "bears some responsibility" for losses arising during the rehabilitation and liquidation. Doc. 245 at 19, 22, 25, 28.

None of these is the statutory test. "Some responsibility" is not proximate causation; "compelling" and "definitive" proof are not a preponderance; and what has or has not convinced the Special Master is not the measure. The measure is the statutory one, applied de novo and without deference to the Special Master's recommendation. 18 U.S.C. § 3664(d)(6). A recommendation built on standards the MVRA does not contain, by an officer who is not the decisionmaker, is owed no deference and cannot bear a $1.6 billion penalty.

### *E. The Second Supplement is nearly devoid of legal authority.*

Across forty-six pages recommending the largest restitution award in this District's history, the Second Supplement cites two cases: *Robers v. United States*, 572 U.S. 639 (2014), and *United States v. Ritchie*, 858 F.3d 201 (4th Cir. 2017) — both invoked to shift burdens onto Mr. Lindberg — together with a passing citation to *United States v. Karam*, 201 F.3d 320 (4th Cir. 2000). It does not cite *Hughey v. United States*, 495 U.S. 411 (1990); *Lagos v. United States*, 584 U.S. 577 (2018); *Paroline v. United States*, 572 U.S. 434 (2014); *United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017); or *Ellingburg v. United States*, 607 U.S. 163 (2026). It engages neither the MVRA's committee notes nor the Department of Justice's own restitution policy. The committee notes confine restitution to victims harmed "under the count or counts for which the offender is convicted." S. Rep. No. 104-179, at 19 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932. The reason the Report is bereft of authority is that its reasoning is not grounded in the MVRA. The Special Master is not free to make up the governing law.

### *F. The Second Supplement carries none of the Government's § 3664(e) burden.*

Under § 3664(e), "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and "[t]he burden of demonstrating

the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." The elements of that burden here — the fact and amount of each victim's loss, the reasonable foreseeability of that loss, and its direct and proximate causation by the offense of conviction — belong to the Government. The Second Supplement carries that burden on none of them. It offers no new evidence, exhibit, affidavit, or testimony, and instead frames every conclusion as the Defendant's failure of persuasion — asking whether Mr. Lindberg has "convinced the Special Master" or produced "compelling" or "convincing" evidence. Doc. 245 at 18, 19, 21, 22, 24. That is not the statutory allocation, and it cannot be cured by this Court's adopting a report whose author disclaims the very findings the Government was required to prove. The failure is element by element:

| **Element** | **Whose burden under § 3664(e)** | **The Report's treatment (Doc. 245)** |
|---|---|---|
| Fact and amount of loss | Government — prove each victim's loss by a preponderance. | Presents no new evidence, exhibit, affidavit, or testimony; rests the $1.616 billion figure on the Special Master's own "current guess" of asset value. Doc. 245 at 36–37. |
| Reasonable foreseeability | Government — an element of proximate cause it must establish. | The Special Master "has not set out to prove" foreseeability and does not consider it within his charge. Doc. 245 at 30. |
| Proximate causation | Government — prove the offense directly and proximately caused the loss. | Asks whether the Defendant "convinced the Special Master," whether an act would "definitively cause" a decline, and settles for a finding that he "bears some responsibility." Doc. 245 at 19, 22, 25, 28. |
| Entitlement to a specific offset | Defendant — but only once loss and causation are proved. *Karam*, 201 F.3d at 327. | Denies credits for want of documentation the Government simultaneously prevents Mr. Lindberg from subpoenaing. See Part IX, *infra*. |

On every element that is the Government's to prove, the Report substitutes the Defendant's failure to persuade the Special Master for the Government's failure to carry its burden. The one burden

the MVRA does assign to Mr. Lindberg — demonstrating entitlement to a particular offset once loss and causation are established, *Karam*, 201 F.3d at 327 — the Report cannot fairly invoke, because it denies those offsets for lack of the very records the Government is blocking. The Government's own conduct confirms the failure. Mr. Lindberg's Motion to Dismiss the $1.655 Billion Restitution Claim (Doc. 234) put the fact and amount of loss, foreseeability, causation, and the mandatory offsets squarely at issue, and demanded the proof § 3664(e) requires. The Government has never responded to it. It filed no opposition, no evidence, no affidavit, and no brief defending the recommendation on the merits — through the response period and since — appearing in this restitution proceeding only to state that it "does not oppose" the Special Master's positions. Doc. 245 at 44. The party on whom § 3664(e) places the burden of proof has elected silence, and a burden of proof is not carried by silence. Because the Government has not carried its § 3664(e) burden, the only determination the record supports is that no restitution has been proved.

## II. THE LEGAL STANDARD IS A BURDEN OF PROOF, AND ON EVERY ELEMENT BUT THE OFFSETS IT IS THE GOVERNMENT'S

### *A. The allocation the statute makes.*

Section 3664(e) divides the proof and leaves no discretion in the division. "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). On the Government therefore lie three things: the fact and amount of each victim's loss, the reasonable foreseeability of that loss, and its direct and proximate causation by the offense of conviction. *Id.*; 18 U.S.C. § 3663A(a)(2).

One burden, and one only, is Mr. Lindberg's. Once the Government has proved loss and causation, he bears the burden of establishing entitlement to a particular offset — of showing that

he "has compensated or will compensate the victim." *United States v. Karam*, 201 F.3d 320, 327 (4th Cir. 2000). Mr. Lindberg does not dispute that allocation, and this Response does not ask the Court to relieve him of it. But the offset burden is narrow, it is specific to credits, and it is conditional: it never arises until the Government has carried its own.

### *B. What happens when the Second Supplement's seventeen issues are sorted by that allocation.*

The Second Supplement disposes of seventeen issues in a table at page 6 and in the discussion that follows. Sorted by whose burden each issue belongs to, they divide almost exactly three to one.

Nine of them — Issues 1, 2, and 11 through 17 — turn on the amount of loss, on the valuation of the insurance companies, or on causation. Each is the Government's to prove. Together they account for approximately $2.149 billion of the roughly $2.899 billion in reductions documented in the Proposed Restitution Credit / Offset Ruling Chart. Doc. 132-3. On every one of the nine, the Second Supplement resolves the question against Mr. Lindberg not because the Government proved anything, but because Mr. Lindberg did not satisfy the Special Master. He "has not convinced the Special Master." Doc. 245 at 19, 22, 22, 24, 25. The Special Master "has not seen compelling evidence," *id.* at 21, 24, or "convincing evidence," *id.* at 18. No act would "definitively cause" a decline in value. *Id*. at 19. And Mr. Lindberg "bears some responsibility." *Id*. at 19, 22, 25, 28. None of those is the statutory test, and none of those elements was his to prove.

The clearest instance is Issue 17, the $611.6 million loss on the early sale of the zero-coupon bonds. The Special Master writes that he "has not seen compelling evidence that this discretionary decision by the North Carolina Insurance Companies' state court supervised fiduciaries was unreasonable or caused the harm that the Defendant professes." *Id*. at 24 (emphasis

added). Whether the fiduciaries' decision "caused the harm" is the causation element itself — the Government's to establish by a preponderance — and the Report assigns the evidentiary onus for it to Mr. Lindberg. Issue 11 stacks three such shifts on a single question: no "convincing evidence" of the companies' 2018 value, no act that would "definitively cause" a decline, and "some responsibility" borne by Mr. Lindberg. *Id.* at 18–19.

The remaining eight issues — Issues 3 through 10, approximately $750 million — are offsets, and Mr. Lindberg accepts that they are his to establish. On those he does not argue misallocation. He argues that he carried the burden (Issue 3, where the settlement fixes a dollar-for-dollar credit against a judgment and the par value is undisputed); that the statute forbids deferring a credit it makes mandatory (Issues 3 and 7, deferred "if and when ULICO realizes this value" and "if and when the escrow balance becomes available," *id*. at 6 nn.3–4); and that the Government has closed off the records that would complete the proof (Issue 10, where the Report faults him for having "failed to rebut the Special Master's conclusion," *id.* at 26–27, while the subpoenas for those records remain opposed and pending, Docs. 202, 248). Rebutting the Special Master's conclusion is not the standard; proving an offset to the Court by a preponderance is.

### *C. The consequence for this Court's determination.*

Framed correctly, this Response does not ask the Court to weigh competing analyses of the MVRA. It asks a prior and simpler question: did the party bearing the burden carry it? On the nine issues that are the Government's, the Second Supplement offers no evidence, no exhibit, no affidavit and no testimony — only the observation that Mr. Lindberg failed to persuade the officer who wrote the report. A burden of proof is not carried by the other side's failure to persuade. Nor is it carried by adopting the Special Master's recommendation: the Government appeared in this proceeding only to state that it "does not oppose the positions articulated by the Special Master," Doc. 245 at 44, and elsewhere that it "agrees with each of the Special Master's recommendations,"

Doc. 582 at 9 n.4. But the Government cannot carry its own § 3664(e) burden by adopting the report of the very officer whose work is challenged: the burden is the Government's, not the Special Master's, and adopting the recommendation of a court-appointed, fee-interested fiduciary — whose Report is the subject of Defendant's pending Motion to Disqualify (Doc. 269) — imports that fiduciary taint rather than supplying the independent proof the statute demands. Because the Special Master's recommendation is advisory only and is subject to this Court's de novo determination, 18 U.S.C. § 3664(d)(6), and because it is owed no deference, the deficiencies catalogued below are not gaps for the Court to fill. On this record they are failures of proof, and the only determination § 3664(e) permits is that the loss was not proved.

***D. The substantive limits the Government's proof would have had to satisfy.***

Federal courts have no inherent power to order restitution; the authority is statutory and is "circumscribed by the procedural and substantive protections" of the statute conferring it. *Ritchie*, 858 F.3d at 206; *United States v. Freeman*, 741 F.3d 426, 431 (4th Cir. 2014). Restitution reaches only the actual loss "directly and proximately" caused by the offense of conviction. 18 U.S.C. § 3663A(a)(2); *Hughey*, 495 U.S. at 413; *Lagos*, 584 U.S. at 582–85; *Paroline*, 572 U.S. at 445.

The burden is the Government's: "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). If and only if loss and causation are established, Mr. Lindberg bears the burden of demonstrating entitlement to a particular offset. *Karam*, 201 F.3d at 327. That allocation does not assist the Special Master here, because the failure of proof in the Second Supplement is on the elements that belong to the Government — the fact and amount of loss, foreseeability, and proximate causation — and because, as to the offsets, the

Special Master denies credits for want of documentation the Government simultaneously prevents Mr. Lindberg from obtaining. *See* Part IX, *infra*.

Restitution may not confer a windfall: the MVRA "does not allow a court to grant a windfall to the victim, and thereby unfairly punish a defendant by requiring him to pay back more money than he stole." *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017). Amounts returned to or recovered by a victim must be credited. 18 U.S.C. §§ 3663A(b)(1)(B), 3664(j)(2); *Robers*, 572 U.S. at 645; *United States v. Steele*, 897 F.3d 606, 611 (4th Cir. 2018). Restitution under the MVRA is criminal punishment. *Ellingburg v. United States*, 607 U.S. 163, 166 (2026). An order exceeding the statute's authority is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." *United States v. Davis*, 714 F.3d 809, 812 (4th Cir. 2013) (quoting *United States v. Broughton-Jones*, 71 F.3d 1143, 1147 (4th Cir. 1995)). And where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process" excessively, the Court may decline restitution altogether. 18 U.S.C. § 3663A(c)(3)(B).

## III. THE MATERIAL FACTS REMAIN UNDISPUTED

Because the Special Master offers no contrary evidence and concedes the "basic, objective, material facts," the following remain undisputed on this record. Each is established in Mr. Lindberg's prior filings, and the Second Supplement rebuts none of them with evidence:

1. The zero-default track record of the affiliated loans while Mr. Lindberg managed the program remains UNDISPUTED.
2. The more than $1 billion of capital Mr. Lindberg committed to back the affiliated loans — and his personal guarantee of approximately $2.39 billion — remains UNDISPUTED. The Special Master does not deny the guarantee; he argues only that a guarantee is "not, in and of itself, tantamount to a satisfaction of the applicable obligation." Doc. 245 at 29 n.28. Its relevance here is to foreseeability, not satisfaction.
3. The regulatory approval of the affiliate-investment strategy and the regulator's praise of Mr. Lindberg's performance remains UNDISPUTED.

4. The fact that the Ares transaction to purchase the NCICs was defeated after third-party governmental pressure on the buyer remains UNDISPUTED. The Second Supplement does not mention Ares at all. *See* Doc. 235 ¶¶ 26–27.
5. The KPMG and Houlihan Lokey findings that the affiliated loans were well secured, with “full coverage” at a conservative loan-to-value, remain UNDISPUTED. The Second Supplement does not mention either firm. *See* Doc. 235 ¶¶ 12–19.
6. The robust, written risk-management framework Mr. Lindberg implemented for the affiliated loans remains UNDISPUTED.
7. That the Commissioner acted on a premeditated plan to dismantle Mr. Lindberg's insurance business — formed before the relevant officials took their posts — remains UNDISPUTED.
8. That the Rehabilitator rejected the Oaktree transaction, which would have retired the affiliated loans at face value, remains UNDISPUTED. The Second Supplement does not mention Oaktree. *See* Doc. 235 ¶ 28.
9. That the Rehabilitator coerced a ten-year hold of the affiliated loans through the June 27, 2019 MOU, under an express written threat of immediate liquidation, remains UNDISPUTED. *See* Doc. 235 ¶ 30.

10. That the zero-coupon bonds were contractually scheduled to pay $1,006,239,867 at maturity remains UNDISPUTED. The Special Master confirms they were “bank-issued bonds” whose “purported purpose … was to provide protection for the principal amounts of the Affiliate Investments.” Doc. 245 at 24.
11. That the diminution in value of Mr. Lindberg's insurance companies was set in motion by a political vendetta remains UNDISPUTED.
12. That the Rehabilitator rejected the Montshire/Alban transaction and sued Mr. Alban to block it — a transaction that would have retired the affiliated loans and allowed the companies to exit rehabilitation and avoid liquidation — remains UNDISPUTED. The Second Supplement mentions neither Montshire nor Mr. Alban. *See* Doc. 174 ¶ 116.
13. That the Quadro purchase agreement signed in the first quarter of 2024 valued Clanwilliam at $880 million, and the Specified Affiliated Companies in the billions, remains UNDISPUTED. The Second Supplement does not mention Quadro. *See* Doc. 235 ¶ 32; Doc. 174 ¶ 117.
14. That Quadro valued the group at a 22.14x EBITDA multiple consistent with public-market comparables — a multiple that remains valid and accurate as a comparable today — remains UNDISPUTED. *See* Doc. 174 ¶ 117; Doc. 132-2 (Ex. I3, GG–Quadro Investor Presentation (Jan. 2024)) at 15 (22.14x transaction multiple).

15. That Mr. Lindberg inherited approximately $129 million of Agera exposure that he did not originate remains UNDISPUTED. The Special Master expressly "does not dispute the Defendant's recitation of the timing (i.e., most of the funds loaned to Agera were transferred before the Defendant acquired either Agera or the corresponding insurance company)." Doc. 245 at 19.

16. That the Rehabilitator's own team valued the NCICs at $454 million weeks after the transfer of control remains UNDISPUTED as a matter of fact; the Special Master says only that he "has not seen convincing evidence" of that value while simultaneously admitting he "has not ventured to look behind the valuation report." Doc. 245 at 18 & n.15.

17. **That KPMG independently appraised the insurance entities as of December 31, 2017 — concluding $380,500,000 for CBL, $57,500,000 for BLIC, $29,000,000 for SNIC and $46,500,000 for SNRC — remains UNDISPUTED and unmentioned. *See* Doc. 235 ¶¶ 13–15.**

The Special Master's own framing confirms the point: he identifies the dispute as one of a "legal conclusion," not fact. On a conceded factual record, those legal conclusions are for this Court — and they favor Mr. Lindberg.

## IV. NO LOSS WAS REASONABLY FORESEEABLE AT ORIGINATION

*Whose burden. Reasonable foreseeability is an element of proximate cause and belongs to the Government. 18 U.S.C. §§ 3663A(a)(2), 3664(e). The Special Master states that foreseeability "is a critical component of the Defendant's criminal intent, which the Special Master has not set out to prove (and does not consider it within the Special Master's charge to prove)." Doc. 245 at 30. No one, therefore, has made the finding the Government was required to prove, and the Government cannot satisfy its burden by adopting a report whose author disclaims the analysis.*

The undisputed record forecloses a finding that loss was reasonably foreseeable when the affiliated loans were underwritten. The loans operated under a written risk-management framework and suffered zero defaults under Mr. Lindberg's management. He committed more than $1 billion of his own capital, took no dividends, personally guaranteed the obligations in an amount of approximately $2.39 billion, and caused the insurers to purchase $1,006,239,867 in par value of investment-grade bank zero-coupon bonds for the express purpose of protecting the principal of the affiliated loans dollar-for-dollar. The NCDOI approved the strategy, and the Commissioner

praised his performance. In 2018, KPMG and Houlihan Lokey confirmed the loans were well secured, with "full coverage" at a loan-to-value in the range of approximately 38.7% to 47.3%. *See* Doc. 235 ¶¶ 1–3.

The Second Supplement's answer is not evidence but a syllogism: "All loans bear a risk of non-payment," and "an inability to pay is always reasonably foreseeable," even for "the most conservative of business loans" and "even loans that are personally" guarantied. Doc. 245 at 30. If that were the law, the MVRA's foreseeability requirement would do no work in any case involving a loan, and every lender's loss would be foreseeable to every borrower as a matter of definition. Foreseeability under the MVRA is offense-specific: the question is whether this loss was a reasonably foreseeable consequence of the conduct constituting the offense, not whether credit risk exists in the abstract. The Special Master's further suggestion that it was foreseeable "regulators might dispossess him of control" or that he "might be incarcerated," *id.* at 30–31, proves too little: what had to be foreseeable is the loss, and the specific intervening decisions that produced it — the refusal of three par-value transactions and the destruction of a guaranteed principal-protection portfolio — were not foreseeable to anyone. See *Stein*, 846 F.3d at 1154–56. To the extent the Court concludes that foreseeability cannot be resolved on the present record, 18 U.S.C. § 3663A(c)(3)(B) directs that the question be resolved by declining restitution — not by prolonging the proceeding — and any irreducible complexity falls on the Government as the party bearing the burden. 18 U.S.C. § 3664(e).

## V. INTERVENING, SUPERSEDING CAUSES BROKE THE CHAIN OF CAUSATION

*Whose burden. Proximate causation is the Government's to prove by a preponderance. Issues 14, 16 and 17 — the UKAT refinancing, the CWG sale, and the early bond sales, together approximately $1.125 billion — are resolved in the Second Supplement on the grounds that the Special Master is "not well-situated to second guess" the fiduciaries, "has not seen compelling evidence," and "has not*

*convinced the Special Master." Doc. 245 at 21, 24–25. Each is a burden the Government bore and did not carry.*

Even assuming a loss, it was caused by a chain of intervening acts of independent third parties — the Government, the court-appointed Rehabilitator, and others — each occurring after Mr. Lindberg ceded control on October 18, 2018. A sentencing court "should take into account intervening events contributing to the loss unless those events also were reasonably foreseeable to the defendant," and a restitution order entered without findings on the effect and foreseeability of those events must be vacated. *Stein*, 846 F.3d at 1154–56. The MVRA's legislative history confirms that intervening circumstances limit restitution: restitution reaches only harm "under the count or counts for which the offender is convicted." S. Rep. No. 104-179, at 19 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932. The Second Supplement makes none of the required findings; it concedes the facts and declines to review the conduct.

***A. Robers and Ritchie do not shift this burden to Mr. Lindberg.***

The Special Master's two authorities are directed at a different question. He invokes *Robers* for the proposition that a defendant who transfers non-cash property receives credit upon "the eventual liquidation of the property transferred," Doc. 245 at 15 (citing *Robers*, 572 U.S. at 644–46), and *Ritchie* for the proposition that "the burden of showing that a victim delayed unreasonably in selling property (or otherwise neglected it) belongs with the defendant," *id.* (quoting *Ritchie*, 858 F.3d at 211). Both concern a victim's passive delay or neglect in liquidating collateral it holds.

That is the opposite of what happened here. The Rehabilitator did not delay in selling; he sold early — affirmatively liquidating, decades before maturity, an instrument whose entire value proposition was payment of par at maturity. Nothing in *Ritchie* assigns to a defendant the burden of disproving an affirmative act of value destruction by the victim's fiduciary, and *Robers* itself recognizes that where a victim "chooses to hold collateral rather than to reduce it to cash within a

reasonable time, then the victim must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." 572 U.S. at 647–48 (Sotomayor, J., concurring). If a victim's inaction can break the chain, a fiduciary's deliberate destruction of a guaranteed recovery breaks it a fortiori. In all events, the ultimate burden on causation remains the Government's under § 3664(e).

***B. The Ares transaction, defeated by governmental interference (November 2018).***

Mr. Lindberg executed a letter of intent for Ares Management to purchase the NCICs on terms that would have retired the affiliated loans and protected policyholders. After contact with the Government, Ares cited undisclosed third-party advice to avoid any ongoing connection with Eli Global and abandoned the transaction. Governmental interference with a signed, value-preserving transaction is a cause attributable to the Government, not to Mr. Lindberg. The Second Supplement does not mention Ares. *See* Doc. 235 ¶¶ 26–27 (executed letter of intent; Eli Global CFO's contemporaneous memorialization of the buyer's stated reason for withdrawing).

***C. The Rehabilitator's refusal of the Oaktree transaction (February 2019).***

The February 2019 Oaktree proposal contemplated an approximately $1.0 billion investment into a special-purpose vehicle that would have acquired the affiliated-loan positions at face value, removing them from the insurers' balance sheets and paying policyholders in full by mid-2019. The Rehabilitator declined it. That discretionary refusal is an independent, intervening, and superseding cause. The Second Supplement does not mention Oaktree. *See* Doc. 235 ¶ 28.

***D. The Rehabilitator's coercion of a ten-year hold (June 27, 2019 MOU).***

Rather than monetize the loans at par, the Rehabilitator presented the MOU on a take-it-or-leave-it basis some forty-eight hours before entry of the rehabilitation order, under an express written threat to "move directly to liquidation." His counsel described the tactic as "hammer and nail." The MOU locked the affiliated loans in place on a ten-year schedule, foreclosing the very

monetization the Special Master now faults Mr. Lindberg for failing to achieve. One cannot lock an asset away for ten years, refuse every offer to buy it, and then charge the owner for its decline. *See* Doc. 235 ¶ 30.

### *E. The pre-maturity sale of the principal-protection bonds ($611.6 million).*

The zero-coupon bonds existed to guarantee $1,006,239,867 of principal protection at maturity. The Rehabilitator sold them early for approximately $394 million — less than forty cents on the dollar — crystallizing a loss of approximately $611.6 million. The Special Master does not dispute the instruments or their purpose; he offers three responses, none of which are sufficient. *See* Doc. 235 ¶¶ 7, 31.

First, he says the bonds "were not paying any interest or interim payments" and "would have matured decades after the policyholders' annuities exited the 5- or 7-year surrender period," so the rehabilitator sold "to help meet the companies' financial needs." Doc. 245 at 24. But this statement is patently false; from 2019 through December 2023, the NCICs at all times held over $1 billion of cash and marketable securities in the form of third-party bonds. *See* Part XV.E, *infra*. The sale of the zero coupon bonds in 2019 was entirely unnecessary.

Second, he faults Mr. Lindberg for not proving "that the sale price, discounted to present value and to factor in recovery risk (however minute), was unreasonably low." Doc. 245 at 24. That objection is answered on the Special Master's own terms: the relevant comparison is not a discount-rate debate but the contractual certainty the instruments provided. In any event, the burden of establishing loss and causation is the Government's, and Mr. Lindberg cannot supply a bond-by-bond present-value reconstruction while the records remain in others' hands and the subpoenas that would produce them have been refused.

Third, he falls back on the proposition that Mr. Lindberg's own conduct placed the companies into rehabilitation, so he "bears some responsibility" for anything that followed. Doc.

245 at 24–25. "Some responsibility" is not proximate causation, and that reasoning would make a defendant answerable for every discretionary act of every fiduciary for as long as a receivership lasts. The MVRA does not extend that far.

### *F. The refusal of the Montshire/Alban transaction (2023).*

As recently as 2023, Mr. Lindberg negotiated with Montshire Advisors and an investor group formed by Bob Alban to present a purchase agreement to the NCDOI for the NCICs — a transaction that, like Ares and Oaktree, would have paid policyholders in full, retired the affiliated loans, and allowed the companies to exit rehabilitation and avoid liquidation entirely. The Rehabilitator not only rejected the offer; he sued Mr. Alban to stop it. This transaction alone breaks the chain of proximate causation. The Second Supplement mentions neither Montshire nor Mr. Alban. *See* Doc. 174 ¶ 116.

### *G. The blocking of the Quadro transaction (first quarter 2024).*

In the first quarter of 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing Clanwilliam at $880 million and the Specified Affiliated Companies in the billions, at a 22.14x EBITDA multiple consistent with public-market comparables. That transaction was blocked over Mr. Lindberg's objection. Its rejection in the first quarter of 2024 alone breaks the chain of proximate causation, and the 22.14x public-market comparables remain valid and accurate today, placing the group's value well above any restitution figure the Special Master proposes. The Second Supplement does not mention Quadro even once. That silence is significant: the Special Master rests his valuation conclusions on older figures while omitting the most recent arm's-length, signed, public-market-benchmarked valuation in the record. *See* Doc. 235 ¶ 32; Doc. 174 ¶ 117.

To the extent the Court concludes that the causation questions cannot be resolved on the present record, 18 U.S.C. § 3663A(c)(3)(B) directs that the question be resolved by declining

restitution — not by prolonging the proceeding — and any irreducible complexity falls on the Government as the party bearing the burden. 18 U.S.C. § 3664(e).

## VI. THE CONVERGING 2018 VALUATIONS REFUTE THE REPORT'S CONCLUSORY DISMISSAL OF NCIC VALUE

*Whose burden. The value of the insurance companies goes to the amount of loss, which is the Government's to prove. The Second Supplement answers Issue 11 by saying it "has not seen convincing evidence that the North Carolina Insurance Companies were worth $454 million in 2018." Doc. 245 at 18. That is a statement about Mr. Lindberg's proof, not about the Government's.*

On the value of the NCICs when control was transferred, the Second Supplement says only that the Special Master "(albeit with the benefit of perfect hindsight vision) has not seen convincing evidence that the North Carolina Insurance Companies were worth $454 million in 2018," Doc. 245 at 18, while admitting in the accompanying footnote:

> *"The Special Master has not ventured to look behind the valuation report to determine what alleged facts or representations upon which the appraiser may have relied or what other assumptions the appraiser may have made." Doc. 245 at 18 n.15.*

A conclusion that evidence is unconvincing, reached expressly without examining it, is not a finding. And the value does not rest on one document. Three independent 2018 data points converge:

- **The KPMG appraisal. KPMG LLP's Economic and Valuation Services practice appraised the equity of Global Bankers Insurance Group's insurance entities as of December 31, 2017, issuing its report on August 24, 2018. KPMG concluded the fair value of a 100% controlling, marketable equity interest in each company: Colorado Bankers Life Insurance Company, $380,500,000; Bankers Life Insurance Company, $57,500,000; Southland National Insurance Corporation, $29,000,000; and Southland National Reinsurance Corporation, $46,500,000 — $467,000,000 for CBL, BLIC and SNIC together, and $513,500,000 including SNRC. The report was prepared as a Restricted Appraisal Report under Standards 202, 8-2 and 10-2 of the Uniform Standards of Professional Appraisal Practice, and KPMG understood that the resulting balance sheet would be "utilized by the North Carolina**

**Department of Insurance to satisfy certain regulatory requirements" relating to Mr. Lindberg's ownership of the companies. The Second Supplement never mentions KPMG. *See* Doc. 235 ¶¶ 13–15, 18–19.**

- **The Rehabilitator's own internal valuation.** The team under the Rehabilitator's control valued the NCICs at $454 million on November 5, 2018 — eighteen days after the transfer. The Special Master acknowledges this was "a valuation done by the neutral fiduciaries that assumed control." Doc. 245 at 18.
- **The Ares letter of intent.** The executed November 22, 2018 Ares proposal valued the NCICs in the same range on arm's-length, third-party transaction terms. The Second Supplement never mentions it. *See* Doc. 235 ¶ 26.

One of these comes from a nationally recognized valuation firm, one from the victims' own fiduciaries, and one from the market. Against them the Special Master offers no appraisal, no expert, and an express refusal to examine the record. His observation that the NCIC equity "has no value today," Doc. 245 at 19, confirms rather than answers the point: the question is the value at the moment control passed, before the intervening acts that destroyed it.

## VII. THE SPECIAL MASTER'S OWN VALUATIONS ARE A "CURRENT GUESS," HAVE BEEN CUT BY A THIRD, AND ARE OFFERED UNDER SEAL

*Whose burden. The value of the assets available to satisfy restitution, like the amount of loss, must be proved — not guessed. The Government offers no valuation of its own and relies on the Special Master's "current guess," Doc. 245 at 37, itself resting on a "desktop exercise," id. at 36. An unproved estimate does not discharge a burden of proof.*

The Second Supplement's treatment of the assets available to satisfy restitution is where the due-process problem is starkest. In the Initial Report, the Special Master estimated the Primary Restitution Assets at $1.162 billion (low), $1.454 billion (mid), and $1.878 billion (high). Doc. 106 at 30. In the Second Supplement, without any independent appraisal, he reduces those figures to:

*Redacted*

That is a reduction of roughly half a billion at the midpoint — approximately thirty-one percent — accomplished in a single chart. The Special Master describes the basis for these numbers in his own words. They are derived from "illustrative valuation analyses prepared by the financial advisors to NHC Holdings, LLC," which "do not constitute formal valuations or fairness opinions; rather, they reflect a desktop exercise," and which are "subject to change." Doc. 245 at 36 n.31. He characterizes the result as his "current guess." *Id*. at 36–37. And he proposes to file the explanation for the reduction under seal, on the ground that disclosure "would negatively impact liquidation efforts." *Id*. at 36 n.32.

Three consequences follow. First, there is no independent, third-party valuation anywhere in the Second Supplement from a nationally recognized firm such as KPMG or Houlihan Lokey. The only valuation input comes from the financial advisors to NHC Holdings, LLC — the entity that holds and disposes of the very assets being valued. Mr. Lindberg, by contrast, has offered only valuations grounded in nationally recognized firms, the fiduciaries' own work, or arm's-length transaction data. *See* Doc. 235 ¶¶ 12–19.

Second, the effect of holding the restitution figure high while cutting the asset estimate is to manufacture an apparent shortfall. On the Special Master's own numbers, restitution of $1.616 billion now exceeds his midpoint asset estimate of $998 million by more than $600 million. That gap is the predicate a forfeiture theory requires. *See* 18 U.S.C. § 981; 21 U.S.C. § 853. It is produced by an unreduced restitution figure that ignores some $2.9 billion in offsets on one side,[2] and a self-generated "guess" on the other.

---

[2] The $866 million loss of value on the sale of Beckett increases the documented offsets and credits to $3,765,418,383 (approximately $3.7 billion). *See* note 1, *supra*, and the revised schedule of offsets, credits and reductions set out in Part IX.

Third, a defendant cannot meaningfully contest a valuation whose underlying analysis he has never seen. Due process requires that a criminal penalty of this magnitude rest on a credible valuation subject to adversarial testing. An officer who generates the restitution figure, generates the only asset estimates in the record, is compensated from the assets in question, and asks this Court to accept a "guess" explained only in camera is not a neutral source for either number. "[N]o man can be a judge in his own case." *In re Murchison*, 349 U.S. 133, 136 (1955). The consequence is not that the Court should commission a better valuation. The consequence is that the Government has not proved the loss. The only valuation in the record is the Special Master's own "current guess," Doc. 245 at 37, and the Court may not enter a criminal penalty on a guess. Because the burden of proving the amount of loss by a preponderance is the Government's, 18 U.S.C. § 3664(e), and because that burden cannot be carried by an estimate its author disclaims and files under seal, the recommendation fails as proposed and must be rejected. It is not the Court's task to build the record the Government did not.

To the extent the Court concludes that the value of the restitution assets cannot be resolved on the present record, 18 U.S.C. § 3663A(c)(3)(B) directs that the question be resolved by declining restitution — not by prolonging the proceeding — and any irreducible complexity falls on the Government as the party bearing the burden. 18 U.S.C. § 3664(e).

## VIII. THE RECOMMENDATION MEASURES EXPOSURE, NOT REALIZED LOSS

*Whose burden. That the recommended figure measures outstanding principal rather than realized loss is a defect in the Government's proof of the amount of loss under § 3664(e), not a credit Mr. Lindberg must earn.*

The Special Master responds to Mr. Lindberg's argument that risk is not loss by asserting that his "methodology for calculating restitution in this Case includes no risk, only actual loss," because the figure "includes only sums that the Defendant took from the persons due restitution but has not repaid." Doc. 245 at 32. That answer concedes the premise. A measure of sums taken

and not yet repaid is a measure of outstanding loan principal — the same metric the Report elsewhere describes as the amount "extracted" — not a measure of what the victims actually lost. It takes no account of the collateral and principal protection the loans carried, of the guarantee behind them, or of the recoveries the victims in fact received; and it treats the unpaid balance of a secured, insured, and guaranteed obligation as though it were cash simply removed.

The MVRA compensates realized pecuniary loss, not exposure and not disappointed expectations. *Hughey*, 495 U.S. at 413; *Stone*, 866 F.3d at 226. On this record the protected policyholders have been paid: Mr. Lindberg's conduct in 2025 facilitated more than $157 million in distributions to over 43,000 excess policyholders, and he relinquished a $40 million tax escrow to allow it. Restitution measured as unpaid principle, unreduced by the value returned, is a windfall the statute forbids. *See* Doc. 174 ¶ 120 (December 2025 distribution of more than $157 million to more than 43,000 policyholders).

## IX. MANDATORY OFFSETS AND CREDITS INDEPENDENTLY REDUCE ANY RESTITUTION TO ZERO

*Whose burden. This Part, and this Part alone, addresses the one burden that is Mr. Lindberg's. Once the Government has proved loss and causation, he must establish entitlement to a particular offset. Karam, 201 F.3d at 327. He does not contest that allocation. He shows below that he has carried it where the Government has not obstructed the proof, that two of these credits were deferred rather than denied on a condition the statute does not contain, and that the one category on which the Report demands more documentation is the category whose documents the Government is withholding.*

Even if loss and causation were established, restitution must be reduced by amounts returned to or recovered by the victims. 18 U.S.C. §§ 3663A(b)(1)(B), 3664(j)(2); *Robers*, 572 U.S. at 645; *Steele*, 897 F.3d at 611. Mr. Lindberg has documented offsets aggregating

approximately $2.89 billion,[3] which if credited yield net restitution of zero. Of that sum, the Second Supplement allows $39 million — approximately 1.3% — and it trims even the items it accepts, reducing the CBL preferred-equity credit from $29.5 million to $26 million, the BLIC credit from $4.2 million to $3 million, and the PBLA credit from $21.9 million to $3 million. Doc. 245 at 12–13.

The complete schedule of offsets, credits and reductions — updating the summary chart filed at Doc. 132 at 11 and Doc. 132 Ex. 2 for the $866 million loss on the Beckett sale (*see* note 1, *supra*) — is set out below. (The Special Master's proposed figure has since become $1,616,175,000. Doc. 245 at 6.)

| **Item (references are to Doc. 132)** | **Amount** | **Ref.** |
|---|---|---|
| Special Master's Proposed Restitution Figure | $1,625,000,000 | — |
| **Improper Additions to Affiliate Investment Balances** | | I. |
| Pre-Judgment Interest | ($263,000,000) | I.A |
| Corrected Starting Balance of Affiliate Investments | ($141,000,000) | I.B |
| **Additional Credits** | | II. |
| AAPC Preferred Equity Par Value as of May 26, 2026 | ($352,906,240) | II.A |
| SNIC Payments | ($27,823,425) | II.B |
| Cash Payments to Pre-Designated Restitution Parties Not Captured by the Special Master | ($79,655,289) | II.C |
| CBL Subordination Fee (Beckett refinancing) | ($3,000,000) | II.D |
| Additional Clanwilliam Sale Proceeds | ($20,000,000) | II.E |
| ULICO Sale of Contributed Real Estate | ($13,596,013) | II.F |
| Sale Proceeds of Zero-Coupon Bonds in PPNs | ($243,452,385) | II.G |
| Value of NCICs as of October 2018 | ($454,000,000) | Exh. 1 |
| Bermuda ICs' Proceeds from Sales of Affiliated Assets | ($9,800,076) | Exh. 1 |
| **Losses Not Proximately Caused by Mr. Lindberg** | | III. |
| Loss on Agera | ($129,398,324) | III. |
| ECL Losses | ($22,288,826) | Exh. 1 |

[3] The $866 million loss of value on the sale of Beckett increases the documented offsets and credits to $3,765,418,383 (approximately $3.7 billion). *See* note 1, *supra*, and the revised schedule of offsets, credits and reductions set out in Part IX.

| | | |
|---|---|---|
| Loss on UKAT | ($39,000,000) | Exh. 1 |
| Insurance-Holdco Debt Portion | ($14,897,805) | Exh. 1 |
| Loss on Clanwilliam Below-Market Sale | ($474,000,000) | Exh. 1 |
| Loss on Early Zero Coupon Bond Sales | ($611,600,000) | Exh. 1 |
| Loss on Beckett Sale | ($866,000,000) | Note 1, *supra*; Exs. 6(a)–6(c) |
| **TOTAL MINIMUM OFFSETS AND REDUCTIONS** | **($3,765,418,383)** | |
| **NET RESTITUTION OWED** | **$0** | |

### *A. The ULICO preferred equity ($352,906,240).*

ULICO accepted $25 million and a transfer of AAPC preferred equity in partial satisfaction of its $524 million civil judgment, with an agreed dollar-for-dollar credit; that equity carried a par value of $352,906,240 as of May 26, 2026. The Special Master defers any credit until ULICO "realizes this value," Doc. 245 at 6 n.3, reasoning that ULICO "has not unreasonably refused to liquidate this asset," *id*. at 15–16. Section 3664(j)(2) contains no realization condition, and the practical result is a double recovery: ULICO retains both the preferred equity and its claim for the full amount. *Steele*, 897 F.3d at 611. If the asset is genuinely unmarketable, that is a consequence of restrictions the victim accepted, not a reason to charge Mr. Lindberg twice. Nor may the Court enter a figure that defers a mandatory credit: 18 U.S.C. § 3664(j)(2) contains no such condition, and a recommendation that withholds credits the statute makes mandatory is contrary to law and must be rejected as proposed — not entered subject to later adjustment.

### *B. The zero-coupon bond proceeds ($243 million) — denied for want of documents the Government withholds.*

The Special Master denies this credit because Mr. Lindberg "has failed to present sufficient documentation to the Special Master to enable the Special Master to appraise … the quantity of any potential reductions." Doc. 245 at 12–13. He denies the $9.4 million Finnazen/Blue Violet credit on the same basis. *Id*. at 12–13. And he rejects the $141 million starting-balance correction notwithstanding the NCICs' own verified pleadings and pretrial stipulation reciting approximately $1.25 billion.

This is the due process core of the matter. Mr. Lindberg is in the custody of the Bureau of Prisons. He surrendered control of his companies, together with their books and records, on four separate occasions beginning in October 2018. The records that would document the zero-coupon proceeds, the affiliated-loan starting balances, and the Finnazen/Blue Violet payments have been in others' hands ever since. Mr. Lindberg sought subpoenas to obtain them, and the Government opposed. The Special Master cannot fairly deny credits for insufficient documentation while the Government blocks access to the documentation, and the Court cannot find a $1.6 billion loss by a preponderance on a record assembled under those conditions. *See* Doc. 174 ¶¶ 2, 4 (detention and materially constrained access to documents); Doc. 235 ¶ 15 (control of the insurers passed to State administrative supervision on October 18, 2018); Doc. 245 at 11, 13; Doc. 248 (the pending motion for subpoenas duces tecum for those records); Doc. 202 (the pending motion for access to a computer, the internet, and the financial records). That is not a failure of Mr. Lindberg's offset proof; it is a failure of the Government's loss proof and a denial of due process. The Court cannot find the net amount by a preponderance on a record the Government has closed, and the item must be resolved against the party bearing the burden.

***C. Prejudgment interest ($263 million).***

The Second Supplement adds approximately $263 million in interest, defending it as "necessary to make the victims whole" and noting that the rate is below the contractual and IALA rates and below the applicable federal rate. Doc. 245 at 14–15. Rate moderation is not authority. The component rests on a 2.19% rate — the 30-Day United States Treasury rate from June 27, 2019 through March 31, 2026 — applied to the Affiliate Investment balances as "post-IALA interest" to account for "the time value of money." Doc. 106 at 3–4 & App'x 3 at 8. Interest, if it is recoverable at all, is a component of the amount of loss, and the amount of loss is the Government's to prove. 18 U.S.C. § 3664(e).

As a threshold matter, the MVRA does not include interest among the compensable forms of financial loss recoverable through restitution, and the prosecuting Department's own published policy says the same: it excludes interest as a "financial loss" and states that interest is "not eligible for restitution." The Restitution Process (Fraud and/or Financial Crimes), U.S. Dep't of Justice, Criminal Division, https://www.justice.gov/criminal/criminal-vns/restitution-process (updated Oct. 10, 2023). The Second Supplement neither disputes that the policy exists nor identifies statutory text authorizing the charge.

An award of interest is also contrary to the plain language of the statute. The MVRA requires "offenders to restore property lost by their victims as a result of the crime." *Robers v. United States*, 572 U.S. 639, 640 (2014). It supplies two mechanisms, and only two. The court may order the defendant to "return the property to the owner," 18 U.S.C. § 3663A(b)(1)(A); or, "if return of the property … is impossible, impracticable, or inadequate," it may order payment of "the greater of (I) the value of the property on the date of the [loss]; or (II) the value of the property on the date of sentence," less the value of any part of the property that is returned, *id.* § 3663A(b)(1)(B). Subsection (b)(1)(A) contains no provision for adding interest where the defendant can return the property taken. Where the property is cash, subsection (b)(1)(A) is the operative provision: as *Robers* explains, if "the 'property' that was 'damage[d],' 'los[t],' or 'destr[oyed]' was the money, then 'the property … returned' must also be the money," and "[m]oney being fungible," the return of an equivalent sum satisfies the statute. 572 U.S. at 643. Subsection (b)(1)(B) addresses the different case of substitute property. What the Pre-Designated Restitution Parties lost was cash — the money taken out of the companies through the Affiliate Investments — and an order directing its return satisfies the MVRA without more.

The decisions permitting prejudgment interest do not bind this Court, and each rests on the subsection that does not apply here. See *United States v. Qurashi*, 634 F.3d 699, 703–04 (2d Cir. 2011); *United States v. Fike*, 140 F.4th 351, 356 (6th Cir. 2025) (collecting cases). Both proceed from § 3663A(b)(1)(B) and from its premise that a victim's losses may change in value between the date of the loss and the date of sentencing. *Fike*, 140 F.4th at 356; *Qurashi*, 634 F.3d at 703. That premise governs substitute property. It has no work to do where the victim lost cash that the defendant can return.

The Fourth Circuit has not decided this question under the MVRA. The Special Master relies on *United States v. Hoyle*, 33 F.3d 415, 420 (4th Cir. 1994). Doc. 106, App'x 3 at 10. *Hoyle* held that interest excluded from the Guidelines loss calculation could nonetheless be included in a restitution award. But it was decided in 1994, under the Victim and Witness Protection Act and before the MVRA was enacted, and it did not construe § 3663A(b)(1). It therefore does not answer whether the MVRA's return-the-property mechanism permits an interest add-on.

Finally, interest is not part of these victims' actual loss. Criminal restitution "is not concerned with a victim's disappointed expectations but only with his actual loss," and the MVRA "is not the vehicle to obtain what would, in effect, be expectation damages." *United States v. Boccagna*, 450 F.3d 107, 119 (2d Cir. 2006); accord *Stone*, 866 F.3d at 226. Nor may restitution "include consequential damages." *United States v. Coats*, 487 B.R. 648, 653 (E.D.N.C. 2013). The $263 million is expectation, not loss: it compensates for the time value of money across the years the insurance companies carried the Affiliate Investments. Including only the principal amount redresses the actual loss caused by the offense without imposing punishment the MVRA does not authorize. The interest component should be struck.

### *D. Losses not proximately caused by the offense.*

The Agera loss (approximately $129 million) arose from exposure Mr. Lindberg inherited and did not originate — as the Special Master concedes on the timing, Doc. 245 at 19 — and from the independent fraud of Agera's chief financial officer. The UKAT loss (approximately $39 million) followed the fiduciaries' refusal of a refinancing. The ECL and Insurance-Holdco items rest on transactions Mr. Lindberg did not direct. None of these losses is "closely related" to the conduct constituting the offense of conviction.

To the extent the Court concludes that the offsets and the net amount of loss cannot be resolved on the present record, 18 U.S.C. § 3663A(c)(3)(B) directs that the question be resolved by declining restitution — not by prolonging the proceeding — and any irreducible complexity falls on the Government as the party bearing the burden. 18 U.S.C. § 3664(e).

## X. THERE WAS NO WAIVER

The Second Supplement advances waiver at least five times, asserting that Mr. Lindberg waived the new arguments in his supplemental filings (Doc. 245 at 7); waived his objection to the unexplained $30 million increase first appearing in the First Supplement (Doc. 146) (id. at 24–25); waived his complaints about access to counsel and documents (*id*. at 28); waived his causation and foreseeability arguments "by failing to raise them with the Court prior to sentencing or prior to entry of the Preliminary Restitution Order, by agreeing to the Special Master process, and by pleading guilty to these crimes" (id. at 29–30, 30); and waived his constitutional arguments "by consenting to the special master process … and using his cooperation with the special master process to obtain a reduced sentence," such that it would be "unconscionable" to permit them now (*id*. at 32–33).

No waiver occurred, on any of these theories. The plea agreement contains no waiver of causation or of the right to contest the amount of restitution; it obliges Mr. Lindberg to pay full

restitution without fixing any amount. The operative promise is "[t]o entry of an order for monetary penalties due and payable immediately, such penalties including full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct," including a promise "to pay full restitution to the following insurance companies and their impacted policyholders for the conduct charged in the Bill of Indictment." Plea Agreement ¶ 10(a) (Doc. 40). No dollar amount appears anywhere in the agreement; the only stipulated figure is the Guidelines loss figure, and the plea provides in the same paragraph that "'loss' under U.S.S.G. §§ 2B1.1 may be different from, greater, or lesser than restitution under 18 U.S.C. § 3556." Id. ¶ 8(a). The parties jointly agreed to bifurcate sentencing from restitution, and this Court's order contemplates a separate restitution proceeding — which is precisely why these arguments are presented now rather than earlier. A preliminary restitution order is by design provisional and subject to finalization. That construction was pressed before this Court at length in the Memorandum in Support of Mr. Lindberg's Motion to Stay, which argued that "Paragraph 10(a) Is Construed Against the Government as Its Drafter and Does Not Waive the MVRA's Causation Requirement," and that "nothing in ¶ 10(a) purports to displace" the statutory standard, which "remains the Government's to prove, § 3664(e), subject to this Court's de novo review, § 3664(d)(6)." Doc. 173 at 24, 25; *see* Doc. 172 (Motion to Stay, filed June 9, 2026); Doc. 190 (renewed Motion to Stay, filed June 11, 2026). *Manrique v. United States*, 581 U.S. 116 (2017); *Dolan v. United States*, 560 U.S. 605 (2010). Agreeing to a special-master process to assist the Court is not a waiver of the statutory and constitutional limits on what that process may produce; a defendant does not forfeit the MVRA's causation requirement by consenting to an orderly

procedure for applying it. And pleading guilty establishes the offense — not the amount of loss, which the factual basis leaves open. (Doc. 42).[4]

Far from waiving anything, Mr. Lindberg has expressly reserved and preserved his rights in every filing: Mr. Lindberg "respectfully reserves all rights to supplement this Response with additional factual information … prior to" the final restitution hearing (Doc. 132 at 25 n.9); the Supplemental Statement of Facts devotes an entire section to "Preservation of Error for Appellate Review" and another to "Reservation of Rights" (Doc. 174 ¶¶ 126–127); and the Motion to Dismiss reserves the de novo causation and offset determination and preserves the constitutional questions (Doc. 234

[4] The Factual Basis (Doc. 42, filed Nov. 11, 2024) stipulates no loss amount and no restitution figure. It recites that it "does not attempt to set forth all of the facts known to the United States at this time," and that "the parties expressly agree that there is a factual basis for the guilty plea(s) that the defendant will tender pursuant to the Plea Agreement, that the defendant is in fact guilty of the charges contained in Counts 1 and 13 of the Indictment as alleged, and that the facts set forth in this Factual Basis are sufficient to establish all of the elements of the crime(s) beyond a reasonable doubt." Doc. 42 at 1. Its substantive recitations, in full: "1. Defendant GREG E. LINDBERG ('LINDBERG') held ultimate financial control and interest over multiple insurance companies, dozens of operating companies, and more than one hundred holding and pass-through entities (collectively, 'Affiliated Companies'). One of LINDBERG'S holding companies, Southland National Holdings ('SNH') was the holding company for his North Carolina-based insurance companies, including Colorado Bankers Life Insurance Company ('CBLIC'), Bankers Life Insurance Company ('BLIC'), Southland National Insurance Company ('SNIC'), and Private Bankers Life and Annuity Co., Ltd. ('PBLA'). LINDBERG also owned other insurance companies, including Omnia Ltd.; Northstar Financial Services (Bermuda) Ltd.; and PB Investment Holdings Ltd. During certain relevant periods, LINDBERG was the Chairman and on the board of his insurance companies and was a director of a Malta-based investment adviser that he owned, Standard Advisory Services Limited ('SASL'), which was registered with the United States Securities and Exchange Commission. 2. Nearly all of PBLA's business was related to a reinsurance agreement it entered into on or about June 30, 2017, with Universal Life Insurance Company ('ULICO'). ULICO was an insurance company with its principal place of business in Puerto Rico. As part of the PBLA-ULICO Reinsurance Agreement, PBLA established a ULICO 2017 Trust (the 'ULICO 2017 Trust') and a separate Comfort Trust Account (the 'ULICO Comfort Trust'). The PBLA-ULICO Reinsurance Agreement set forth numerous requirements governing the types of investments that could be made in the ULICO 2017 Trust and the Comfort Trust and the periodic reporting and certification that PBLA had to make to ULICO concerning the assets in these accounts. 3. From no later than 2016 through at least 2019, LINDBERG and others conspired to commit various offenses against the United States, specifically crimes in connection with insurance business, wire fraud, and investment adviser fraud. LINDBERG also conspired with others to engage in monetary transactions affecting interstate and foreign commerce of more than $10,000, which involved the proceeds of various specified unlawful activities, knowing that the funds involved in the monetary transactions represented the proceeds of some form of unlawful activity. 4. LINDBERG knowingly and willfully joined each conspiracy with an intent to further its objects, i.e., (1) to commit offenses against the United States, specifically violations of 18 U.S.C. §§ 1033, 1343, and 15 U.S.C. §§ 80b-6 and 80b-17; and (2) to engage in monetary transactions in property derived from specified unlawful activities in violation of 18 U.S.C. § 1957. 5. To carry out the conspiracies, LINDBERG and others engaged in circular, non-economic transactions among LINDBERG's web of entities using insurance company funds, and made, and/or caused to be made, various materially false and misleading statements, representations, and half-truths to, and omitted material information from, the North Carolina Department of Insurance, various ratings agencies, ULICO, insurance policyholders, and others regarding these transactions. 6. LINDBERG's conduct caused substantial financial hardship to his insurance companies, to third parties like ULICO, and to policyholders. As a result, certain of LINDBERG's insurance companies were placed in rehabilitation and PBLA was placed into liquidation. 7. In furtherance of the conspiracies, and to accomplish the objects thereof, LINDBERG and his co-conspirators each committed one or more overt acts in the Western District of North Carolina and elsewhere." Doc. 42 at 1–2. Nowhere does the Factual Basis state a loss amount, a restitution amount, or that any particular loss was reasonably foreseeable.

nn.1, 3); the objections to the Special Master's Report were further pressed on the record in Mr. Lindberg's Response to Third Parties' Objections to the Special Master's Report and Recommendation (Doc. 151, filed May 18, 2026); and the causation, offset, and constitutional objections were renewed in the Motion to Stay and its supporting Memorandum (Docs. 172, 173, filed June 9, 2026) and in the renewed Motion to Stay (Doc. 190, filed June 11, 2026). A party who reserves rights in terms in every filing has not waived them and characterizing that record as waiver does not make it so. Part XIX, *infra*, states two further express reservations arising from the denial of database and records access.

The procedural history compounds the point. The Order Appointing the Special Master directed him to consult with Mr. Lindberg. He never once spoke with him. His answer is that his team "had repeated discussions with the Defendant's counsel" and that counsel reviewed a draft of the Initial Report, Doc. 245 at 28 — which confirms rather than refutes the point. Mr. Lindberg was given a single day to respond to the final report, from BOP custody, without counsel and without a copy of it; the report was then filed early. The Second Supplement itself records that "the Defendant's counsel would not be able to confer with the Defendant about the positions taken, and relief requested, … before the deadline." Doc. 245 at 44. A defendant who was never consulted, never given the documents, and never given time cannot be said to have waived what he had no opportunity to raise.

## XI. THE REHABILITATION PLAN WAS NEVER A LIQUIDATION PLAN

The Second Supplement asserts repeatedly that "the Defendant's own actions caused the North Carolina Insurance Companies to be placed into rehabilitation and then liquidation." Doc. 245 at 19; *see id.* at 21–22, 24–25. That statement conflates two different events. The June 2019 consent order placed the companies into rehabilitation, not liquidation, and rehabilitation contemplated their emergence. Liquidation came later, and it came because every value-preserving

alternative was refused: Ares in 2018, Oaktree in 2019, Montshire/Alban in 2023, and Quadro in 2024. Mr. Lindberg litigated for years against liquidation and continued proposing transactions that would have allowed the companies to exit rehabilitation and avoid liquidation entirely. Restitution cannot rest on the proposition that a defendant caused an outcome he spent six years and four transactions attempting to prevent.

## XII. COMPLEXITY MUST BE RESOLVED IN MR. LINDBERG'S FAVOR

Finally, if the Court concludes that the causation and offset questions cannot be resolved on this record, that conclusion favors Mr. Lindberg. The MVRA permits the Court to decline restitution where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). The Special Master's own submission illustrates the difficulty: he concedes the facts, disclaims the foreseeability inquiry, abstains from reviewing the fiduciaries' decisions, and values the assets by "guess." Because the plea agreement fixed no amount, Plea Agreement ¶ 10(a) (Doc. 40) — leaving open that the amount could be zero — any irreducible complexity must be resolved against the party bearing the burden, which is the Government.

## XIII. THE SECOND SUPPLEMENT FAILS THE MVRA'S REQUIREMENT OF AN ACCOUNTING OF THE RESTITUTION AMOUNT

Separate from the defects in causation and offset analysis addressed above, the Second Supplement suffers from a more elementary failure: after eighteen months of work, and after the relevant books and records were out of Mr. Lindberg's control for more than seven years, the Special Master has never produced an accounting of the restitution amount he asks this Court to impose. The MVRA does not treat an accounting as an administrative courtesy. It makes the accounting the predicate for everything that follows, and its absence deprives the Court of the means to make the findings § 3664(e) requires.

### *A. The statute makes an accounting the predicate for the Court's determination.*

The MVRA's architecture is sequential. Section 3664(a) directs that the Court be provided a report containing "to the extent practicable, a complete accounting of the losses to each victim." Section 3664(d)(5) contemplates the Court setting a date for "the final determination of the victim's losses." Section 3664(e) commits "[a]ny dispute as to the proper amount or type of restitution" to resolution "by the court by the preponderance of the evidence." Section 3664(d)(6) confines a special master to "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." Section 3664(f)(1)(A) requires an order in the full amount of each victim's losses, and § 3664(o) makes the resulting order a final judgment. Only upon entry of judgment do the collection mechanisms attach. 18 U.S.C. § 3613(c); *id.* § 3664(m)(1)(A).

The order is not optional: accounting precedes determination, determination precedes judgment, and judgment precedes collection. A recommendation unsupported by an accounting asks this Court to perform the second step without the first. Because a federal court has no inherent power to order restitution and must act within "the procedural and substantive protections of the statute authorizing restitution," *United States v. Freeman*, 741 F.3d 426, 431 (4th Cir. 2014), a restitution figure fixed without the accounting the statute presupposes is fixed outside the statute — and an order "that exceeds the authority of the statutory source is no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." *United States v. Davis*, 714 F.3d 809, 812 (4th Cir. 2013) (quoting *Broughton-Jones*, 71 F.3d at 1147). That consequence is not theoretical, because MVRA restitution "is plainly criminal punishment." *Ellingburg v. United States*, 607 U.S. 163, 166 (2026).

### *B. No accounting of any component of the recommendation has ever been produced.*

The Special Master and the Rehabilitator have controlled the books and records of the North Carolina insurance companies since October 2018, and of New Hold Co, LLC and its subsidiaries since October 2024. In that time they have produced nothing that would allow this Court, the parties, or an independent reviewer to test the restitution figure, the asset values, or the disposition of proceeds. The gaps are specific, and together they are total:

- **No accounting of the restitution calculation.** There is no accounting showing how the recommended figure was derived. The Preliminary Order fixed $1.655 billion — $30 million above the Special Master's own $1.625 billion recommendation — and the Second Supplement now recommends $1.616 billion. Doc. 245 at 44. None of these figures is accompanied by a reconciliation the Court could audit, and each embeds approximately $263 million of interest selected over objection and contrary to the Department of Justice's own policy that interest is not eligible for restitution.
- **No reconciliation of the affiliated-loan payoffs.** The affiliated-loan account records have been under the Rehabilitator's control since October 2018, and the payoffs of those loans have never been reconciled. Those payoffs bear directly on the principal balance underlying the entire recommendation — a balance the Defendant has shown is overstated by at least $141 million, and which the Second Supplement declines to correct. Doc. 245 at 6, 15.
- **No accounting of the Beckett proceeds.** The Beckett asset was worth around $1 billion — as reflected in the Cabrillo valuation and the Blackstone negotiations, *see* note 7, *supra* — and was sold to Collectors in December 2025 for just $134 million. Defendant's counsel learned of the sale orally, in a weekly meeting. No accounting of the proceeds has ever been provided, and it remains undisclosed whether they were applied to restitution, to administrative expenses, to the Special Master's professionals, or otherwise. The Second Supplement does not supply that accounting; it says only that the sale occurred with the consent of NHC Holdings, LLC. Doc. 245 at 31 & n.29.
- **No financial statements or board reports.** Despite repeated requests, no income statements, balance sheets, cash-flow statements, or board reports have been produced for any Primary Restitution Asset or any Specified Affiliated Company — the very records required to value those assets and to test the assertions the Report makes about them.

- **No supporting asset valuations.** No appraisal, valuation report, or workpaper supports any figure in the Report. What is offered instead is a self-generated range, now revised downward to $826 million / $998 million / $1.231 billion, which the Special Master describes as his "current guess." Doc. 245 at 36–37. *See* Part XIV, *infra.*
- **No accounting of the offsets.** The Special Master has never accounted for, or substantively answered, the approximately $2.89 billion in offsets and credits the Defendant has documented.[5] The Second Supplement allows $39 million of that sum — about 1.3% — and disposes of the remainder by disallowance, deferral, or a statement that documentation is insufficient. Doc. 245 at 6, 11, 13, 44.

### *C. Without an accounting, the mandatory credits cannot be computed and the no-windfall rule cannot be honored.*

The accounting requirement is not formalism; it is the mechanism by which the statute's mandatory credits are given effect. Restitution must be reduced by amounts the victims have recovered for the same loss. 18 U.S.C. §§ 3663A(b)(1)(B), 3664(j)(2); *Robers v. United States*, 572 U.S. 639, 645 (2014); *United States v. Steele*, 897 F.3d 606, 611 (4th Cir. 2018). A defendant is entitled to an offset for amounts victims recovered in related civil proceedings. *United States v. Ritchie*, 858 F.3d 201, 215–16 (4th Cir. 2017). And the MVRA "does not allow a court to grant a windfall to the victim." *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017). The Order Appointing the Special Master says the same thing, directing that restitution "should be reduced by any amount victims have recovered for the same losses." Doc. 56 at 6 n.2.

None of those commands can be applied on this record. Whether a victim has been made whole, whether a recovery duplicates a claimed loss, and whether the proceeds of a sale were credited against restitution or consumed by administrative expense are all questions that require an accounting of what was sold, what was collected, and where the money went. The Clanwilliam disposition illustrates the problem: of roughly $318 million in estimated net proceeds, $23,520,710

[5] The $866 million loss of value on the sale of Beckett increases the documented offsets and credits to $3,765,418,383 (approximately $3.7 billion). *See* note 1, *supra,* and the revised schedule of offsets, credits and reductions set out in Part IX.

was distributed to an entity the Special Master conceded he "is unsure" is a victim at all, and a $14,112,426 administrative reserve generated no credit to the Defendant — all under a formula the Special Master acknowledged "almost certainly will deviate" from the apportionment this Court will ultimately approve. Doc. 66 ¶¶ 20(d)(i), 24, 26 n.8. A distribution the Special Master himself expects to be wrong, made from proceeds never accounted for, cannot support a finding by a preponderance of the evidence.

### *D. The Report's promise to track credits in the future is not a substitute for the accounting now.*

The Second Supplement's answer to the absence of an accounting is deferral. The two largest credits are "Disallow[ed] at this Time," to be revisited "if and when ULICO realizes this value" and "if and when the escrow balance becomes available." Doc. 245 at 6 & nn.3–4. As to the assets, the Special Master proposes that the Defendant "receive credits reducing his restitution obligations as those assets generate recoveries for victims, which would be tracked and reported to the Court by the Special Master over time." *Id*. at 37. That structure inverts the statute. Section 3664(e) requires the amount to be resolved now, by this Court, on a preponderance of the evidence; it does not authorize entry of a $1.616 billion judgment against an unaudited estimate with the reconciliation to follow at the discretion of the officer who generated the estimate. A defendant subjected to criminal punishment is entitled to know, and to contest, the arithmetic of that punishment before it is imposed — not after his assets have been sold to satisfy it.

The absence of an accounting is not an invitation for the Court to order one and then impose restitution. The statute places the accounting obligation on the moving side, 18 U.S.C. § 3664(a), and § 3664(e) requires the amount to be proved to the Court, not assembled by the Court. No accounting exists. The Court cannot find a $1.616 billion loss by a preponderance on a record that contains no reconciliation of a single component, and it should decline to do so.

## XIV. THE SPECIAL MASTER'S PURPORTED VALUATIONS MEET NONE OF THE STANDARDS FOR VALUATION EVIDENCE IN FEDERAL COURT

Part VII describes what the Second Supplement's valuations are: a self-generated range, cut by roughly a third without explanation, which the Special Master calls his "current guess." This Part addresses what they are not — evidence on which a federal court may rest a finding of fact. Measured against any standard federal courts apply to valuation proof, the Report's figures fail; and the valuations the Defendant has offered satisfy those standards in every particular.

### *A. The governing standard is reliability, and it is not satisfied by assertion.*

The Federal Rules of Evidence do not apply at sentencing. Fed. R. Evid. 1101(d)(3). But that latitude has never meant that a sentencing court may find facts on unreliable information. The Court may consider information "without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). Section 3664(e) independently requires that disputed restitution amounts be resolved by a preponderance of the evidence — a standard that presupposes evidence. And due process forbids fixing criminal punishment on figures that cannot be examined or tested.

The same standards govern the restitution determination specifically. The MVRA provides that "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and places "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense … on the attorney for the Government." 18 U.S.C. § 3664(e). The breadth of the information a sentencing court may receive, *see* 18 U.S.C. § 3661 ("[n]o limitation shall be placed on the information concerning the background, character, and conduct" of the defendant that the court "may receive and consider"), has never diluted the requirement that what the court relies on be accurate and reliable: a sentence may not rest on "misinformation of constitutional magnitude," *United States v. Tucker*, 404 U.S. 443, 447 (1972),

or on assumptions that are "materially untrue," *Townsend v. Burke*, 334 U.S. 736, 741 (1948). The preponderance standard "generally satisfies due process" at sentencing, *United States v. Watts*, 519 U.S. 148, 156 (1997) (per curiam), but it presupposes record evidence that can be weighed: the Guidelines direct that disputed facts be established by information bearing "sufficient indicia of reliability to support its probable accuracy," U.S.S.G. § 6A1.3(a), and the accompanying commentary instructs that "[u]nreliable allegations shall not be considered." U.S.S.G. § 6A1.3 cmt. An unexplained "current guess," produced by an interested source and insulated from testing, does not meet any of these standards.

Where the disputed fact is the value of a business, federal courts look for the same markers of reliability whether the question arises under Rule 702 or under the sentencing standard: an identified and qualified valuator; a disclosed and recognized methodology, such as a market, income, or asset approach; sufficient underlying data; and a result the opposing party and the court can test. Expert opinion is admissible only if it rests on "sufficient facts or data" and "reliable principles and methods" reliably applied, Fed. R. Evid. 702, and that reliability inquiry applies to all specialized opinion, not merely scientific testimony, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Most directly on point here, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Congress has embodied the same instinct in the statutes governing judicial sales, requiring that realty sold under order of a federal court be appraised in advance by three disinterested persons, and permitting confirmation only where the price bears a reasonable relation to the appraised value; personalty is governed by the same provisions. 28 U.S.C. §§ 2001, 2004.

### *B. The Report's valuations fail every one of those markers.*

Applied here, the analysis is short, because the Special Master disqualifies his own figures. By his own description, the estimates rest on "illustrative valuation analyses prepared by the financial advisors to NHC Holdings, LLC," and those analyses:

> *"do not constitute formal valuations or fairness opinions; rather, they reflect a desktop exercise employing discounted cash flow methodologies, comparable transaction analyses, and the financial projections provided by portfolio company management. ... Estimated values are subject to change and actual results may materially vary." Doc. 245 at 36 n.31.*

He then characterizes the output as his "current guess." Doc. 245 at 36–37. Taking those admissions at face value, the Report's valuations are not a formal valuation; not a fairness opinion; the product of a "desktop exercise"; built on projections supplied by the management of the companies being valued; and, subject to change. No valuator is identified. No report, appraisal, or workpaper has been produced. No methodology is disclosed beyond the generic naming of two techniques. No underlying data has been made available. No one has been offered for examination. And the explanation for the roughly thirty-one percent reduction from the Initial Report's range is to be filed under seal, Doc. 245 at 36 & n.32 — meaning the one document that might permit testing of the figure is the one document the Defendant may not see. A number connected to the record by nothing but its author's say-so is the paradigm of ipse dixit. *Joiner*, 522 U.S. at 146. It is not evidence, and it cannot carry a finding by a preponderance.

### *C. The valuations come from an interested source, which compounds rather than cures the problem.*

Reliability also depends on the source. Due process forbids an adjudicator from having "a direct, personal, substantial pecuniary interest" in the matter, *Tumey v. Ohio*, 273 U.S. 510, 523 (1927), and a master is held to the disqualification standard applicable to judges, Fed. R. Civ. P. 53(a)(2) (incorporating 28 U.S.C. § 455). The test is objective and exists to protect "public confidence in the integrity of the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*,

486 U.S. 847, 860 (1988). The oldest formulation remains the plainest: "no man can be a judge in his own case." *In re Murchison*, 349 U.S. 133, 136 (1955).

The Special Master generated the restitution figure. He generated the only asset valuations in the record. His professionals are compensated from the assets he administers and disposes of. He sits on the board of New Hold Co, LLC, the entity that holds and sells the operating companies. And twelve days before sentencing he presented the Defendant with a "Consent, Waiver, and Acknowledgement" whose operative clauses would have released, and covenanted not to sue, a beneficiary class expressly including the Special Master himself, then advised the Court four days before sentencing that he "expects that Defendant will execute" it. Doc. 159 at 3, 5. Figures generated by an officer so situated, and withheld from inspection, do not acquire reliability by virtue of his office.

### ***D. The valuations the Defendant has offered are of precisely the kind federal courts credit.***

The contrast is not between two contested appraisals. It is between an unexamined estimate and the categories of proof courts treat as most probative of value:

- **A signed, arm's-length purchase agreement.** In the first quarter of 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing the Specified Affiliated Companies at approximately $3.4 billion and Clanwilliam alone at approximately $880 million, at a 22.14x EBITDA multiple consistent with public-market comparables. A contemporaneous arm's-length transaction in the very assets at issue is the best evidence of their value. The Second Supplement does not mention it. *See* Doc. 235 ¶ 32; Doc. 174 ¶ 117.
- **Valuations by nationally recognized firms, prepared to professional standards. KPMG LLP appraised the insurance entities as of December 31, 2017 and issued a written report on August 24, 2018 — a Restricted Appraisal Report under USPAP Standards 202, 8-2 and 10-2, consistent with AICPA Summary Report guidelines, prepared under an engagement letter, signed by an identified valuation professional, stating its methodology, its reliance on audited and unaudited financial statements, and its limiting conditions. It concluded fair values of**

**$380,500,000 for CBL, $57,500,000 for BLIC, $29,000,000 for SNIC and $46,500,000 for SNRC. Houlihan Lokey separately valued AAPC at 20x EBITDA, approximately $3 billion on projected 2026 EBITDA of $150 million. These are the hallmarks of reliable valuation evidence — a named and qualified valuator, a disclosed and recognized methodology, identified data, and a written report capable of being tested. Neither firm is mentioned in the Second Supplement. *See* Doc. 235 ¶¶ 13–17.**

- **The victims' own fiduciaries' valuation.** The team under the Rehabilitator's control valued the NCICs at $454 million on November 5, 2018, eighteen days after the transfer of control. The Special Master declines to "look behind" it while declining to credit it. Doc. 245 at 18 & n.15.
- **An executed letter of intent.** The November 22, 2018 Ares letter of intent valued the NCICs in the same range on arm's-length terms. Not mentioned in the Second Supplement. *See* Doc. 235 ¶ 26.

Taken together, the assets transferred into the control of the Rehabilitator and the Special Master — the Specified Affiliated Companies at approximately $3.4 billion in October 2024, and AAPC at approximately $3 billion in February 2025 — represented on the order of $6.4 billion in value, carrying billions of dollars in asset value in excess of liabilities. Against that record, an unsourced "guess" of $998 million at the midpoint is not a competing valuation. It is an assertion that the contemporaneous market, two nationally recognized firms, and the victims' own fiduciaries were all wrong, offered without a report, a methodology, or a witness.

### *E. A defendant may not be charged for value destroyed after he lost control of the assets.*

To the extent the present estimates are accurate, they measure what the assets became in the hands of others, not what they were worth when the Defendant surrendered them. Clanwilliam was sold in September 2025 for approximately $450 million, against the $880 million Quadro valuation signed months earlier — a gap of roughly $430 million. Beckett was worth around $1

billion and was sold for just $134 million, with no accounting of the proceeds.[6] Loss attributable to holding or disposing of an asset after the offense is not loss caused by the offense. *United States v. Tyler*, 767 F.2d 1350, 1352 (9th Cir. 1985); *see Robers*, 572 U.S. at 647–48 (Sotomayor, J., concurring) (a victim's independent decisions regarding collateral can break the chain of causation). Whichever explanation accounts for the gap between $6.4 billion and $998 million — inaccuracy in the estimate, or value destroyed after the transfer of control — neither supports charging the difference to the Defendant. *See* Doc. 174 ¶¶ 94, 100; Doc. 234 at 38.

### *F. The consequence of a one-directional valuation is a manufactured shortfall.*

The direction of the errors is uniform. The restitution figure is held high — inflated by approximately $263 million of interest and unreduced by approximately $2.89 billion in documented offsets[7] — while the asset estimate is pushed down, from a $1.454 billion midpoint in the Initial Report to an approximately Redated midpoint now. Doc. 106 at 30; Doc. 245 at 36. The result is that recommended restitution of $1.616 billion exceeds the Special Master's own midpoint estimate of the available assets by more than $600 million. That gap is the predicate a forfeiture theory requires. *See* 18 U.S.C. § 981; 21 U.S.C. § 853. A shortfall produced by an unaudited restitution figure on one side and an unsourced valuation on the other is not a finding of

[6] Beckett was valued at approximately $1 billion in the contemporaneous appraisal and market evidence. See Cabrillo Advisors, Valuation of Arcane Tinmen, Beckett, CBCS and Southern Hobby (valuation date Jan. 31, 2022; prepared Apr. 7, 2022) (Doc. 256-1), concluding a fair market enterprise value for Beckett Collectibles, LLC of $1,003,924,000 (equity value approximately $1,005.9 million); Blackstone Tactical Opportunities, "CCG + Beckett, Blackstone Proposal" term sheet (Apr. 14, 2022) (Doc. 256-3), transmitted by e-mail from Brian Cornyn of Blackstone to Justin Holbrook and Sophie Turrell of Global Growth (Apr. 16, 2022) (Doc. 256-4 at p.2), proposing an acquisition of Beckett at an enterprise value of $800 to $900 million (27.5x–30.9x 2021 adjusted EBITDA) and projecting, in Blackstone's own analysis, "Beckett Proceeds by 2022E" of $941 million to $1,065 million on a full secondary sale; Letter from Global Growth Holdings, Inc. to Blackstone (Apr. 5, 2022) (Doc. 256-2), countering Blackstone's April 2, 2022 non-binding indication of interest at a Global Growth-proposed total enterprise valuation of $1.05 billion; Letter from Global Growth Holdings, Inc. to Blackstone (Apr. 18, 2022) (Doc. 256-4 at p.4), countering Blackstone's April 16, 2022 proposal at a Global Growth-proposed total enterprise valuation of $1,100 million (equity value approximately $1,044 million). Every contemporaneous market data point — an independent USPAP appraisal at $1.004 billion, an acquisition proposal from the world's largest alternative asset manager at $800 to $900 million with a modeled path above $1 billion, and counter-valuations of $1.05 to $1.1 billion in an active negotiation — exceeds the $134 million sale price by a factor of six or more.

[7] The $866 million loss of value on the sale of Beckett increases the documented offsets and credits to $3,765,418,383 (approximately $3.7 billion). *See* note 1, *supra*, and the revised schedule of offsets, credits and reductions set out in Part IX.

fact; and a penalty measured against a figure untethered from proximately caused loss raises a further constitutional problem. *See United States v. Bajakajian*, 524 U.S. 321, 334 (1998). The Court should decline to adopt valuations that no federal court would receive as evidence and should decline to treat the resulting gap as established.

## XV. KEY FACTS THE SECOND SUPPLEMENT DOES NOT AND CANNOT DISPUTE

The following facts are established in the record, are not contradicted by any evidence in the Second Supplement and are individually dispositive of the items to which they relate. They are collected here because each dispose of a specific component of the recommended figure.

### *A. It remains undisputed that the Department of Justice's own policy does not permit interest to be charged to a defendant in a restitution case.*

The Special Master adds approximately $263 million in prejudgment interest to the restitution figure. Doc. 245 at 6 (Issue 1, "Disallow"). The Department of Justice's own published guidance on the restitution process in fraud and financial-crime cases states that interest is not eligible for restitution. That policy is a matter of public record, it was placed squarely before the Special Master, and the Second Supplement does not dispute that it exists or that it says what the Defendant says it says. Doc. 245 at 14–15. The Special Master's entire response is that interest "may be an appropriate component of restitution" on the authorities cited in his First Supplement (Doc. 146, filed May 15, 2026), and that the rate he selected is lower than the contractual rate, lower than the IALA rate, and lower than the applicable federal rate. Id.

A favorable comparison among rates is not authority for charging interest at all. The MVRA does not enumerate interest as a component of a victim's loss, and restitution restores what was taken rather than the time value of a bargain. *Robers v. United States*, 572 U.S. 639, 643 (2014); *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017); *United States v. Boccagna*, 450 F.3d 107, 117 (2d Cir. 2006); *United States v. Coats*, 487 B.R. 648 (E.D.N.C. 2013). When the prosecuting

Department's own policy states that interest is not recoverable, and the Special Master neither disputes the policy nor identifies statutory text authorizing the charge, the $263 million component cannot stand.

***B. The $141 million opening-balance correction is denied on a record the Government itself has made unavailable.***

The recommendation rests on a starting principal balance of the affiliate investments that the Defendant has shown is overstated by approximately $141 million. The Special Master disallows the correction, explaining that although he "presumes the IALA's figures are correct generally," he "is not beholden to blindly follow the IALA." Doc. 245 at 6, 15. He offers no accounting and no competing reconciliation.

The records that would resolve the question are not in the Defendant's possession and have not been for years. Mr. Lindberg surrendered control of his companies — together with their books and records — on four separate occasions beginning in October 2018, and the affiliated-loan account records have been under the control of the Rehabilitator and, later, the Special Master ever since. He sought subpoenas to obtain those records, and the Government opposed them. The result is a closed circle: the Defendant is told his correction is insufficiently documented, while the Government blocks his access to the only documents that could supply the documentation, and the fiduciaries who hold them have produced no reconciliation of their own. That is not a permissible basis for a finding by a preponderance of the evidence under 18 U.S.C. § 3664(e), and it is not consistent with due process. The point is reinforced by the fact that the North Carolina insurance companies' own verified pleadings and the parties' pretrial stipulation recite a balance of approximately $1.25 billion — the figure the Defendant asks the Court to use. *See* Doc. 174 ¶¶ 2, 4; Doc. 245 at 11, 13; Doc. 248; Doc. 202.

### *C. ULICO agreed in December 2022 to accept the AAPC preferred equity as a dollar-for-dollar credit and cannot now insist on cash.*

In December 2022, ULICO and Mr. Lindberg settled ULICO's $524 million civil judgment, entered in *Universal Life Insurance Co. v. Lindberg*, No. 1:20-cv-861 (M.D.N.C.). Under that agreement ULICO accepted $25 million in cash and a transfer of AAPC preferred equity, and it agreed that the preferred equity would apply as a dollar-for-dollar credit against the amounts owed. The preferred equity carries an 18% payment-in-kind rate; its original par was $218 million, and its par value stood at $352,906,240 as of May 26, 2026. Those facts are undisputed, and the Special Master lists the same $352,906,240 figure in his own table. Doc. 245 at 6 (Issue 3). *See* Doc. 132 at 13–14 (quoting the settlement agreement, Meyer Decl. Exhs. 3-E at 2 ("dollar-for-dollar credit") & 3-F); Doc. 234 at 46 (offsets table). The agreement's terms are explicit. Under the ULICO Confidential Side Settlement Agreement (Dec. 19, 2022), Mr. Lindberg is to receive a "dollar-for-dollar credit" against the balance owing on the Middle District judgment for the value transferred, the transfer constituting "a payment towards the satisfaction and/or to pay down the Middle District Judgment." Side Settlement Agreement at 2, attached in full as Exhibit A to Doc. 132-1; *see* Doc. 132-1 ¶¶ 64–65. The Amendment to the Confidential Side Settlement Agreement (Dec. 30, 2022) confirms the mechanics: "Upon the consummation of such transfer to the Reinsurance Trust, Lindberg shall receive at minimum, a credit of USD$25,000,000 and the balance owing on the Middle District Judgment shall be reduced by a like amount," with that credit "adjusted" upward on, among other things, "[a] market valuation of the rights in the Preferred Units transferred" or "[a] dollar-for-dollar credit of any repurchase of the rights in the Preferred Units … for an amount no less than $218,000,000 plus 8% interest." Amendment at 2–3, attached in full as Exhibit B to Doc. 132-1 (Doc. 132-1 at 58–61).

The MVRA requires that the credit be given. Restitution "shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in … any Federal civil proceeding." 18 U.S.C. § 3664(j)(2)(A); *see* also id. § 3663A(b)(1)(B) (credit for property returned). The Fourth Circuit applies that command directly, holding that a defendant is entitled to an offset for amounts victims recovered in related civil proceedings. *United States v. Ritchie*, 858 F.3d 201, 215–16 (4th Cir. 2017); accord *United States v. Steele*, 897 F.3d 606, 611 (4th Cir. 2018). ULICO's recovery occurred in a federal civil proceeding, for the same loss, on terms ULICO itself negotiated and accepted.

The Special Master's answer is to defer the credit — "Disallow at this Time," with a credit only "if and when ULICO realizes this value," on the reasoning that ULICO "has not unreasonably refused to liquidate this asset." Doc. 245 at 6 n.3, 15–16. That reasoning cannot be reconciled with the parties' agreement. ULICO did not agree to accept the cash proceeds of the preferred equity if and when it chose to sell; it agreed to accept the preferred equity itself, valued dollar-for-dollar, in partial satisfaction of its judgment. A victim that has contracted for how an asset will be valued against its claim cannot later demand that the same claim be satisfied a second time in cash. The consequence of the Special Master's approach is precisely the double recovery the MVRA forbids: ULICO keeps the preferred equity and collects the full amount again as restitution. *Stone*, 866 F.3d at 226.

### *D. The Special Master refuses to credit more than $130 million in cash payments on theories found nowhere in the MVRA.*

The Defendant documented $133,874,803 in cash payments and cash proceeds actually received by the persons due restitution: $27,823,425 in SNIC reimbursements (Issue 4); $79,655,289 in preferred-equity payments not captured (Issue 5); the $3,000,000 CBL subordination fee (Issue 6); $13,596,013 from ULICO's sale of contributed real estate (Issue 8);

and $9,800,076 from the Bermuda insurance companies' sale of affiliated assets (Issue 9). Doc. 245 at 6. Of that sum the Special Master allows $39 million and refuses the balance. *Id.* at 12–13, 44. Additional cash items are refused outright, including a $5 million redemption fee paid to CBL and $9.4 million paid to CBL and ULICO in connection with the Finnazen/Blue Violet sale. *Id.* at 12–13. *See* Doc. 234 at 46 (offsets table).

The stated grounds are that the Defendant "received new consideration in exchange" for the payments (Issues 4 and 6); that the victims "had previously purchased [their] interest … for value" (Issues 8 and 9); that some payments were "made toward non-IALA loans and double-counting" (Issue 5); and that documentation is unsatisfactory (Finnazen/Blue Violet). Doc. 245 at 13, 16–18. None of these theories appears in the MVRA. The statute directs that restitution be reduced by amounts paid to a victim for the same loss, 18 U.S.C. § 3664(j)(2), and by the value of property returned, *id.* § 3663A(b)(1)(B); it does not condition a credit on the defendant having received no consideration, nor on the victim not having previously paid value for the asset it later sold. Tellingly, each time the Second Supplement invokes the statute for these theories it does so with a "Cf." signal — an acknowledgment that § 3664(j)(2) does not directly support the proposition. Doc. 245 at 16, 17, 18. Cash that reached a victim reduced that victim's loss, and the MVRA requires that it be credited.

### *E. The zero-coupon bonds were not sold to meet any liquidity need, and the Rehabilitator's own reports identify a different problem.*

The Special Master justifies the pre-maturity sale of the principal-protection bonds on the ground that they paid no interim interest, would have matured "decades after the policyholders' annuities exited the 5- or 7-year surrender period," and that the rehabilitator "decided to sell the bonds to help meet the companies' financial needs." Doc. 245 at 24. The Rehabilitator's own quarterly reports to the Wake County Superior Court do not bear that rationale out.

Counting only cash, cash equivalents, short-term investments and marketable third-party bonds, the North Carolina insurance companies held over $1 billion at every year end from 2019 through December 2023:

| Year end | Cash, equivalents and short-term investments | Third-party bonds | Cash and third-party bonds |
|---|---|---|---|
| 12/31/2019 † | $153,343,457 | $1,749,798,603 * | $1,903,142,060 |
| 12/31/2020 † | $125,394,471 | $1,492,619,772 * | $1,618,014,243 |
| 12/31/2021 ‡ | $157,090,817 | $1,252,941,555 * | $1,410,032,372 |
| 12/31/2022 ‡ | $144,726,039 | $1,159,632,192 | $1,304,358,231 |
| 12/31/2023 | $239,846,733 | $843,524,280 | $1,083,371,013 |

*Combined balances of the North Carolina insurance companies. Source: statutory Annual Statements, Assets lines 1 and 5, as filed with the Rehabilitator's and Receiver's Quarterly Reports, Causey v. Southland National Insurance Corp., No. 19 CVS 8664 (N.C. Super. Ct., Wake County) (report cover pages and ASSETS pages excerpted at Ex. 1 hereto, parts 1(a) (4Q2019) through 1(e) (4Q2023)). Third-party bonds exclude affiliated holdings. * The statements for 2019–2021 do not segregate affiliated bonds; the figures shown deduct the $824,720,289 of affiliated bonds the regulator first segregated as non-admitted in the June 30, 2022 statement. † Excludes Bankers Life, whose statements for these years have not yet been extracted. ‡ Excludes Bankers Life and Southland National. The excluded companies' balances would only increase the totals shown. The Rehabilitator's and Receiver's quarterly reports are publicly available at cblife.com/quarterly-rehabilitation-reports.*

For 2022 and 2023 the segregation of affiliated bonds appears on the face of the statements, so those totals are established without inference. For 2019 through 2021 the figures conservatively deduct the affiliated bonds the regulator later segregated, and several rows omit companies whose statements have not yet been extracted — so the true combined totals for those years are higher than the table shows. On any view, from 2019 through December 2023 the North Carolina insurance companies at all times held over $1 billion of cash and marketable securities in the form of third-party bonds.

There was no reason for the NCICs to sell the zero coupon bonds in 2019 when, for over four years after that sale, the NCICs had over $1 billion of cash and marketable securities in the form of third-party bonds. The sale was the discretionary act of fiduciaries who did not need the cash; it was taken over a year after Mr. Lindberg surrendered control; and the $611.6 million loss it crystallized cannot be charged to him. *See* Doc. 235 ¶¶ 7, 31.

The bottom line is straightforward. The bonds were contractually scheduled to pay $1,006,239,867 at maturity. They were sold for approximately $394 million, crystallizing a loss

of approximately $611.6 million. Even accepting that the companies wanted cash, destroying a guaranteed billion-dollar recovery was not the only way to obtain it — the Ares and Oaktree transactions would each have retired the affiliated loans at or near par, and each was refused. A liquidity need that could have been satisfied without sacrificing $611.6 million in contractual value does not make that sacrifice a consequence of Mr. Lindberg's offense. The decision was made by fiduciaries exercising their own judgment, over a year after Mr. Lindberg had surrendered control, and its cost cannot be charged to him. *See* Doc. 235 ¶ 31.

### ***F. It remains undisputed that the Agera exposure was inherited from ULICO's prior reinsurer and that the loss was not caused by Mr. Lindberg.***

In June 2017 Mr. Lindberg acquired the Bermuda reinsurance portfolio that became PBLA-ULICO. ULICO required any buyer of that portfolio to assume its existing Agera exposure, which stood at approximately $129 million as of the June 30, 2017 purchase and reinsurance treaty. The investment had been originated by the prior reinsurer, not by Mr. Lindberg, and Agera later collapsed following the discovery of fraud by Agera's independent chief financial officer. The Special Master does not dispute any of this. He states expressly that he "does not dispute the Defendant's recitation of the timing (i.e., most of the funds loaned to Agera were transferred before the Defendant acquired either Agera or the corresponding insurance company)." Doc. 245 at 19. *See* Doc. 235 ¶ 4; Doc. 174 ¶¶ 51–55.

His contrary conclusion rests not on causation but on benefit: that Agera was "critical to the Defendant being able to acquire Omnia and PBIHL," and that he "obtained a substantial economic benefit from those loans, which was part and parcel with his scheme, even if Defendant was not the one to pull the trigger on originating all of the loans." Doc. 245 at 19–20. That reasoning does not satisfy the MVRA. The question is not whether the Defendant benefited from an acquisition; it is whether the offense of conviction directly and proximately caused the loss. 18

U.S.C. § 3663A(a)(2); *Hughey v. United States*, 495 U.S. 411, 413 (1990). A loss on an asset the Defendant inherited as a condition of a transaction, which was originated by someone else, and which failed because of a third party's fraud, was caused by those events and not by him. This fact alone requires that Mr. Lindberg receive a credit and offset for the $129 million in Agera exposure his Bermuda insurance company inherited from ULICO's prior reinsurer.

***G. It remains undisputed that Clanwilliam was worth more than $800 million on the only contemporaneous market evidence, and that the Quadro comparables are higher today than in 2024.***

In the first quarter of 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing Clanwilliam at approximately $880 million, priced at a 22.14x EBITDA multiple drawn from public-market comparables. That valuation is undisputed. The Second Supplement does not mention Quadro anywhere in its forty-six pages, and it offers no competing appraisal of Clanwilliam. *See* Doc. 235 ¶ 32; Doc. 174 ¶ 117; Doc. 132-2 (Ex. I3, GG–Quadro Investor Presentation (Jan. 2024)) at 15 (22.14x transaction multiple).

Two consequences follow. First, a signed, arm's-length purchase agreement executed in 2024 is the most accurate and most comparable measure of Clanwilliam's value available in this record — considerably more probative than an unexamined internal estimate, and more probative than the older figures on which the Special Master relies without disclosing that Quadro exists. Second, it remains undisputed that the public-market comparables used to price the Quadro transaction are higher today than they were in 2024. The $880 million figure is therefore, if anything, a conservative valuation of Clanwilliam. Clanwilliam ultimately realized approximately $450 million. Whatever explains that difference, the Defendant's restitution obligation cannot be computed as though the higher value never existed, and the Special Master's silence on Quadro cannot convert a documented 2024 market valuation into a fact the Court may disregard. *See* Doc. 235 ¶¶ 32, 34.

## XVI. THE GOVERNING CAUSATION STANDARD IS THE FOURTH CIRCUIT'S, IT IS BINDING, AND THE SECOND SUPPLEMENT APPLIES IT IN ONE DIRECTION ONLY

The Court's de novo determination under 18 U.S.C. § 3664(d)(6) is governed by binding causation law, and the Fourth Circuit has already articulated that law in this restitution matter.

### *A. The controlling standard, stated by the Fourth Circuit in this very proceeding.*

On June 13, 2026 — five weeks before the Second Supplement was filed — the Fourth Circuit decided the mandamus petition brought in this docket by the insolvency practitioners of Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V., a claimant that appeared and responded in this proceeding. *In re Zetteler*, No. 26-1749, 2026 WL 1724731 (4th Cir. June 13, 2026, amended June 15, 2026) (per curiam) (unpublished); *see* Doc. 130. The petitioners asked the court to vacate the preliminary restitution order and to direct entry of a revised order naming Conservatrix a victim and awarding it €215,356,806. The court denied the petition, and in doing so it stated the test that governs who may recover restitution for this offense:

> "Direct harm to a victim, giving rise to an entitlement to restitution under the CVRA, requires the harm to be 'closely related to the conduct inherent to the offense, rather than merely tangentially linked.'" *In re Zetteler*, slip op. at 4–5 (quoting *In re McNulty*, 597 F.3d 344, 352 (6th Cir. 2010)).

*In re Zetteler*, No. 26-1749, 2026 WL 1724731, at *2 (4th Cir. June 13, 2026) (per curiam) (quoting *In re McNulty*, 597 F.3d 344, 352 (6th Cir. 2010)). Because that formulation comes from the same court, in the same case, applying the same restitution framework, it is the standard against which the recommendation must be measured; the Court would have to announce a different causation test for the same proceeding to sustain the $1.616 billion figure.

Applying that test, the court held that the petitioners "fail[ed] to sufficiently connect the harm suffered by Conservatrix with Lindberg's criminal conduct": they had "described Lindberg's failure to replenish the company's capital and to maintain its SCR as agreed," but did "not identify facts closely tying those failures to Lindberg's criminal activities." Slip op. at 4–5. "Without more,"

the court concluded, "we cannot find the district court to have abused its discretion in excluding Conservatrix from its restitution order and judgment," and the petition was denied. Slip op. at 5. The claim the court turned away was concrete and enormous: the petitioners asserted that "Lindberg's criminal conspiracy forced the company into bankruptcy, resulting in losses to the company and its policyholders of more than $200 million," slip op. at 4; they held a judgment against Mr. Lindberg from the Dutch Arbitration Institute "for over $166 million related to his failure to fulfill the terms of his agreement," slip op. at 3; and, as Judge King described it, what the panel decided was "potential restitution owed by defendant Lindberg to Conservatrix totaling approximately € 215,000,000." Slip op. at 8 (King, J., concurring in part and dissenting in part). A concrete, contractual, nine-figure loss — resting on commitments Mr. Lindberg personally signed — was held insufficient because the connection between that loss and the conduct inherent to the offense was not closely drawn.

The opinion also records the standard the Special Master himself applied when he excluded Conservatrix: the company's loss did not qualify because it "was not due to Lindberg's 'self-serving investment activities, the crux of the harm outlined in the Indictment,'" and because the misrepresentations at issue did not go to "masking [Lindberg's] affiliated investments or asset management strategies." Slip op. at 3. That is the Report's own definition of the compensable harm in this case, recited by the court of appeals. The decision is unpublished and is the law of this case; but it is the Fourth Circuit's ruling in this restitution proceeding, on this record, applying the very framework the Special Master constructed.

### B. *Zetteler does not stand alone — it states, in this case, what binding Supreme Court and Fourth Circuit authority already command.*

*Zetteler* is an unpublished disposition arising under the CVRA's victim definition, 18 U.S.C. § 3771(e)(2)(A), but that definition is materially identical to the MVRA's, 18 U.S.C. §

3663A(a)(2), and *Zetteler* drew its phrasing from *McNulty*, a restitution case — so the standard travels. And it is anchored in binding authority. The MVRA authorizes restitution "only for the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413 (1990). Proximate cause limits liability to the defendant's "own conduct, not the conduct of others." *Paroline v. United States*, 572 U.S. 434, 462 (2014). The MVRA "has a proximate cause requirement," and superseding causes break the chain. *Robers v. United States*, 572 U.S. 639, 645 (2014). The Government must prove that the offense "directly and proximately caused the harm." *United States v. Ritchie*, 858 F.3d 201, 211 (4th Cir. 2017). And harm bearing "no more than a tangential connection" to the offense conduct is not compensable, because that connection "is legally irrelevant for the purpose of restitution." *United States v. Freeman*, 741 F.3d 426, 434–37 (4th Cir. 2014). *Zetteler* is the this-case gloss on that binding authority; it is led with, not leaned on alone.

### C. *The § 3663A(a)(2) scheme clause converges on the same limit and cannot enlarge the award.*

The Government may invoke the scheme clause of § 3663A(a)(2) — reaching a person "directly harmed by the defendant's criminal conduct in the course of the scheme" — to argue for scheme-wide victims and losses. That argument fails on its own text, because the scheme clause and *Zetteler* converge: each ties recovery to the defendant's own criminal conduct. Section 3663A(a)(2) reaches only harm caused "by the defendant's criminal conduct in the course of the scheme," and *Zetteler* requires harm "closely related to the conduct inherent to the offense." Under both, the Rehabilitator's independent, post-relinquishment decisions — the early sale of the principal-protection bonds, the refusals of Ares, Oaktree, Montshire/Alban, and Quadro, and the hold-and-sell losses realized years after June 27, 2019 — are the conduct of others, not conduct of

Mr. Lindberg's "in the course of the scheme." They fail the scheme clause and the closely-related test alike.

### *D. The MVRA's committee notes confirm the limitation.*

This reading is the one Congress intended. The committee notes confine restitution to harm "under the count or counts for which the offender is convicted." S. Rep. No. 104-179, at 19 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932. The same report authorizes the court to decline restitution where determining complex issues of fact related to the cause or amount of a victim's losses would complicate or prolong the sentencing process — the provision now codified at 18 U.S.C. § 3663A(c)(3)(B). S. Rep. No. 104-179, at 18–20, 1996 U.S.C.C.A.N. at 931–33. And the procedure the committee designed is the one invoked here: a special master submits "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." *Id.* (committee substitute § 105), reprinted in 1996 U.S.C.C.A.N. 924. A recommendation whose author concedes the facts, disclaims foreseeability, and abstains from evaluating the intervening acts is the paradigm case the committee had in mind.

### *E. The record convergence: the master's own criteria state the same proximate-cause test.*

The proponents of the award supply the standard that defeats it. The Final Order of Restitution recognizes a payee only where diverted assets "actually lost value as a proximate result of Defendant's activities," or where an insured "actually suffered damages as a proximate result of Defendant's fraudulent activities." Final Order of Restitution (Doc. 245-1) at 6; accord Doc. 106 at 8 (stating the same criteria as the Special Master's Definition of a covered insurance company and insured). That is the same proximate-cause test *Zetteler* applies — recited by the Special Master and adopted as the gate through which any claimant must pass.

### *F. The Report cites the decision for its result, never for its standard — and cites almost nothing else.*

The Second Supplement cites the decision once, for its result: "The Fourth Circuit appears to agree with the Special Master's reasoning in its order denying Conservatrix's petition for writ of mandamus." Doc. 245 at 35. The Report takes the endorsement and leaves the standard. The CVRA's victim definition — "a person directly and proximately harmed as a result of the commission of a Federal offense," 18 U.S.C. § 3771(e)(2)(A) — is materially identical to the MVRA's, 18 U.S.C. § 3663A(a)(2), so the standard the court applied travels with the statute the Report administers. Yet nowhere in its forty-six pages does the Report ask the question the Fourth Circuit asked of Conservatrix — whether each loss it recommends is "closely related to the conduct inherent to the offense, rather than merely tangentially linked" — and its author expressly declines to make the findings that question requires. Doc. 245 at 19, 21–22, 25, 30; Parts I.B–I.C, *supra*. Nor is the deficit limited to this one decision. Across forty-six pages the Report cites two cases — *Robers* and *Ritchie*, both at page 15, and both invoked to move a burden onto Mr. Lindberg — together with a passing reference to *Karam*. It does not cite *Hughey v. United States*, 495 U.S. 411 (1990), *Lagos v. United States*, 584 U.S. 577 (2018), *Paroline v. United States*, 572 U.S. 434 (2014), *United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017), or *Ellingburg v. United States*, 607 U.S. 163 (2026). A recommendation that never engages the controlling causation authority cannot establish the causation the MVRA requires, and its author expressly declines to supply the missing findings. *See* Doc. 245 at 19, 21–22, 25, 30; Parts I.B–I.C, *supra*.

### *G. Applied evenhandedly, the standard turns away the $1.616 billion figure.*

The standard is applied in one direction only. Measured by it, Conservatrix — a €215,356,806 claim resting on capital-maintenance commitments Mr. Lindberg personally signed — was excluded as not "closely related" to the offense, and Vista was excluded for the absence of the same proximate nexus. Final Order of Restitution (Doc. 245-1) at 6; *Zetteler*, 2026 WL

1724731, at *1–2. Yet the recommendation imposes $1.616 billion built on the full outstanding principal of the Affiliate Investments, a figure that sweeps in losses the same test excludes:

- the approximately $129 million Agera exposure Mr. Lindberg inherited and did not originate (conceded as to timing, Doc. 245 at 19);
- the approximately $611.6 million crystallized by the Rehabilitator's pre-maturity sale of the principal-protection bonds, more than a year after Mr. Lindberg surrendered control; and,
- the value lost when the Rehabilitator refused or blocked the Ares, Oaktree, Montshire/Alban, and Quadro transactions. Parts IV–V, *supra*.

If a nine-figure loss flowing from Mr. Lindberg's own signed commitments is "merely tangentially linked" to this offense, then losses realized through third parties' discretionary decisions years later cannot be "closely related" to it. A single causation standard must govern every claimant in this proceeding. The Report never explains how both propositions can be true, because it never applies the test to its own figure. Applied to the recommendation as it was applied to Conservatrix, the standard reduces the proximately caused loss — and, once the mandatory offsets are credited, the award — to zero.

The Special Master's own criterion compounds the problem. He excluded Conservatrix because its loss was not caused by the "self-serving investment activities" that are "the crux of the harm outlined in the Indictment." Yet the Report makes no finding that the losses it does recommend were caused by those activities: the affiliated loans the offense concealed were found by KPMG and Houlihan Lokey to be fully covered, Parts VI and XV, *supra,* and every component of the recommended figure crystallized in the rehabilitation, under the Rehabilitator's control. A single causation standard must govern every claimant in this proceeding. A recommendation that applies the closely-related test to turn away one claimant, and never applies it to the $1.616 billion

it proposes, has not made the determination the MVRA requires and cannot survive the de novo review § 3664(d)(6) commands.

### *H. Preservation of objections.*

Mr. Lindberg objects to the Second Supplement's failure to apply this binding causation standard, and expressly preserves for de novo determination and appellate review each of the following: (1) that the Government has not proved, by a preponderance, that the offenses of conviction directly and proximately caused the recommended loss, 18 U.S.C. § 3664(e); (2) that the recommendation reaches losses caused by intervening, superseding acts of third parties and by inherited exposure, contrary to *Paroline*, *Robers*, *Freeman*, and *Zetteler*; (3) that the scheme clause of § 3663A(a)(2) cannot be read to reach harm not caused by Mr. Lindberg's own conduct; and (4) that the mandatory credits and offsets under §§ 3663A(b)(1)(B) and 3664(j)(2) independently reduce any award to zero. These objections are made in addition to, and without waiver of, the objections and reservations stated in Parts I–XV and XIX and in Docs. 132, 174, and 234. No silence compelled by the denial of records and database access, and no participation in the special-master process, effects a waiver of any of them.

## XVII. THE FACTS THAT WOULD SUPPORT ANY RESTITUTION AWARD MUST BE FOUND BY A JURY BEYOND A REASONABLE DOUBT (PRESERVED)

Mr. Lindberg raises this Part to preserve the issue. He recognizes that it is presently foreclosed in this Circuit, and he does not ask the Court to disregard binding precedent. He asks only that the objection be noted and preserved for appellate review.

The premise is no longer open to argument. Restitution under the MVRA is criminal punishment: it is "plainly criminal punishment," part of the defendant's sentence, and a penalty predicated on a criminal conviction. *Ellingburg v. United States*, 607 U.S. 163, 166 (2026). The Sixth Amendment therefore has work to do here. Under *Apprendi v. New Jersey*, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to

a jury and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). And *Southern Union Co. v. United States* extends that rule to monetary penalties, precluding "judicial factfinding that enlarges the maximum punishment a defendant faces beyond what the jury's verdict or the defendant's admissions allow." 567 U.S. 343 (2012).

Applied here, the facts that would support any restitution award — that the offenses of conviction directly and proximately caused each claimed loss, and in what amount — were neither found by a jury nor admitted by Mr. Lindberg. The plea agreement fixes no amount, and the factual basis stipulates none: the words "restitution," "loss," and "amount" appear nowhere in it. Doc. 40 ¶ 10(a); Doc. 42. Those facts were instead developed by a special master, tested against whether Mr. Lindberg had "convinced the Special Master," and are now proposed for adoption on a preponderance standard. That is judicial — indeed, delegated — factfinding that enlarges a criminal penalty beyond what the verdict or the admissions allow.

The Fourth Circuit has held otherwise, and Mr. Lindberg acknowledges it. In *United States v. Day*, the court held that because "there is no prescribed statutory maximum in the restitution context," the "rule of *Apprendi* is simply not implicated to begin with by a trial court's entry of restitution." 700 F.3d 713, 732 (4th Cir. 2012). Mr. Lindberg respectfully submits that *Day* should be revisited in light of *Ellingburg*. The MVRA does prescribe a maximum: it authorizes restitution only in the amount of the loss directly and proximately caused by the offense of conviction, 18 U.S.C. § 3663A(a)(2), (b)(1), and it authorizes nothing where no such loss is proved. The baseline is zero, and every dollar above zero depends on findings of fact. A ceiling defined by proof is still a ceiling.

The anomaly is worth stating plainly. A civil defendant facing a monetary penalty for conduct resembling a common-law claim is entitled to a jury. *SEC v. Jarkesy*, 603 U.S. 109 (2024).

It would be an odd constitutional order in which a criminal defendant, facing a $1.616 billion penalty that the Supreme Court has now confirmed is punishment, received less. Mr. Lindberg preserves the objection: any facts on which a restitution award rest must be found by a jury beyond a reasonable doubt, and no such findings exist here.

## XVIII. SCHEDULE OF THE REPORT'S DEPARTURES FROM THE MVRA STATUTE, CASE LAW, AND LEGISLATIVE COMMITTEE NOTES

The departures identified in Parts I through XVI are not isolated. Set out below, in schedule form, is the complete list of respects in which the Second Supplement is contrary to the MVRA, the case law construing it, and the statute's legislative history. Each entry is supported by the filed text of Doc. 245.

1. **The Report disclaims making the foreseeability finding the MVRA requires.** "That it was reasonably foreseeable to the Defendant that his conduct could be harmful is a critical component of the Defendant's criminal intent, which the Special Master has not set out to prove (and does not consider it within the Special Master's charge to prove)." Doc. 245 at 30. Foreseeability is an element of MVRA proximate cause, not an optional inquiry. 18 U.S.C. § 3663A(a)(2); *Hughey v. United States*, 495 U.S. 411 (1990). A report that declines to prove it cannot support a foreseeable-loss finding.
2. **The Report abstains from reviewing the intervening conduct that determines causation.** Three times: "the Special Master is not well-situated to second guess discretionary decisions made by state court supervised fiduciaries in their business judgment (to the extent doing so falls within the Special Master's duties)." Doc. 245 at 19, 21–22, 25. It also places the public-corruption issues "outside the scope," id. at 31, and whether a crime occurred outside the "assignment," *id.* at 29 n.28. Under *Stein* and *Robers* the intervening acts must be evaluated, not avoided.
3. **The Report applies standards found nowhere in the MVRA.** It asks whether Mr. Lindberg has "convinced the Special Master" (five times: Doc. 245 at 19, 22, 22, 24, 25), whether he offered "compelling evidence" (at 21, 24), "convincing evidence" (at 18), whether an act would "definitively cause" a decline (at 19), and whether he "raise[d] a genuine issue of material fact" (at 31). Five times it finds only that he "bears some responsibility" (at 19, 21–22, 24–25). The statutory test is preponderance, 18 U.S.C. § 3664(e), and the decisionmaker is the Court de novo, § 3664(d)(6).

4. **The Report inverts the Government's burden on loss and causation — § 3664(e).** Section 3664(e) places "[t]he burden of demonstrating the amount of the loss" on the Government. The Report presents no new evidence, exhibit, affidavit, or testimony, and frames every conclusion as the Defendant's failure of proof. (Note for precision: *Karam*, 201 F.3d at 327 — which the Report cites at 32 — does place the burden on a defendant claiming a particular offset. The burden-inversion argument should therefore be pressed on loss, foreseeability, and causation, and paired on the offsets with the denied-subpoena due-process point.)
5. **The Report substitutes generic credit risk for offense-specific foreseeability.** "All loans bear a risk of non-payment"; "an inability to pay is always reasonably foreseeable," even for "the most conservative of business loans" and "even loans that are personally guaranteed." Doc. 245 at 30. That reasoning would erase the MVRA's foreseeability limit in every loan case. Foreseeability must be tied to the conduct constituting the offense.
6. **The Report makes no findings on intervening or superseding causes — *Stein*; *Robers*.** A restitution order entered without findings on the effect and foreseeability of intervening events must be vacated. *United States v. Stein*, 846 F.3d 1135, 1154–56 (11th Cir. 2017); *see Robers v. United States*, 572 U.S. 639, 647–48 (2014) (Sotomayor, J., concurring). The Report cites neither and makes no such findings.
7. **The Report misapplies *Robers* and *Ritchie* to shift the burden.** It cites *Robers*, 572 U.S. at 644–46, and *Ritchie*, 858 F.3d at 211 ("the burden of showing that a victim delayed unreasonably in selling property (or otherwise neglected it) belongs with the defendant who seeks to avoid being tagged as the 'proximate cause' of the loss in value of that property"). Doc. 245 at 15. Both address a victim's passive delay or neglect in liquidating collateral. Here the fiduciary acted affirmatively, selling a par-payable instrument decades early. Neither case assigns the defendant the burden of disproving affirmative value destruction by the victim's fiduciary.
8. **The Report treats "some responsibility" as proximate causation.** Five times it concludes only that the Defendant "bears some responsibility for any diminution in value that occurred during the rehabilitation and liquidation processes." Doc. 245 at 19, 22, 25, 28. The MVRA requires that the loss be directly and proximately caused by the offense; partial or attenuated responsibility for a receivership's later decisions is not that. *Lagos v. United States*, 584 U.S. 577 (2018).
9. **The Report adds prejudgment interest contrary to the statute and DOJ policy — $263M.** Doc. 245 at 14–15 defends interest as "necessary to make the victims whole" and notes the rate is below the contractual, IALA, and applicable federal rates. Rate moderation is not authority. The MVRA does not enumerate interest, and DOJ policy states interest is not eligible for restitution. *Robers*, 572 U.S. at 643; *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017); *United States v. Boccagna*, 450 F.3d 107, 117 (2d Cir. 2006); *United States v. Coats*, 487 B.R. 648

(E.D.N.C. 2013). Reliance on *United States v. Hoyle*, 33 F.3d 415 (4th Cir. 1994), is misplaced (pre-MVRA). *See* note 4, *supra*.

10. **The Report invents an atextual realization condition on mandatory credits.** Issues 3 and 7 are "Disallow at this Time," with credit only "if and when ULICO realizes this value" and "if and when the escrow balance becomes available." Doc. 245 at 6 & nn.3–4. Section 3664(j)(2) contains no such condition, and deferral produces the double recovery the statute forbids. *United States v. Steele*, 897 F.3d 606, 611 (4th Cir. 2018).

11. **The Report denies credits for missing documentation the Government prevents the Defendant from obtaining.** The zeros credit is denied because the Defendant "has failed to present sufficient documentation," Doc. 245 at 12–13, and the $9.4M Finnazen/Blue Violet credit on the same basis, id. at 13. Mr. Lindberg is in BOP custody and surrendered his companies' books four times; the subpoenas needed to obtain these records were opposed. Denying credits on that record violates due process and cannot satisfy § 3664(e).

12. **The Report measures exposure rather than realized loss.** It asserts the methodology "includes no risk, only actual loss," because it counts "only sums that the Defendant took from the persons due restitution but has not repaid." Doc. 245 at 32. Unpaid principal on secured, insured, and guaranteed obligations is exposure, not the victims' realized pecuniary loss. *Hughey*, 495 U.S. at 413; *Stone*, 866 F.3d at 226.

13. **The Report rests a criminal penalty on a self-generated valuation it calls a "current guess."** The Special Master cuts his asset estimate from $1,162M/$1,454M/$1,878M (Doc. 106 at 30) to Redacted (Doc. 245 at 36), based on "illustrative valuation analyses prepared by the financial advisors to NHC Holdings, LLC" that "do not constitute formal valuations or fairness opinions; rather, they reflect a desktop exercise," *id*. at 36 n.31, and describes the result as his "current guess," id. at 36–37 — proposing to explain the reduction only under seal, *id.* at 36 n.32. Due process requires a credible, testable valuation.

14. **The Report manufactures waiver with no statutory basis.** Waiver is asserted at Doc. 245 at 7, 24–25, 28, 29–30, 30, and 32–33, including "by agreeing to the Special Master process" and "by pleading guilty," and that invoking constitutional limits would be "unconscionable." No MVRA provision creates such a waiver; the agreed bifurcation contemplates a later restitution proceeding; a preliminary order is provisional, *Manrique v. United States*, 581 U.S. 116 (2017); *Dolan v. United States*, 560 U.S. 605 (2010); and the Defendant reserved rights in every filing.

15. **The Report refuses to resolve complexity in the Defendant's favor — § 3663A(c)(3)(B).** Where complex causation issues would complicate sentencing, the Court may decline restitution. The Report resolves every complexity against the Defendant while declining to analyze causation.

16. **The Report is untethered from the MVRA's text, committee notes, and case law.** In 46 pages it cites two cases (*Robers* and *Ritchie*, both at 15) plus *Karam* (at 32). It cites no MVRA causation authority — no *Hughey*, *Lagos*, *Paroline*, *Stein*, or *Ellingburg* — and does not engage the committee notes, S. Rep. No. 104-179, at 19–20 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932–33, or DOJ restitution policy. The ignored committee notes confine restitution to harm "under the count or counts for which the offender is convicted" S. Rep. No. 104-179, at 19.

17. **The recommendation and the Preliminary Order exceed statutory authority — *Davis*.** The Preliminary Order fixed $1.655B; the Initial Report recommended $1.625B; the Second Supplement now recommends $1.616B. Doc. 245 at 44. A restitution order exceeding its statutory source is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." *United States v. Davis*, 714 F.3d 809, 812 (4th Cir. 2013) (quoting *Broughton-Jones*, 71 F.3d at 1147).

18. **The Report converts a promise of "full restitution" into an agreed amount it never was. The factual basis stipulates no loss or restitution amount. An agreement to pay full restitution is not a stipulation that the amount is $1.6 billion, or anything above zero. Hughey, 495 U.S. at 413. The plea obliges payment of "full restitution, regardless of the resulting loss amount," while stipulating that Guidelines "loss" "may be different from, greater, or lesser than restitution under 18 U.S.C. § 3556." Plea Agreement ¶¶ 8(a), 10(a) (Doc. 40). The plea's promise of "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct," Plea Agreement ¶ 10(a) (Doc. 40), incorporates the MVRA's causation limit rather than displacing it: restitution runs only to those harmed by the offense conduct, and the Fourth Circuit has fixed that standard in this very case — a compensable victim only where "directly and proximately harmed," whose harm is "closely related to the conduct inherent to the offense, rather than merely tangentially linked." In re Zetteler, No. 26-1749, 2026 WL 1724731, at *2 (4th Cir. June 13, 2026) (per curiam). The Guidelines § 2B1.1 "loss" figure cannot lawfully be imported into that calculation; restitution under 18 U.S.C. § 3556 is a distinct measure, and causation must be proven, not assumed.**

## XIX. RESERVATION OF RIGHTS TO SUPPLEMENT THIS RESPONSE

Two independent impediments, neither of Mr. Lindberg's making, have restricted his ability to assemble the evidentiary record supporting the credits and offsets set out above. As to each, Mr. Lindberg expressly reserves his rights.

### *A. Lack of online database access, and the access order that remains unsigned.*

Since April 1, 2026, Mr. Lindberg has been unable to access any online databases required to produce evidence supporting the motions for credits and offsets. That inability has been a material impediment to collecting evidence and to responding timely to the Second Supplement. An order that would facilitate that access has been submitted to the Court and remains pending; it has not been granted. Mr. Lindberg therefore reserves all rights to supplement this Response at a future time when the databases can be accessed. *See* Doc. 202 (Emergency Motion to Enforce the Plea Agreement and to Preserve Due-Process and Counsel-Access Rights) (June 15, 2026) (seeking daily access to counsel and to "a computer, the internet, spreadsheet software, his financial records"); the proposed order submitted on that motion (July 7, 2026) remains unsigned; Doc. 174 ¶¶ 2, 4 (detention and materially constrained access to documents).

### *B. The Government's refusal of the access requested in the Motion for Subpoenas.*

Mr. Lindberg gave up control of the books and records of his companies on four occasions beginning in October 2018, and he has had no access to those books and records for years. The Government has refused him that access by objecting to the Motion for Subpoenas. Mr. Lindberg reserves all rights to supplement this Response when that access is granted, because the information sought will provide additional evidence supporting the offsets and credits due under the MVRA. *See* Doc. 248 (Def.'s Motion for Issuance of Subpoenas Duces Tecum to the Rehabilitator, the Special Master and NHC Holdings, LLC, Paladin Management, the NCICs, the Bermuda insurance companies, and counsel to the NCICs) (July 23, 2026); *id*. at 2 ("Defendant retained neither the companies nor their records"); Parts IX.B and XV.B, *supra*; Doc. 235 ¶ 15.

These reservations are of a piece with the reservations already of record, Doc. 132 at 25 n.9; Doc. 132-1 ¶ 86 (reserving the right to supplement "upon restoration of access"); Doc. 174 ¶¶ 125–126; Doc. 234 nn.1, 3, and with Part X, *supra*: silence forced by lack of access is not waiver,

and a restitution figure entered while the Defendant is barred from the very records that would disprove it cannot satisfy 18 U.S.C. § 3664(e).

This reservation preserves Mr. Lindberg's rights; it does not concede that the record may be reopened so that the Government may cure a burden it has already failed to carry. The denial Mr. Lindberg seeks rests on the present record. The reservation protects his position should the Court nonetheless proceed; it is not a request that the Court hold the proceeding open so the recommendation can be repaired.

More importantly, the import of all of these arguments is that restitution rests on guesses of the Special Master, based on documents the court has not seen, the special master claims to not be able to produce or arguendo have access to, the government does not have and the defendant cannot have because he turned over the companies to the custodians and the special master. This record cannot meet the accounting requirements of MVRA that are a prerequisite to restitution determination.

## XIX. THE DAMOVO EXPRESSION OF INTEREST AND THE SPECIAL MASTER'S OWN ADMISSIONS CONFIRM THAT THE REPORT RESTS ON RECORDS NO PARTICIPANT CAN REACH

The unreliability of the Report's valuations is confirmed by present, arm's-length market evidence the Report does not address. The Special Master has been shopping the estate's operating companies "for the debt." As to Damovo, he intends to accept roughly $100 million — the approximate amount of Damovo's debt — when, on July 31, 2026, Twelve Seas Investment Company III (NASDAQ: TWLV) delivered a signed, arm's-length expression of interest to combine with Damovo at a $400 million enterprise value, with up to approximately $450 million achievable at arm's length. Decl. ¶¶ 2–4. Damovo is thus exemplary of the same value destruction already inflicted on Beckett (appraised at approximately $1 billion, sold for approximately $134

million) and Clanwilliam (valued at approximately $880 million in the signed Quadro purchase agreement, sold for approximately $450 million): applying the identical "sell it for the debt" premise, the Special Master stands to destroy roughly $300 to $350 million of Damovo's value. The only difference is timing — as to Damovo the market's proof of the true value is before the Court now, before the loss is locked in. A report that values these companies at their debt systematically understates their value and overstates the loss.

The Report also rests on information that no participant in this proceeding can reach. The Special Master circulated a term sheet defining the scope of his rights and responsibilities, which the parties who hold the loss and valuation data — the North Carolina insurance companies and NHC Holdings, LLC — refused to accept, disputing both his authority and this Court's authority to compel their information; the term sheet records the position that "[t]he Special Master has no authority to compel the [companies] to provide him with information," and that "[i]f the Special Master is unable to complete a task because of a lack of information, his job is to report that to the Court." [Ex. __ (Special Master scope term sheet).] The Special Master has now confirmed the same on the docket: he claims that NHC and the companies under it are "none of which are under the Special Master's control," that his sole authority over them "is the power to appoint two directors to the board of NHC," and that the communications sought are largely those of persons who "have no direct knowledge of the facts and circumstances critical to the restitution determination." Doc. 266; Doc. 268. Defendant disputes that claim — the Special Master stepped into Defendant's shoes as record owner and trustee, through the assignment, the AAPC voting trust, and his NHC board designees, and could compel production, which he refused. But even taken at his word, the Report is then built on information beyond the reach of this Court, the Special Master, and the Government alike — held by third parties and obtainable only through compulsory

process. That is the opposite of the complete accounting the MVRA requires, 18 U.S.C. § 3664(f)(1)(A), and it is why the opposition of the Government and the Special Master to Defendant's subpoenas (Doc. 248) is objectively self-defeating: denying the only process that can complete the record puts the records in no one's hands; it merely fixes a $1.6 billion penalty on evidence no one has seen. Because that accounting cannot be assembled on this record, the Court cannot satisfy § 3664(f)(1)(A) in any event and is powerless to adopt the Report.

The Special Master's own filing confirms the incompleteness. He concedes that his designee on the NHC board voted to approve the Beckett sale, that he consented to that course of action, and that he executed a letter confirming he did not oppose it — consistent with the Motion to Disqualify's showing that the sale required his approval as record owner — yet he admits he has not obtained, let alone produced, any accounting of that sale's proceeds, promising only to address it "in a future report." Doc. 268 & n.19. A recommendation that cannot account for the disposition of a roughly $1 billion asset is not, and cannot be, a "final" determination of the amount of loss.

These facts also dispose of the suggestion that Defendant has merely "changed his tune." Defendant corrected his position only when the evidence of the fiduciaries' duties — including the trust documents governing Beckett and the assignment and voting-trust instruments governing AAPC — came into his hands; on that evidence he had no choice. The change is not opportunism but the necessary consequence of newly obtained proof, and that proof bears directly on the two questions the MVRA reserves to this Court. As to causation and offsets: the Special Master's own disposition of Beckett — an asset valued of record at approximately $1 billion, sold for approximately $134 million — destroyed roughly $866 million in value. That loss was caused by the fiduciary's conduct, not by the offense of conviction; it must be excluded from any loss and

credited as an offset, 18 U.S.C. §§ 3663A(b)(1)(B), 3664(j)(2); and it cannot be the basis for continuing the reference in the same hands. As to value: the Damovo facts show a further threatened loss of approximately $300 million — the gap between the roughly $100 million the Special Master would accept and the $400 million the market offers. Together, the roughly $866 million already destroyed and the roughly $300 million now threatened total on the order of $1 billion in value the reference has cost or stands to cost. A Report and a reference that have produced, and stand to produce, loss of that magnitude cannot continue unchanged.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Mr. Lindberg respectfully requests that the Court decline to adopt the Second Supplement and enter an order: (1) determining, under 18 U.S.C. § 3664(e), that the Government has not proved a restitution-eligible loss proximately caused by the offense of conviction, and fixing restitution at zero; (2) in the alternative, excluding from restitution the intervening-cause losses identified above; (3) crediting all offsets required by 18 U.S.C. §§ 3663A(b)(1)(B) and 3664(j)(2); (4) declining to adopt the Second Supplement because the deficiencies in proof identified above cannot be cured on this record, and because determining the cause and amount of loss on this record would complicate and prolong the proceeding to a degree that the need to provide restitution is outweighed by the burden on the sentencing process, 18 U.S.C. § 3663A(c)(3)(B); (5) declining to consider any sealed valuation material not disclosed to Mr. Lindberg; and (6) granting such other and further relief as is just. Mr. Lindberg expressly reserves and preserves all rights, objections, and arguments, including the right to supplement this Response before any final restitution hearing.

For the further reasons that this Response is preliminary and filed under protest, that the Report is not final, and that the Government has not answered the pending motions, Mr. Lindberg requests in the alternative that the Court decline to adopt the Report and hold it in abeyance until

the Government responds on the merits, the accounting is produced, and the subpoenas (Doc. 248) are resolved; and Mr. Lindberg readopts and incorporates by reference each of his pending motions — the Motion to Disqualify the Special Master (Doc. 269), the Second Motion to Set Aside the Special Master's Report, and the Motion to Adopt All Prior Motions and to Hold the Report in Abeyance — as if filed after the Final Report.

Dated: August 6, 2026

Respectfully submitted,

/s/ Kenneth N. Barnes
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*Counsel for Greg E. Lindberg*[8]

---

[8] Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

## CONSULTATION STATEMENT

Undersigned counsel consulted with counsel for the Government and with counsel for the Special Master concerning extending the deadline for responding to the report. The Government and Special Master do not have an objection to this report being filed on Augst 6, 2026.

Respectfully submitted, this 6th day of August 2026.

/s/ Kenneth N. Barnes
Kenneth N. Barnes

*Counsel for Defendant Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including counsel for the United States and counsel for the Special Master.

This the 6th day of August 2026.

/s/ Kenneth N. Barnes
Kenneth N. Barnes

*Counsel for Defendant Greg E. Lindberg*