**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>*Defendant.* | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC<br><br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S MOTION TO STRIKE THE GOVERNMENT'S OMNIBUS RESPONSE (DOC. 279) AND TO REQUIRE THE GOVERNMENT TO RESPOND ON THE MERITS TO EACH PENDING MOTION**

Defendant Greg E. Lindberg respectfully moves the Court, pursuant to 18 U.S.C. § 3664(e) and the Court's inherent authority to manage its docket, to strike the Government's Omnibus Response in Opposition to Defendant's Motions Regarding Restitution (Doc. 279) and to require the Government to file a substantive response, on the merits and issue by issue, to each of Defendant's pending motions. The Omnibus Response is not a response: it declines to engage the motions, defers wholesale to the Special Master, and asks the Court to fix a restitution award exceeding $1.6 billion on a record the Government has never defended on the merits. In support, Defendant states:

## I. The Omnibus Response does not respond to the motions; it declines to engage them.

1. The Omnibus Response asks the Court to deny all of Defendant's motions and to adopt the Special Master's Second Supplement (Doc. 245) and proposed Final Order (Doc. 245-1). Doc. 279 at 1. But it does not answer the

motions. The Government states that it "concurs with the arguments and conclusions contained in the Special Master's filings and sees no reason to duplicate them here," *id.* at 2, and that "substantive reply at a more minute level" is "unproductive in light of the Special Master's comprehensive responses," *id.* at 2 n.2. It asks that "[a]ny remaining motions … be … denied as moot," *id.* at 1 n.1, and offers to address Defendant's arguments only "[i]f the Court would like" it to, *id.* at 2–3.

2. A brief that declines to engage the motions is not an opposition to them. The Government does not identify the loss the offense of conviction proximately caused, does not address the mandatory offsets and credits, does not join issue on causation, foreseeability, or the offense-of-conviction limit, and does not respond on the merits to the constitutional and fiduciary grounds raised in the Motion to Disqualify (Doc. 269) or the Second Motion to Set Aside. It substitutes the Special Master's recommendation for its own proof and its own argument. The Government has separately opposed only Defendant's subpoena motion (Doc. 248), in its Opposition (Doc. 261); that single opposition does not cure its failure to respond, on the merits, to any of the other pending motions.

3. Worse, the Government and the Special Master ask the Court to adopt the Report and fix a restitution award exceeding $1.6 billion before the threshold question — whether any restitution is owed at all — has been answered. That question turns on causation and foreseeability, and on extraordinary measures the record shows and does not dispute: Mr. Lindberg committed more than $1 billion of

his own capital to back the affiliated loans as a first-loss position that would be exhausted before any protected policyholder or creditor bore a dollar of loss; he personally guaranteed approximately $2.39 billion; he took no dividends; and the loans suffered zero defaults under his management. On that record, no loss to the protected parties was reasonably foreseeable at origination. Those are precisely the questions the Omnibus Response leaves unanswered.

4. The Government's default also disregards this Court's Local Rules. Local Criminal Rule 47.1(d) provides that, "[u]nless otherwise directed by the Court, the government must respond to all potentially dispositive defense motions in a criminal case," giving as examples "motions to suppress and motions to dismiss the indictment." W.D.N.C. LCrR 47.1(d). Subsection (e) requires that any such response be filed "within seven (7) days of the date on which the motion is served." W.D.N.C. LCrR 47.1(e). Mr. Lindberg's Motion for a Determination That No Restitution Is Owed (Docs. 234, 235) seeks the dismissal of the restitution claim in its entirety and is precisely such a potentially dispositive motion. So too are Mr. Lindberg's Motion to Disqualify and Remove the Special Master (Doc. 269) and his Second Motion to Set Aside the Special Master's Report, each of which seeks to set aside the Report and would thereby dispose of the very recommendation on which the entire $1.6 billion restitution award rests. Most fundamentally, Mr. Lindberg has challenged the Special Master's appointment and exercise of judicial authority under Article III of the Constitution — a challenge he first raised in his Emergency Motion to Stay All Asset Sales Pending Entry of a Final Restitution Order and a De Novo Article

III Determination, with Consolidated Objections to the scope and validity of the Special Master reference (Doc. 190), filed well before the Report, and renewed in his Motion to Disqualify (Doc. 269), and one the Government has never answered. That challenge is dispositive in the most basic sense: if the Special Master was appointed or is functioning in violation of Article III, he lacked the authority to produce the Report at all, and the recommendation falls with the office. The Government was thus required by the Rule to respond to each of these dispositive motions on the merits, and it has not. That default is not only a failure of proof under § 3664(e); it disregards the Rule's mandatory-response requirement, and it warrants treating the unanswered motions as unopposed under the Court's inherent authority to manage its docket.

5. The Government's posture is confirmed by its own counsel's contemporaneous words. In an August 7, 2026 email exchange with defense counsel — attached as Exhibit B — the attorney for the Government took the position that there is "not a requirement to confer on a response." Ex. B. Defense counsel's reply catalogs the consequences: the Government "will not develop the record"; it "will not allow discovery of information affecting billions in restitution which are with the custodians, and with the special master"; and, "after all the delay in response from the government," it now "wish[es] to file a two pager to dismiss all the evidence without a response." Ex. B. The Government thus used its filing both to avoid answering the pending motions and to insert, unilaterally, the very August 17 hearing date it now presses — as addressed in Part VIII. That contemporaneous

record is the non-response this motion asks the Court to strike, in the parties' own words.

**II. Section 3664(e) places the burden on the attorney for the Government, and a master's report cannot discharge it.**

6. The MVRA is explicit about whose burden this is: "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). The Fourth Circuit enforces that allocation: restitution must be vacated where the Government fails to carry its burden, and the burden does not shift to the defendant until the Government first meets it. *United States v. Steele*, 897 F.3d 606, 613–14 (4th Cir. 2018).

7. A court-appointed master's recommendation is not the attorney for the Government's proof. By its terms, § 3664(e) assigns the burden to "the attorney for the Government" — not to a master compensated from the very assets in question. The Government cannot discharge a burden the statute places on the prosecutor by announcing that it "concurs" with the Special Master and adopting his report by reference. Doc. 279 at 2. Adoption is not proof.

8. The same is true of the constitutional and fiduciary challenges. The Government suggests that the Special Master has already responded to those objections and intends to respond again to the Motion to Disqualify. Doc. 279 at 2. That is insufficient, for three reasons. First, the Special Master is not the public prosecutor: he is an interested, fee-compensated officer — and the very subject of

the disqualification motion — not the attorney for the Government who must answer a constitutional challenge to the reference and who bears the MVRA's burden. Second, a court-appointed master's submissions cannot be the vehicle for developing the record on a question of law under the MVRA and the constitutional rights it implicates; the validity of the reference and the legal limits the MVRA places on restitution are for the Court to decide on the Government's proof and argument, not to be litigated through, or resolved by, the officer whose own authority is challenged. Third, permitting the Government to shelter behind the Special Master lets it avoid committing to any position of its own — leaving it free to take up whatever position it likes later, after Mr. Lindberg has been forced to litigate against the master instead of against the party that bears the burden.

9. Nor did the plea agreement relieve the Government of that burden. As Mr. Lindberg has explained in his motion for a determination that no restitution is owed, the plea preserves the causation requirement rather than displacing it. In Paragraph 10(a) Mr. Lindberg agreed to pay "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct." Plea Agreement ¶ 10(a) (Doc. 40). Two features of that language are dispositive. It reaches only persons "harmed by the defendant's criminal conduct" — an express causal predicate — and the phrase "regardless of the resulting loss amount" speaks to quantum alone, confirming that the figure is not tied to the Guidelines loss calculation but is bounded by causation. The plea agreement confirms the point expressly: it provides that restitution "may be

different from, greater, or lesser than" the loss found under U.S.S.G. § 2B1.1. Plea Agreement ¶ 8(a) (Doc. 40). Paragraph 10(a) thus fixes no amount, admits no reasonably foreseeable loss, and does not abandon the requirement — central to *Hughey* and to the MVRA alike — that the loss be caused by the conduct of conviction. *Hughey v. United States*, 495 U.S. 411, 413 (1990). Mr. Lindberg agreed to the obligation to pay whatever loss his conduct is proven to have proximately caused; he did not stipulate causation, a loss amount, or foreseeability, and any ambiguity in the Government's own drafting is construed against it. Causation was therefore neither admitted nor waived; it remains the attorney for the Government's to prove under § 3664(e), and Mr. Lindberg has expressly reserved and preserved that challenge in every filing.

## III. De novo review under § 3664(d)(6) cannot cure these defects.

10. The Government's implicit answer to all of this — that the Special Master's Report is only a recommendation the Court will review de novo under 18 U.S.C. § 3664(d)(6), so any defect washes out — mistakes both the statute and the record. De novo review is a standard of review; it is not a substitute for the attorney for the Government carrying the burden that § 3664(e) assigns to him, and it presupposes an adversarial record for the Court to review. The Government's refusal to respond on the merits has produced no such record: there is nothing before the Court to weigh de novo but the Special Master's own say-so. A court cannot make a genuine de novo determination of a loss that the party bearing the burden has declined even to attempt to prove.

11. Nor can de novo review repair a record that is itself the product of a structurally conflicted process. As the pending motions establish, the Special Master both controls and liquidates the estate and quantifies the loss, and he is compensated from the very assets he administers and sells. Doc. 190. The only asset valuations in the record are his — figures he himself calls a "current guess" drawn from a "desktop exercise," Doc. 245 at 36–37, built on data he says is not available to him and refuses to obtain. A court reviewing those figures de novo still has only those figures. De novo review of an admittedly conjectural valuation, produced by a conflicted officer from information he cannot reach, cannot manufacture the reliable and complete accounting the MVRA requires before any restitution is fixed. 18 U.S.C. § 3664(f)(1)(A).

12. Least of all can de novo review cure the constitutional defect. If the Special Master was appointed or is functioning in violation of Article III — the challenge Mr. Lindberg raised in Doc. 190 and renewed in Doc. 269 — the Court's later de novo adoption of his product does not launder the violation; a report generated through the unauthorized exercise of judicial power is not made valid by being reviewed. Section 3664(d)(6) authorizes a master only to assist the Court, subject to the Court's de novo determination; it does not authorize the master to assume the adjudicative function Article III commits to the Court, or the burden of proof § 3664(e) commits to the prosecutor. De novo review presumes a record lawfully and adversarially developed; it cannot conjure one. That is precisely why

the Government must be required to respond, on the merits, before the Report is adopted at all.

## IV. The report the Government adopts is, by the Special Master's own admissions, a "current guess" built on information he cannot reach.

13. The Government adopts a report the Special Master himself does not defend as evidence. He describes his asset figures as his "current guess," Doc. 245 at 36–37, derived from a "desktop exercise," *id.* at 36, resting on "illustrative valuation analyses prepared by the financial advisors to NHC Holdings, LLC" that, in his own words, "do not constitute formal valuations or fairness opinions," *id.* at 36. No appraisal, valuation report, or workpaper supports any figure in the report.

14. More fundamentally, the Special Master admits he cannot reach the information on which the restitution figure depends. The term sheet defining the scope of his authority records that "[t]he Special Master has no authority to compel the [companies] to provide him with information," and that "[i]f the Special Master is unable to complete a task because of a lack of information, his job is to report that to the Court." He has confirmed the same on the docket, describing the entities that hold the loss and valuation data as "none of which are under the Special Master's control" and his sole authority over them as "the power to appoint two directors to the board of NHC." Doc. 266; Doc. 268. On the Government's own theory, then, the report rests on information beyond the reach of the Court, the Special Master, and the Government alike — an estimate no one in this proceeding has tested. That is the opposite of the "complete accounting" the MVRA requires before restitution is fixed. 18 U.S.C. § 3664(f)(1)(A).

15. Against that unsourced estimate, neither the Government nor the Special Master has addressed the concrete, third-party valuations Defendant placed before the Court in his Motion for a Determination That No Restitution Is Owed. Those valuations come from nationally recognized firms and establish both the value the companies held before they were transferred to the custodians and the destruction in value that followed. KPMG LLP appraised the insurance entities as of December 31, 2017 — concluding, for example, $380,500,000 for Colorado Bankers Life — and KPMG and Houlihan Lokey found the affiliated loans well secured, with "full coverage" at a conservative loan-to-value; the Cabrillo Advisors valuation and Blackstone's own analysis valued Beckett at roughly $1 billion. Docs. 234, 235 ¶¶ 12–19. The assets transferred into the custodians' control — the Specified Affiliated Companies at approximately $3.4 billion and AAPC at approximately $3 billion — carried on the order of $6.4 billion in value; what followed under the custodians was the fire-sale destruction already described. The Second Supplement never mentions KPMG or Houlihan Lokey, and the Government does not mention them at all.

16. That silence is itself proof that the motions go substantially unanswered: on the record's most important factual questions — what the companies were worth, and who destroyed that value — neither the Government nor the Special Master engages the evidence. And even if the Special Master had referenced these valuations, it would not cure the defect: a report that shifts to Mr. Lindberg the burden of proving value and causation defeats § 3664(e), which places

that burden on the attorney for the Government. The prosecutor's failure, on the record, to meet that burden requires a rebuttal issue by issue; absent one, the Government has failed to prosecute the restitution claim and has failed to place on the record the evidence the MVRA requires — and a $1.6 billion award cannot rest on that void.

## V. The fiduciary and accounting defects the Government refuses to address concern billions of dollars — including $866 million in Beckett value never accounted for.

17. Beckett alone illustrates the problem, and it is a fiduciary problem worth roughly a billion dollars. As Defendant's Motion to Disqualify and Remove the Special Master details, the Beckett asset was appraised at approximately $1 billion — by the Cabrillo Advisors valuation and by Blackstone's own acquisition proposal and analysis — yet the Special Master sold it, in December 2025, for approximately $134 million. Doc. 269. That is roughly $866 million in restitution value forfeited, and the Report contains no accounting of the Beckett proceeds. Nor was the sale authorized: it proceeded without any court order, in violation of the Court-approval condition the appointing order imposes, and only the Special Master — the officer who took control of the asset through the NHC transfer — could approve it; his designee on the NHC board voted to approve the sale, and he executed a letter confirming he did not oppose it. A fiduciary who disposed of a Primary Restitution Asset without court approval, forfeited $866 million in value, and has never accounted for the proceeds cannot supply the full and verified accounting the MVRA makes mandatory before restitution is fixed, 18 U.S.C. § 3664(f)(1)(A) — and the Government cannot adopt his Report as though he had.

18. The concern is not confined to Beckett; it infects every prior sale and the process through and through. Present, arm's-length evidence confirms the same debt-based undervaluation is happening again: as set out in Defendant's Second Motion to Set Aside the Special Master's Report, the Special Master proposes to sell Damovo — which live, arm's-length evidence values at $400 to $450 million — "for the debt," roughly $100 million. The Damovo proposal is not an isolated data point; it confirms the pattern already documented in the companies the Special Master sold "for the debt," including Clanwilliam — valued at approximately $880 million in the signed Quadro purchase agreement and sold for approximately $450 million — and others. That pattern infects the entire valuation process on which the Report rests: the same officer who undersold these assets generated the only asset valuations in the record and now asks the Court to fix a restitution award exceeding $1.6 billion on them.

19. The same officer is now positioning AAPC for the same treatment. The Special Master has refused to credit the AAPC preferred equity — par value $352,906,240, part of roughly $3 billion in AAPC value transferred into his control — against ULICO's claim, deferring any credit until ULICO "realizes this value." Doc. 245 at 6 n.3. And AAPC faces a refinancing requirement in 2027 that the same maturity-driven dynamic could be used to convert into a below-value forced sale rather than a routine refinancing — the same "for the debt" playbook already run on Beckett, Clanwilliam, and Damovo, now aimed at devaluing AAPC to trigger a

foreclosure. Decl. ¶ 9. An officer who devalues the estate's assets to force their sale is not a neutral source of the valuations on which a $1.6 billion penalty would rest.

20. The zero-coupon bonds are a third illustration of the same burden-shifting, and they make its stakes plain. To protect the affiliated-loan principal, the insurers held roughly $1 billion in par value of bank-issued zero-coupon bonds; after Mr. Lindberg surrendered control, the court-supervised Rehabilitator sold them before maturity, generating approximately $394 million in cash proceeds and forfeiting approximately $611 million in guaranteed value. Neither figure appears in the Report: the roughly $394 million actually recovered has never been credited against the sum the Special Master seeks, and the roughly $611 million in value destroyed by the custodian's own act is charged to Mr. Lindberg rather than to the fiduciary who caused it. The proceeds, and the accounting that would fix them, sit with the custodians and the Rehabilitator — not with Mr. Lindberg, who surrendered those books years ago. The Special Master says that accounting is not available to him; he has declined to obtain it from the custodians even though, as a trustee with board representation, he holds the power to compel it; and he and the Government have opposed the very subpoenas that would produce it — Mr. Lindberg's Motion for Issuance of Subpoenas (Doc. 248), which the Government opposed (Doc. 261) and the Special Master opposed (Doc. 266). The import is the same across Beckett, the operating-company sales, and the zero-coupon bonds: billions of dollars are unaccounted for under the custodians' watch, and the Government asks the Court to adopt restitution figures built on an accounting that

is not available to the Special Master, that the Special Master refuses to obtain, and that the Special Master and the Government actively block. Section 3664(e) does not permit a restitution award to rest on that foundation.

21. The Government's answer to all of this is telling. Confronted with a roughly $1 billion fiduciary breach, $866 million in Beckett value unaccounted for, a sale made without any court order, roughly $394 million in zero-coupon proceeds recovered but never credited and a further $611 million in zero-coupon value destroyed and charged to Mr. Lindberg, and a documented pattern of selling the estate's companies far below their arm's-length value, the Government has no answer — and it has refused to respond, on the merits, to any of it. That silence is itself an admission: these questions cannot be answered on this record, and a Report that leaves them unanswered cannot bear the weight of a $1.6 billion order.

## VI. The Ares transaction is exemplary of the § 3664(e) burden of proof the Government bears and has inverted.

22. In November 2018, Mr. Lindberg executed a letter of intent for Ares Management to purchase the North Carolina insurance companies on arm's-length terms that would have retired the affiliated loans and protected the policyholders. After contact with the Government, Ares cited undisclosed third-party advice to avoid any ongoing connection with Eli Global and abandoned the transaction — as documented in Defendant's Motion for a Determination That No Restitution Is Owed (the motion to dismiss the restitution claim) and in the note placed on the record attached to it. Docs. 234, 235 ¶¶ 26–27. That interference is memorialized in a contemporaneous January 6, 2019 email of Christa Miller of Eli Global, written

"for the files," attached as Exhibit A. It records that, in the days before Ares walked away, Ares "reiterated their position of preferring to have a balance sheet upon closing … devoid of any affiliated loans," and "said that they had been told by a third party constituent that they should avoid any ongoing connection to Eli Global after the close." Ex. A. Ares had said the same on a December 21, 2018 call — that they "had been advised to not have any ongoing ties to Eli Global after close" and, asked who had given that advice, "refused to say" — a call that "took place soon after a meeting/call that Ares had with the DOJ." *Id.* As the email concludes, "it seems very likely … that they have been heavily influenced by a third party with power." *Id.* Governmental interference that defeats a signed, value-preserving transaction is a cause attributable to the Government, not to Mr. Lindberg, and it breaks the chain of proximate causation on which any restitution award depends. The Special Master's Second Supplement does not mention Ares at all.

23. The Ares transaction is exemplary of the burden of proof this dispute turns on. Section 3664(e) requires the attorney for the Government to prove that the claimed loss was proximately caused by the offense of conviction; it does not require Mr. Lindberg to disprove it. Yet the Government adopts a Report that ignores a value-preserving transaction the Government itself defeated, and proceeds as though the burden ran the other way. That inversion of the burden of proof recurs throughout these proceedings, and it is highlighted and developed extensively in Defendant's Response and Objection to the Special Master's Second Supplement, to

which Defendant respectfully refers the Court. A response that inverts the statutory burden and then declines to defend it is not the response § 3664(e) requires.

24. The Government's response to Mr. Lindberg's contemporaneous demand for Ares information confirms the inversion. In the August 7 correspondence attached as Exhibit B, defense counsel asked the Government to produce any evidence — expressly including evidence held by other arms of the government, such as the FBI — bearing on the Ares transaction and the Government's interference with it. The Government deflected. It answered only that the undersigned prosecutor is "not aware of any Government interference in the Ares transaction," and asserted that "discovery in this matter was previously produced to prior counsel." Ex. B. Neither answer discharges the § 3664(e) burden. The first speaks to one prosecutor's personal awareness alone — not to what the FBI or any other arm of the Government knows, which is exactly what the request sought. The second is contradicted by the record: prior counsel has confirmed that no information about the Ares transaction was ever provided. Ex. B. And the Ares interference is neither new nor a surprise: Mr. Lindberg placed it squarely at issue in his Motion for a Determination That No Restitution Is Owed — the motion to dismiss the restitution claim — so the Government has been on notice of it since that filing and cannot now meet a restitution demand exceeding $1.6 billion by professing personal unawareness of a transaction it is charged with having blocked.

## VII. The Government cannot press the § 3664(d)(5) deadline while refusing to join issue.

25. The Omnibus Response urges the Court to set a final restitution hearing for August 17 and to enter a final order before the August 24 date in 18 U.S.C. § 3664(d)(5). Doc. 279 at 3. The Government cannot have it both ways. A court that does not meet that deadline "nonetheless retains the power to order restitution," *Dolan v. United States*, 560 U.S. 605, 608 (2010), so the date supplies no reason to fix a $1.6 billion penalty before the Government answers the motions. The deadline was in any event mooted by the bifurcation process, and any delay in these proceedings is the Government's own — it elected to defer to the Special Master rather than respond. Having declined to join issue, the Government cannot invoke the clock it created to foreclose a response it never gave.

26. The urgency is illusory and of the Government's own making. The Special Master's report was never going to be complete within the time the Government now invokes — that is a direct consequence of the bifurcation process the Government itself pursued. The Government cannot manufacture a compressed schedule through bifurcation, decline to respond on the merits, and then rely on the very timeline it created to rush an admittedly incomplete report — one the Special Master calls his "current guess" — into a final restitution order.

**VIII. The proposed August 17 hearing cannot afford Defendant the process he is due.**

27. The constitutional and fiduciary defects the pending motions raise are not technicalities. They concern billions of dollars, and the MVRA makes a full and accurate accounting of that sum mandatory before any restitution may be fixed. 18 U.S.C. § 3664(f)(1)(A). A single hearing on August 17, scheduled to beat a deadline,

cannot supply the adversarial testing that a penalty of this magnitude, and these threshold questions, require.

28. The proposed date cannot be met consistent with due process for two further, practical reasons. First, counsel does not have availability in August: counsel is committed to multiple other matters during that period and cannot, in any instance, agree to a hearing this month. Second, the factual record is not yet in Defendant's hands. Counsel has been working with Defendant's prior counsel, Katten Muchin Rosenman LLP — which was replaced as Mr. Lindberg's counsel — to obtain the transfer of the complete case files and information; that transfer is being produced in tranches, and the first tranche since Katten was replaced was made available to Mr. Lindberg only today, at approximately 1:00 p.m.[1] Katten has been processing that transfer as quickly as it can, and it remains in progress. This case history spans eight years, and it is not reasonable to expect counsel to mount a defense to a restitution demand exceeding $1.6 billion on August 17 — roughly ten days' notice — while much of the record is still being actively transferred between Katten and current counsel. Fixing a restitution award exceeding $1.6 billion on August 17 — before counsel is available, before the file transfer is complete, and before the mandatory accounting can be assembled and tested — would deny Defendant the meaningful opportunity to be heard that due process requires.

29. The August 17 date is also the product of exactly the unilateral practice this motion challenges. The Government proposed that date without

[1] As of the filing of this document, counsel has still been unable to review the materials Katten produced, because of a password issue with the production.

securing defense counsel's agreement, and defense counsel advised the Government, in the August 7 correspondence attached as Exhibit B, that the date "does not work for any defense counsel" and that fixing it in a filing "without seeking defendant's counsel is exactly the harm we pointed out at the 4th circuit." Ex. B. Confronted with that objection, the Government did not defend the date, justify it, or offer to confer; it deflected — asserting only that there is "not a requirement to confer on a response" and inviting Mr. Lindberg to "propose an alternative on the docket." Ex. B. That answer confirms rather than dispels the problem: the Government fixed August 17 unilaterally and, once told the date works for no defense counsel, declined even to reconsider it. A hearing date set that way, to beat a statutory clock the Government itself agreed could run longer, cannot bear the weight of a billion-dollar restitution determination.

## IX. The constitutional and statutory limits on any restitution award are raised, preserved, and likewise unanswered.

30. Because MVRA restitution is now settled to be criminal punishment, *Ellingburg v. United States*, 607 U.S. 163 (2026), several constitutional and statutory limits constrain any restitution the Court may impose. Mr. Lindberg has developed these limits in his filed Objections and Response to the Special Master's Report, and he raises and preserves them here. Each is a merits question the Government's Omnibus Response does not answer, and each independently caps or bars the award the Government asks the Court to enter.

31. First, the Eighth Amendment's Excessive Fines Clause. Because restitution is criminal punishment, the Clause applies as a substantive limit, *Timbs*

*v. Indiana*, 586 U.S. 146 (2019), and a monetary sanction "grossly disproportional to the gravity of [the] offense" is unconstitutional, *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). On this record — every protected policyholder paid in full (more than $157 million distributed to some 43,000 policyholders), approximately $1 billion of first-loss capital, an approximately $2.39 billion personal guarantee, no defaults under Mr. Lindberg's management, and offsets that drive the net loss toward zero — a restitution award exceeding $1.6 billion is grossly disproportional, and no deference to the Special Master can cure a constitutional ceiling.

32. Second, the Sixth Amendment. Because restitution is punishment and *Apprendi* applies to criminal fines, *Southern Union Co. v. United States*, 567 U.S. 343 (2012), the facts that fix the amount must be found by a jury beyond a reasonable doubt. Mr. Lindberg preserves this argument: while *United States v. Day*, 700 F.3d 713, 732 (4th Cir. 2012), held otherwise, it rested on the premise — that restitution is not punishment — that *Ellingburg* has since displaced, and the point is preserved for review on that changed footing.

33. Third, the statutory bar on double recovery. The MVRA's anti-duplication provisions, 18 U.S.C. § 3664(j), forbid restitution that duplicates a victim's recovery for the same loss: subsection (j)(2) requires that restitution be reduced by amounts a victim recovers as compensatory damages in any federal or state civil proceeding, and subsection (j)(1) fixes the accounting and subrogation order by which a third party that has already compensated a victim stands in the victim's place and is reimbursed only after the victim has been made whole. The

award the Government seeks sweeps in losses already reduced to civil judgment elsewhere — including the civil judgment ULICO has obtained (credited only in part) — which § 3664(j) commands be excluded, not merely left for a later offset.

34. Fourth, the limits of the reference itself. Section 3664(d)(6) authorizes referral of an issue to a master subject to the Court's de novo determination; it does not authorize delegating the entire loss determination together with custody and liquidation of the estate. The appointing order exceeded that authorization, and a restitution order entered on such an ultra vires reference is not a valid arrangement but an illegal sentence — one "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." *United States v. Cohen*, 459 F.3d 490, 497 (4th Cir. 2006); *see United States v. Broughton-Jones*, 71 F.3d 1143, 1149 (4th Cir. 1995) (a defendant's consent "cannot, without more, authorize a restitution order not authorized by the statutory source").

35. These are threshold limits the Government must meet, not questions the Special Master's recommendation can answer for it. By declining to respond, the Government has left each of them unaddressed. That is a further reason its Omnibus Response should be stricken and a merits response required.

**X. Relief.**

36. WHEREFORE, Defendant respectfully requests that the Court: (1) strike the Government's Omnibus Response (Doc. 279) as non-responsive and as an impermissible attempt to shift the § 3664(e) burden of proof from the attorney for the Government to the Special Master; (2) direct the Government to file, within a time the Court sets, a substantive response, on the merits and issue by issue, to

each of Defendant's pending motions — including Docs. 172, 190, 201, 202, 234 and 235, and 269, and the Second Motion to Set Aside the Special Master's Report — joining issue on each point or conceding it; (3) hold the Special Master's Second Supplement (Doc. 245) and proposed Final Order of Restitution (Doc. 245-1) in abeyance until the Government has done so; (4) in the alternative, because the Government has not responded to Mr. Lindberg's potentially dispositive motions within the time Local Criminal Rule 47.1 requires, treat those motions — the Motion for a Determination That No Restitution Is Owed (Docs. 234, 235), the Emergency Motion to Stay Asset Sales and for a De Novo Article III Determination (Doc. 190), the Motion to Disqualify and Remove the Special Master (Doc. 269), and the Second Motion to Set Aside the Special Master's Report — as unopposed and grant them, under Local Criminal Rule 47.1 and the Court's inherent authority to manage its docket; (5) enforce the bifurcation order as granted — under which Mr. Lindberg's sentencing proceeded separately and the restitution determination was to continue thereafter, rather than be truncated by the ninety-day period the Government now invokes — and hold the Government to the agreement on which that bifurcation, and Mr. Lindberg's early sentencing, were premised; and (6) direct a complete accounting, as 18 U.S.C. § 3664(f)(1)(A) requires, of all restitution assets, credits, offsets, and sale proceeds — including the Beckett proceeds, the zero-coupon-bond proceeds, and the records held by the custodians and the Rehabilitator — before any restitution is fixed.

Dated: August 7, 2026.

Respectfully submitted,

*/s/ Kenneth N. Barnes*[2]
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*Counsel for Greg E. Lindberg*

[2] Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

## CONSULTATION STATEMENT

Pursuant to the Local Rules, counsel states that the relief requested was raised with counsel for the United States and counsel for the Special Master, both of whom were consulted; both did not respond on the motion to strike.

Dated: August 7, 2026.

Respectfully submitted,

*/s/ Kenneth N. Barnes*[3]
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*Counsel for Greg E. Lindberg*

[3] Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 7, 2026.

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*