**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>*Defendant.* | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC<br><br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S SUPPLEMENTAL RESPONSE IN SUPPORT OF HIS OBJECTIONS TO THE SPECIAL MASTER'S REPORT REGARDING THE ZERO-COUPON PRINCIPAL-PROTECTED BONDS**

Defendant Greg E. Lindberg respectfully submits this supplemental response to address the zero-coupon principal-protected bonds, in further support of his Objections to the Special Master's Report and his Response to the Second Supplement, and supported by the accompanying Declaration of Greg E. Lindberg. Two points frame the issue. The bonds were extremely high-quality, principal-protected instruments that the court-supervised Rehabilitator — not Mr. Lindberg — chose to sell before maturity, in a decision Mr. Lindberg could not have anticipated and did not cause. And the Report neither credits the proceeds those sales actually generated nor rests on any information the Special Master has obtained about them.

## I. The bonds were high-quality, principal-protected notes issued through major banks.

1. Beginning in 2018, with the express permission of the North Carolina Department of Insurance, the North Carolina insurance companies acquired a

portfolio of principal-protected notes (PPNs) issued through nationally recognized financial institutions — including Barclays, RBC, UBS, and Natixis. The closing memoranda document the transactions: the RBC note (closed March 21, 2018); the Barclays note (closed April 5, 2018, a roughly $102 million trade); the Franklin Street & Marseille 2018-I closing (May 3, 2018); the UBS note (closed June 7, 2018, a $100 million trade); and the Pierre Mendes/Natixis note (closed July 23, 2018, a $75 million trade), among others. In the aggregate the notes were contractually scheduled to pay approximately $1,006,239,867 at maturity.

2. A principal-protected note is exactly what its name says. Each note was structured with two components: a zero-coupon bond that guaranteed repayment of the principal if the note was held to maturity, and an affiliate-loan component. Because the issuers were major, highly rated banks and the principal was guaranteed at maturity, it is customary for insurance companies to hold such notes to maturity; held to maturity, they return the full guaranteed principal. Sold early, they return only a fraction of that amount — the equivalent of surrendering a life-insurance policy for a fraction of its face value.

3. The closing memoranda in evidence confirm this structure transaction by transaction. Exhibits A through F — the closing memoranda for the RBC, Barclays, Franklin Street & Marseille, UBS, Pierre Mendes/Natixis, and NOM GB notes — each document a specific, identified zero-coupon bond issued by a major bank and purchased for a single purpose: to protect the principal of the affiliate investments the note backed. The bonds served no independent investment purpose.

Their approximately $1.006 billion in aggregate par value existed solely to insure the affiliate-loan principal, dollar-for-dollar, at maturity. The disposition summary (Exhibit G) reflects that same one-to-one design: it accounts for the outcome issuer by issuer and CUSIP by CUSIP, because each zero was a discrete instrument, tied to an identified position and sold and accounted for individually.

4. That these notes were affiliate investments is confirmed by the companies' own contemporaneous records. An August 6, 2018 internal schedule itemizes the principal-protected notes held by Academy Financial Assets, the affiliate holding entity: $7.2 million (BMO), $48.2 million (Barclays), $37.2 million (Franklin Street), $39.3 million (Marseille), $35 million (UBS), $40.6 million (Whitehorse), and $45.6 million (NOM GB) — $253,135,036 in all. Ex. H. The affiliate's own underlying-investment schedule reflects the same notes as affiliate line items. Ex. I. And the executed prefunding documentation for the Franklin Street and Marseille notes memorializes the structure at inception. Ex. J. These are the companies' own books, made and kept years before this dispute, and they establish that the zero-coupon bonds existed to fund and protect the affiliate investments — not as free-standing assets.

## II. The subcomponents: the zero-coupon component guaranteed — and, when sold, actually returned — the principal.

5. The mechanics matter, because they show real cash was recovered that the Report does not credit. Each PPN could be "unwound": when it was, the zero-coupon bond was sold, and its proceeds paid down the principal owed to the insurance companies; what remained was the affiliate-loan component. The

Rehabilitator's own September 30, 2019 balance sheets for the North Carolina insurance companies — including that of Colorado Bankers Life Insurance Company (CBL Life), attached hereto — illustrate the point. For CBL Life, the Franklin Street PPN was unwound and its zero-coupon bond sold, taking the book-adjusted carrying value from $47.9 million to $29.5 million — a reduction of $18.4 million, meaning the zero-coupon component was approximately 38.4% of the carrying value, and it was sold for par or higher. Applied across the roughly $293 million of such notes reflected on that company's schedule, approximately 38.4% — on the order of $112.5 million — was recovered in cash from the zero-coupon sales for that company alone. Critically, all of the zero-coupon bonds were sold for par or higher; the principal-protection component performed exactly as designed. Colorado Bankers Life remains an active company, now in court-ordered liquidation under the North Carolina Insurance Commissioner; the Rehabilitator's and Receiver's quarterly reports and the September 30, 2019 balance sheets on which this analysis relies are publicly available at cblife.com/quarterly-rehabilitation-reports.

6. Contemporaneous records already of record confirm that the zero-coupon disposals returned their value and more. In an October 28, 2019 email — Exhibit H to Mr. Lindberg's prior filing, Doc. 234-38 — the insurers' own investment professional reported the "final outcome" on the principal-protected notes. The notes that remained, he explained, "were the ones that were priced most out of the money" — the least favorably positioned in the portfolio. Yet even those were disposed of at a gain: "Earlier in the year we talked about a best case loss on

the zeros in the -50mm to -60mm range but we ended up making +6mm on the disposals." Doc. 234-38 (Ex. H) (Oct. 28, 2019). The worst-positioned zero-coupon components thus produced a net gain of approximately $6 million on disposal — not the $50-to-$60 million loss that had been projected. That is contemporaneous, documentary confirmation that the principal-protection components performed as designed and generated proceeds that the Report nowhere credits.

7. The spreadsheet attached to that email — Book1.xlsx, appended hereto as Exhibit G — proves the point issuer by issuer. It records the "Cash Gain/Loss" realized on each zero, netting to a "Total Gain" of $6,036,766.05 across the portfolio, and it tabulates the "Total Cash Proceeds by Lender" actually recovered: $329,169,087.55 for Colorado Bankers Life, $21,842,490.43 for Bankers Life Insurance Company, and $43,567,328.50 for Southland National Insurance Corporation, for a grand total of $394,578,906.48 in cash proceeds. Ex. G. Those are not projections or "illustrative" figures; they are the recorded, dollar-for-dollar proceeds of the dispositions, broken out by issuer (Barclays, RBC, UBS, Natixis, CIBC, Citigroup, BMO, Nomura, Wells Fargo, JPMorgan, and TVA) and by company. The Special Master's Report neither reflects these amounts nor reconciles against them. The issuer-by-issuer detail underlying that summary — the per-bond disposition worksheets for each position — is attached as Exhibit K, which maps each zero-coupon bond to its principal-protected note and to the specific underlying affiliate assets it funded — for example, the RBC zero to the GIC $29 million position, the Natixis zero (Pierre Mendes) to CAF III, the Nomura zero (NOM GB)

to the AAPC $55 million preferred, and the UBS zero to the CAF I $64 million and AFI $11.8 million positions — confirming again that every one of these bonds existed to fund an identified affiliate investment. The companies' contemporaneous treasury records tracing the paydowns and the sales are collected at Exhibit L, and their portfolio dashboard and holdings-master schedules are attached as Exhibits M and N.

**III. The Rehabilitator, not Mr. Lindberg, sold the bonds — and the sale could not have been anticipated.**

8. Mr. Lindberg surrendered control of the companies and their books and records beginning in October 2018. In 2019 — after control had passed to the court-supervised Rehabilitator, Mr. Dinius — the Rehabilitator made the unilateral decision to sell the notes before maturity, in a fire sale, for approximately $394 million. That was less than forty cents on the dollar of the approximately $1.006 billion guaranteed at maturity, and it crystallized a loss of approximately $611.6 million. That decision was the discretionary act of the court-supervised fiduciary then in control; it was not Mr. Lindberg's conduct, and — having surrendered control the year before — he could neither have anticipated nor prevented it. The stated plan when the notes were purchased was to hold them to maturity, at which point the full guaranteed principal would have been repaid. Selling early defeated the entire purpose of the instrument.

9. Nor was the sale forced by any genuine need for cash — and the exhibits prove it. The Rehabilitator's own reports and the North Carolina insurance companies' June 30 and September 30, 2019 balance sheets — including that of

Colorado Bankers Life (CBL Life), attached hereto — reflect that, for years after the 2019 sale, the companies held more than $1 billion in cash and marketable securities in the form of third-party bonds. There was no liquidity need that required selling the principal-protected notes before maturity. The early liquidation was therefore not a necessity but a discretionary choice by the fiduciaries who then controlled the companies — an intervening, superseding cause of whatever loss the sale produced, and one attributable to them rather than to Mr. Lindberg.

**IV. The Report neither credits the sale proceeds nor rests on any information the Special Master obtained.**

10. Separate from the loss the premature sale caused, Mr. Lindberg has never been credited with the proceeds the sales actually generated — proceeds that the insurers' own records fix at $394,578,906.48. Ex. G. The zero-coupon components were sold for par or higher; those proceeds paid down the principal owed to the insurance companies, returning that protected value to the victims; and for an offense against property the Mandatory Victims Restitution Act fixes restitution as the value of the property less the value of any part of it that is returned. 18 U.S.C. § 3663A(b)(1)(B). Restitution may not confer a windfall by requiring a defendant to "pay back more money than he stole." *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017). Yet the Special Master's figures do not account for these cash paydowns at all.

11. Two credits follow from the zero-coupon bonds, and Mr. Lindberg presses both. First, he is entitled to a credit for the $394,578,906.48 in cash the sales actually generated. Those proceeds returned the protected principal to the

victims, and the Mandatory Victims Restitution Act commands that the restitution figure be reduced by the value of property so returned. 18 U.S.C. § 3663A(b)(1)(B); *see Stone*, 866 F.3d at 226; Ex. G; Ex. K. Second, he is entitled to a credit for the approximately $611.66 million in value the premature sale destroyed. Held to maturity, these notes were contractually obligated to pay $1,006,239,867; the Rehabilitator's decision to sell them early, for $394,578,906.48, forfeited the difference — approximately $611,660,961 — on instruments whose sole function was to protect principal. That loss was caused by the intervening, discretionary act of a court-supervised third party, taken after Mr. Lindberg had surrendered all control; under settled proximate-cause principles it is not a loss he caused, and it cannot be charged to him. Together the two credits account for the entire $1,006,239,867 of principal protection the notes were designed to deliver: the portion recovered in cash must be credited because the statute requires it, and the portion destroyed must be excluded because Mr. Lindberg did not cause it. On either footing, the zero-coupon bonds cannot add a dollar to restitution against Mr. Lindberg — they subtract from it.

12. The reason is the same pattern these proceedings have exposed elsewhere. Mr. Lindberg has been denied access to the books and records that would document the exact proceeds of the zero-coupon sales and how they were applied — he surrendered control of those records years ago and has had no access since. The only process that could obtain that data is the very compulsory process the Government and the Special Master have opposed: Mr. Lindberg's Motion for

Issuance of Subpoenas (Doc. 248), which the Government opposed (Doc. 261) and the Special Master opposed (Doc. 266). They have thus opposed the one mechanism that could establish the figures, and the Special Master has not otherwise obtained the cash-payoff data, while nonetheless seeking to have Mr. Lindberg pay restitution using numbers for which he has provided no supporting basis. The Rehabilitator's own balance sheets confirm that substantial proceeds were recovered and never credited. A restitution figure that ignores the money the assets actually returned, and that no one has reconciled against the records, cannot satisfy the complete accounting the MVRA requires before restitution is fixed. 18 U.S.C. § 3664(f)(1)(A).

13. What the Report proposes, in the end, is to fix billions of dollars in restitution in undue haste, on the Special Master's own admitted guesses, and then to shift to Mr. Lindberg the burden — and the blame — for the discretionary act of a third party. The premature sale of the zero-coupon bonds was the decision of a court-supervised state regulator, taken after Mr. Lindberg had surrendered all control; yet the Report charges the resulting loss to him, refuses to credit the proceeds the sale generated, and asks the Court to do all of this before the Government answers the pending motions and before the records are produced. Section 3664(e) does not permit that inversion: the burden of proving the amount of loss is the Government's, not Mr. Lindberg's, and it cannot be discharged by haste, by guesswork, or by charging a defendant with a regulator's independent choices.

**V. Conclusion.**

14. The zero-coupon bonds were high-quality, principal-protected instruments designed to be held to maturity. The court-supervised Rehabilitator sold them early, over Mr. Lindberg's lack of any control, in a decision he could not have anticipated — crystallizing a loss he did not cause and generating proceeds he has never been credited. For the reasons stated, and in support of his Objections, Mr. Lindberg respectfully requests that the Court decline to adopt any restitution figure premised on the zero-coupon bonds until (a) the $394,578,906.48 in proceeds actually recovered from their sale is credited as the MVRA requires; (b) the approximately $611,660,961 in value destroyed by the Rehabilitator's premature sale is excluded as an intervening-cause loss Mr. Lindberg did not cause; and (c) the accounting the Special Master has declined to obtain is performed. Taken together, these two credits account for the full $1,006,239,867 of principal protection the notes were designed to deliver, and they eliminate any restitution the zero-coupon bonds could otherwise support.

Dated: August 10, 2026.

Respectfully submitted,

*/s/ Kenneth N. Barnes*[1]
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*Counsel for Greg E. Lindberg*

---

[1] Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

**CONSULTATION STATEMENT**

Pursuant to the Local Rules, counsel states that the relief requested was raised with counsel for the United States and counsel for the Special Master, both of whom were consulted; the Government disagrees with and opposes the relief requested, as does the Special Master.

Dated: August 10, 2026.

Respectfully submitted,

*/s/ Kenneth N. Barnes*[2]
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com
Counsel for Greg E. Lindberg

[2] Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 10, 2026.

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*